**No. 21 - _____**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE JASON FENTY, ET. AL., AND PUENTE HUMAN RIGHTS MOVEMENT

*Petitioners,*

v.

UNITED STATES DISTRICT COURT, DISTRICT OF ARIZONA,

*Respondent,*

SHERIFF PAUL PENZONE, IN HIS OFFICIAL CAPACITY, AND MARICOPA COUNTY, A MUNICIPAL ENTITY,

*Real Parties in Interest.*

On Petition for a Writ of Mandamus to the United States District Court for the District of Arizona (No. 2:20-cv-01192-SPL-JZB)

## PETITION FOR WRIT OF MANDAMUS

David C. Fathi *
ACLU NATIONAL PRISON PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
(202) 548-6610

* Not admitted in DC; practice limited to federal courts

Corene T. Kendrick **
Kyle Virgien
ACLU NATIONAL PRISON PROJECT
39 Drumm St.
San Francisco, CA 94111
(202) 548-6610

** Courtney Colwell, Stanford Law ‘22, assisted counsel

Jared G. Keenan
Victoria Lopez
ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011

Larry Wulkan
ZWILLINGER WULKAN PLC
2020 North Central Avenue, Suite 675
Phoenix, AZ 85004
(602) 962-0089

*Attorneys for Petitioners*

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

CORPORATE DISCLOSURE STATEMENT ........ VI

INTRODUCTION ........ 1

RELIEF SOUGHT ........ 4

ISSUES PRESENTED ........ 5

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........ 5

DISCUSSION ........ 7

- I. THE MANDAMUS STANDARD ........ 7
- II. THE DISTRICT COURT CLEARLY ERRED WHEN IT SHIFTED DISCOVERY COSTS ONTO INDIGENT CIVIL RIGHTS PLAINTIFFS ........ 8
  - A. The Law of Discovery Cost-Shifting ........ 9
  - B. The Court Below Clearly Erred in Its Cost-Shifting Analysis ........ 12
    - i. At a Minimum, the Court Should Apply Its Rule 54(d)(1) Cost-Shifting Precedent and Find Clear Error in the District Court's Failure to Consider Petitioners' Indigency and the Chilling Effect of Cost-Shifting ........ 13
    - ii. The Better Approach Is to Hold that the Zubulake Standard Governs Cost-Shifting in Discovery ........ 14
    - iii. The Zubulake Factors All Weigh Against Cost-Shifting in this Case ........ 16
      - a. The Extent to Which the Request Is Specifically Tailored to Discover Relevant Information ........ 17
      - b. The Availability of Such Information from Other Sources ........ 17
      - c. The Total Cost of Production, Compared to the Amount in Controversy ........ 18
      - d. The Total Cost of Production, Compared to the Resources Available to Each Party ........ 18

**TABLE OF CONTENTS**
(continued)

**Page**


e. The Relative Ability of Each Party to Control Costs and Its Incentive to Do So ........ 23

f. The Importance of the Issues at Stake in the Litigation ........ 23

g. The Relative Benefits to the Parties of Obtaining the Information ........ 24

III. PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO ATTAIN RELIEF ........ 25

IV. PETITIONERS WILL BE DAMAGED OR PREJUDICED IN A WAY NOT CORRECTABLE ON APPEAL ........ 26

V. THE DISTRICT COURT'S ORDER RAISES NEW AND IMPORTANT PROBLEMS OR ISSUES OF FIRST IMPRESSION ........ 28

CONCLUSION ........ 29

CERTIFICATE OF COMPLIANCE ........ 31

CERTIFICATE OF SERVICE ........ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*,
881 F.2d 1486 (9th Cir. 1989) ....................25, 26, 28

*Bauman v. U.S. Dist. Ct.*,
557 F.2d 650 (9th Cir. 1977) .................... *passim*

*Brown v. Board of Educ.*,
347 U.S. 483 (1954) .................... 2

*U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*,
305 F.R.D. 225 (S.D. Cal. 2015) .................... 11

*In re Cement Antitrust Litig. (MDL No. 296)*,
688 F.2d 1297 (9th Cir. 1982), *aff'd sub nom. Arizona v. U.S. Dist. Ct. for Dist. of Arizona*, 459 U.S. 1191, 103 S. Ct. 1173, 75 L. Ed. 2d 425 (1983) .................... 26

*Cole v. U.S. Dist. Ct. For Dist. of Idaho*,
366 F.3d 813 (9th Cir. 2004) .................... 8

*Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*,
495 F.3d 1062 (9th Cir. 2007) .................... 26

*Draper v. Rosario*,
836 F.3d 1072 (9th Cir. 2016) .................... 19, 24

*Escriba v. Foster Poultry Farms, Inc.*,
743 F.3d 1236 (9th Cir. 2014) .................... 19

*Fleisher v. Phoenix Life Ins. Co.*,
No. 11 CIV. 8405 CM JCF, 2012 WL 6732905 (S.D.N.Y. Dec. 27, 2012) .................... 19, 20

*U.S. ex rel. Guardiola v. Renown Health*,
No. 3:12-CV-00295-LRH-VPC, 2015 WL 5056726 (D. Nev. Aug. 25, 2015) .................... 10, 15, 20

*Guerra v. W. Los Angeles Coll.*,
No. CV 16-6796-MWF (KSX), 2019 WL 7881616 (C.D. Cal. June 18, 2019) ....................19

*Hawa v. Coatesville Area Sch. Dist.*,
No. CV 15-4828, 2017 WL 1021026 (E.D. Pa. Mar. 16, 2017) ....................23

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)....................24

*In re Henson*,
869 F.3d 1052 (9th Cir. 2017) ....................8

*Hernandez v. Tanninen*,
604 F.3d 1095 (9th Cir. 2010) ....................8

*John B. v. Goetz*,
879 F. Supp. 2d 787 (M.D. Tenn. 2010) ....................4, 14, 22

*Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*,
No. CIV.A. 12-3427 JLL, 2013 WL 541972 (D.N.J. Feb. 11, 2013) ....................17

*Lifetouch Nat'l Sch. Studios, Inc. v. Moss-Williams*,
No. C10-05297 RMW (HRL), 2013 WL 11235928 (N.D. Cal. Oct. 15, 2013) ....................11

*Little v. Streater*,
452 U.S. 1 (1981)....................4, 22

*Maney v. Brown*,
516 F. Supp. 3d 1161 (D. Or. Feb. 2, 2021) ....................2

*McPherson v. Fla. Dep't of Corr.*,
No. 4:19CV156-MW/CAS, 2019 WL 11271430 (N.D. Fla. Oct. 9, 2019) ....................15, 22

*Medhekar v. U.S. Dist. Ct. for the N. Dist. of California*,
99 F.3d 325 (9th Cir. 1996) ....................26

*Monessen Sw. Ry. Co. v. Morgan*,
486 U.S. 330 (1988)....................16

*Nehad v. Browder*,
No. 15-CV-1386 WQH NLS, 2016 WL 3769807 (S.D. Cal. July 15, 2016) ........20

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)........9, 12

*Perez v. DirecTV Grp. Holdings, LLC*,
No. SACV1601440JLSDFMX, 2021 WL 840437 (C.D. Cal. Jan. 25, 2021) ........10

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ........8, 27, 28

*Price v. Synapse Group*,
No. 16CV1524- BAS(BLM), 2018 WL 9517276 (S.D. Cal. Sept. 12, 2019) ........10

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ........2

*SG Cowen Sec. Corp. v. U.S. Dist. Ct. for N. Dist. of CA*,
189 F.3d 909 (9th Cir. 1999) ........25

*Shapiro v. Rynek*,
250 F. Supp. 3d 775 (D. Colo. 2017)........3, 4, 22

*Stanley v. Univ. of S. Cal.*,
178 F.3d 1069 (9th Cir. 1999) ........*passim*

*State of Ariz. v. U.S. Dist. Ct. for Dist. of Ariz.*
709 F.2d 521 (9th Cir. 1983) ........27

*In re Sussex*,
781 F.3d 1065 (9th Cir. 2015) ........8

*Unknown Parties v. Johnson*,
No. CV-15-00250-TUC-DCB, 2017 WL 7520603 (D. Ariz. Dec. 19, 2017) ........10

*Valentine v. Collier*,
993 F.3d 270 (5th Cir. 2021) ........2

*Varsic v. U.S. Dist. Ct.*
607 F.2d 245 (9th Cir. 1979) ....................................................................28

*In re Williams-Sonoma, Inc.*,
947 F.3d 535 (9th Cir. 2020) ......................................................................8

*Zubulake v. UBS Warburg LLC*,
216 F.R.D. 280 (S.D.N.Y. 2003) ...............................................................10, 17

*Zubulake v. UBS Warburg LLC*,
217 F.R.D. 309 (S.D.N.Y. 2003) ...............................................................*passim*

**Statutes**

28 U.S.C. § 634(a) .........................................................................................21

**Rules**

Fed. R. Civ. P. 26 .....................................................................................*passim*

Fed. R. Civ. P. 37 .........................................................................................9, 19

Fed. R. Civ. P. 54 ..............................................................................................9

**Other Authorities**

COVID Prison Project, National COVID-19 Statistics,
https://covidprisonproject.com/data/national-overview/
(accessed October 26, 2021)...........................................................................1

Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*,
New York Times (Apr. 10, 2021)....................................................................1

Maricopa County, *FY 2022 Adopted Budget*,
https://www.maricopa.gov/ArchiveCenter/ViewFile/Item/5266
(last accessed Oct. 26, 2021) ........................................................................20

Maura Turcotte et al., *The Real Toll from Prison Covid Cases May Be Higher than Reported*, New York Times (Jul. 7, 2021)
https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html.............................................................................................1

*Nuts and Bolts*, 99 Judicature 26, 30 (2015), available at https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/judicature-99-3_rules-roundtable.pdf ......................................................12

Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production* ........................................................................10

United States Courts, Judicial Compensation, available at https://www.uscourts.gov/judges-judgeships/judicial-compensation (last accessed Oct. 26, 2021) ..........................................................................21

## CORPORATE DISCLOSURE STATEMENT

Puente Human Rights Movement is a non-profit corporation. It has no parent corporations and does not issue stock.

## INTRODUCTION

The COVID-19 pandemic has had a particularly devastating impact on places of incarceration, where people are tightly packed into cages, denied basic safety measures like adequate masks or testing, and exposed to unvaccinated correctional officers or staff who may bring the virus in from the outside world.

People incarcerated in America's prisons, jails, and detention centers are over three times more likely to have been infected over the course of the pandemic than the average U.S. resident. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, New York Times (Apr. 10, 2021), www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html. At least 2,600 people have died of COVID-19 while incarcerated in prison alone, COVID Prison Project, National COVID-19 Statistics, https://covidprisonproject.com/data/national-overview/ (accessed October 26, 2021), with many more deaths in other places of incarceration such as jails and immigration detention facilities. And even these tragic figures significantly undercount the impact COVID-19 has had on our nation's incarcerated population, with many more cases and deaths going uncounted. *See* Maura Turcotte et al., *The Real Toll from Prison Covid Cases May Be Higher than Reported*, New York Times (Jul. 7, 2021) https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html.

In facilities with particularly flawed COVID-19 safeguards, named plaintiffs have bravely stepped up to file class actions seeking injunctive and declaratory relief, risking retaliation and intrusive discovery, in order to protect themselves and

their fellow incarcerated people from unsafe conditions. These class representatives followed in the footsteps of other civil rights litigants who have fought in the courts for many of the important protections that shape our modern democracy. As this Court has recognized: "Without civil rights litigants who are willing to test the boundaries of our laws, we would not have made much of the progress that has occurred in this nation since *Brown v. Board of Educ.*, 347 U.S. 483 (1954)." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1080 (9th Cir. 1999). Some of these incarcerated litigants have achieved important protections. *E.g.*, *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (holding that the government's "inadequate response" to the COVID-19 pandemic "reflected a reckless disregard for detainee safety" so as to warrant a preliminary injunction); *Maney v. Brown*, 516 F. Supp. 3d 1161, 1184 (D. Or. Feb. 2, 2021) (requiring the state to offer vaccines to everyone in its custody). Others did not prevail in court, but nonetheless achieved important policy changes by shining a spotlight on unsafe conditions. As the Fifth Circuit noted in overturning a permanent injunction requiring COVID-19 protections: "We are firmly convinced that this litigation . . . played a role in motivating the prison officials into action and saved countless lives." *Valentine v. Collier*, 993 F.3d 270, 289 (5th Cir. 2021).

Petitioners are indigent people who are or were incarcerated at the Maricopa County Jail, along with a small nonprofit community-based organization that counts many currently or formerly incarcerated people and their families as its leaders and members. They brought suit to challenge the Jail's[1] unsafe handling of the pandemic,

---

[1] Defendants in the case below are Maricopa County and its Sheriff, Paul Penzone. Petitioners refer to them as the "Jail."

and this suit has since been certified as a class action. They, like many others who have challenged carceral facilities' unsafe handling of the pandemic, took on the burdens of bringing this suit with the sole goal of protecting their incarcerated community. They seek only an injunction (or writ of habeas corpus) requiring the jail to comply with basic safety protocols and release certain people at high risk, and they stand to gain no monetary damages from this case.

The district court penalized Petitioners for their selfless act by forcing them to personally pay for the Jail's discovery costs. Exhibit 9 at 2. The only reasoning that either the magistrate judge or the district judge offered to support this drastic measure was that the dollar value at issue ($700) seemed to the magistrate judge like a "low cost." Exhibit 3 at 6:19. But $700 represents a serious imposition on an indigent, incarcerated person or a small non-profit. For example, one Petitioner was only incarcerated in the first place because he could not afford a $500 bond, and even the Petitioners lucky enough to have a job in jail or prison make just 25 cents per hour, meaning that this $700 cost could take years to pay if they were to devote their entire income to that task. But even that would be impossible because they also need to use their meager income to cover hundreds of dollars in fines and fees from their criminal cases, not to mention phone calls with their loved ones, toiletries, and food. As a district court rejecting a cost award against an indigent incarcerated plaintiff found, he "would suffer great and severe hardship, presumably for the rest of his life, if he could not provide for himself through his prison wages at least some modicum of simple life comforts." *Shapiro v. Rynek*, 250 F. Supp. 3d 775, 780-81 (D. Colo. 2017).

To shift a cost from a well-financed government entity to indigent civil rights plaintiffs is—in the words of district courts that have considered the issue—"outrageous" and "manifestly unjust." *John B. v. Goetz*, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010) (holding that the State of Tennessee was responsible for costs associated with production of electronically stored information in litigation brought by a class of children enrolled in Medicaid program); *Shapiro*, 250 F. Supp. 3d at 781. As this Court has recognized, shifting costs onto "civil rights plaintiffs of modest means may chill civil rights litigation in this area." *Stanley*, 178 F.3d at 1080 (holding a district court abused its discretion in shifting fees under Rule 54(d)(1) onto a civil rights plaintiff of limited means). And the Supreme Court has recognized that a $250-500 discovery cost can be so prohibitive to an indigent, incarcerated litigant that it violates due process. *Little v. Streater*, 452 U.S. 1, 14 n.10, 16-17 (1981). The district court clearly erred when it shifted routine discovery costs onto civil rights plaintiffs who were unable to bear them. This Court should issue a writ of mandamus to correct that error and to provide guidance to the district courts it supervises on a clear, fair test for shifting discovery costs, especially in litigation vindicating plaintiffs' civil and constitutional rights.

## RELIEF SOUGHT

Petitioners respectfully request that the Court issue a writ of mandamus directing the district court to reverse the portion of its order shifting discovery costs from the Jail onto Petitioners.

## ISSUES PRESENTED

Whether this Court should issue a writ of mandamus to correct the portion of the district court's decision shifting costs from a well-financed government entity onto indigent named plaintiffs and a small non-profit.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Petitioners are indigent incarcerated people and a small, grass-roots non-profit. The indigent, incarcerated petitioners have limited means. Some have no income. *E.g.*, Exhibits 6, 7. Those who do have an income make only 25 cents per hour through their jobs in state prison—for example, as a porter cleaning bathrooms or a kitchen worker preparing food. Exhibits 4, 5. They face significant fines and fees as a result of their criminal cases and incarceration. One Petitioner, for example, was ordered to pay $2,700 as part of his sentence, has a "gate fee" taken out of his prison earnings, and will need to pay community supervision fees upon release. Exhibit 4. Petitioners are unable to afford even basic necessities of jail and prison life—such as food and toiletries from the commissary, or phone calls and letters with loved ones—and they rely on the kindness of family and friends to cover these expenses. *E.g.*, Exhibit 7. And many were only incarcerated in the Jail at all because they could not afford bond—set as low as $500. Exhibits 4, 6.

Another Petitioner is Puente Human Rights Movement ("Puente"), a grassroots nonprofit. Puente stretches its $1.2 million annual budget to fund a wide array of programs—including advocacy and educational programs, a food bank, free legal services, and COVID-19 vaccine education. Exhibit 8 at 1. Some of Puente's funding is earmarked for specific purposes and could not be used to pay litigation

costs. *Id.* If Puente were to pay litigation costs from its general funds, it could do so only by diverting funding from its other crucial programming. *Id.* at 2.

Petitioners brought this suit on June 16, 2020, seeking a temporary restraining order, a writ of habeas corpus, and a permanent injunction. Exhibit 11 at 1-4. The district court construed Petitioners' motion for a temporary restraining order as a motion for a preliminary injunction and denied that motion, finding that Petitioners had "not established, at this stage, that [the Jail's COVID-19-safety] measures are objectively unreasonable" and that "there are disputed issues of material fact as to the reasonableness of the measures implemented by [the Jail] and whether those measures have been consistently carried out that preclude the Court from issuing a preliminary injunction…." *Id.* at 4, 37-38. The case has since proceeded toward trial, with fact discovery scheduled to close on January 14, 2022.

The parties conducted documentary discovery in two portions. First, they produced non-email documents. Then, the parties began to negotiate over production of email (or "ESI"). After these negotiations broke down, Petitioners requested the assistance of the magistrate judge. The magistrate judge granted Petitioners' request that they provide the Jail's attorneys search terms that would result in a production of 8,000-10,000 email documents, and the Jail be required to produce them, making "best efforts to deduplicate emails." Exhibit 2 at 16:3-13; *see also* Exhibit 10 at 1-2.

Petitioners worked with the Jail to provide search terms targeting key emails among top Jail leadership regarding COVID-19. The Jail's attorneys, however, refused to fully de-duplicate the emails for production by performing a process termed "threading," which removes emails whose content is fully duplicated in other

emails belonging to the same chain. For example, if one person sends an email to a second person, who replies and then forwards that reply to a third person, the forwarded email will contain duplicate versions of the original email and reply. Threading would remove the original email and reply as duplicative. Petitioners raised the Jail's refusal to fully de-duplicate to the magistrate judge, who enforced his original order by ordering the Jail to perform threading. Exhibit 9 at 1; Exhibit 3 at 13:22-14:2. However, the magistrate judge also ordered relief that neither party had sought or briefed: "the parties shall evenly split the cost of threading the responsive emails (estimated to be $1400)." Exhibit 9 at 2. Petitioners requested the opportunity to brief cost-shifting, but the magistrate judge rejected that request. Exhibit 3 at 6:2-7:6. Petitioners then objected to the magistrate judge's order under Fed. R. Civ. P. 72(a). The district court denied that objection without any written analysis. Exhibit 1.

## DISCUSSION

The Court has jurisdiction over this Petition under the All Writs Act, 28 U.S.C. §1651.

## I. THE MANDAMUS STANDARD

To determine whether to issue a writ of mandamus, this Court balances five factors first set out in *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654-55 (9th Cir. 1977):

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent

> disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression.

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010). "Rarely if ever will a case arise where all the guidelines point in the same direction," so this Court does not need to find every factor present to issue a writ. *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) (citing *Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 994 (9th Cir. 2004)). Indeed, this Court regularly issues writs of mandamus with only three factors present. *E.g.*, *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 540 (9th Cir. 2020); *In re Henson*, 869 F.3d 1052, 1062 (9th Cir. 2017); *Hernandez*, 604 F.3d at 1102.

Four of the five *Bauman* factors are present here, so the Court should issue a writ of mandamus.

## II. THE DISTRICT COURT CLEARLY ERRED WHEN IT SHIFTED DISCOVERY COSTS ONTO INDIGENT CIVIL RIGHTS PLAINTIFFS

Petitioners begin their analysis with the third *Bauman* factor—clear error—which is "highly significant" in the mandamus determination. *Cole v. U.S. Dist. Ct. For Dist. of Idaho*, 366 F.3d 813, 820 (9th Cir. 2004). Clear error exists when the Court has "a definite and firm conviction that a mistake has been committed." *In re Sussex*, 781 F.3d 1065, 1071 (9th Cir. 2015) (citations and quotation omitted). This Court may find clear error even when there is no binding precedent by this Court. *Perry*, 591 F.3d at 1159. Indeed, "the very existence of the fifth *Bauman* factor, whether the issue presented is one of first impression[,] illustrate[s that] the necessary 'clear error' factor does not require that the issue be one as to which there

is established precedent." *Id.* The record below compels the conclusion that the district court clearly erred.

**A. The Law of Discovery Cost-Shifting.**

Federal Rule of Civil Procedure 26(b) governs the permissible scope of discovery. Under this rule, a court will bar discovery that is—among other things—not "proportional to the needs of the case." Fed. R. Civ. P. 26(b). For discovery that falls within this permissible scope, "the presumption is that the responding party must bear the expense of complying." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). Rule 26(c) contains a limited exception to this rule, where in certain circumstances, a party responding to a discovery request may overcome this presumption and obtain an order shifting costs onto the requesting party (or, in the language of Rule 26(c), "allocating" these costs). Fed. R. Civ. P. 26(c)(1)(B).[2] The Sedona Principles explain this framework:

> If the result of the [Rule 26(b)] proportionality analysis clearly demonstrates that the requested discovery is appropriately proportional, the discovery should be allowed with the presumption that costs will not be allocated among the parties. Conversely, if the result of the proportionality analysis clearly demonstrates that the requested discovery is not proportional, and the request is not within the permissible scope of discovery, the request should be denied and cost allocation would not apply. If, however, the result of the proportionality

[2] Rule 26(c) is distinct from other Rules that shift fees and costs. For example, Rule 37 addresses "sanctions" for "failure to make disclosures or to cooperate in discovery," which can include attorney fees. Fed. R. Civ. P. 37. Rule 54(d)(1) addresses cost-shifting after a final judgment. Fed. R. Civ. P. 54(d)(1). Rules 37 and 54 presume shifting of costs (and in the case of Rule 37, fees) to the party that prevails on a discovery motion or judgment. Fed. R. Civ. P. 37(a)(5)(A), 54(d)(1). Rule 26(c), in contrast, presumes costs will not be shifted.

> analysis is not clear cut, the court has discretion [under Rule 26(c)] to allocate some or all of the costs to the requesting party.

The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 188 (2018).

District courts across the nation shift costs under Rule 26(c) using a framework set out definitively in the "seminal" opinion of *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) ("*Zubulake I*") and then applied in *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) ("*Zubulake II"*). *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH-VPC, 2015 WL 5056726, at *2 (D. Nev. Aug. 25, 2015). Although Petitioners are unaware of binding authority by this Court addressing cost-shifting under Rule 26(c), multiple district courts in this circuit (including the District of Arizona) apply the *Zubulake* analysis. *See Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2017 WL 7520603, at *7 (D. Ariz. Dec. 19, 2017); *see also Perez v. DirecTV Grp. Holdings, LLC*, No. SACV1601440JLSDFMX, 2021 WL 840437, at *4 (C.D. Cal. Jan. 25, 2021); *Price v. Synapse Group*, No. 16CV1524- BAS(BLM), 2018 WL 9517276, at *10 (S.D. Cal. Sept. 12, 2019); *Guardiola*, 2015 WL 5056726 at *2.

*Zubulake* interpreted Rule 26(c) to provide the authority to shift costs even though the then-current version of that rule lacked an express recognition of this authority. *Zubulake I*, 217 F.R.D. at 316 (citing Fed. R. Civ. Proc. 26(c)). The *Zubulake* test focuses on "the central question": "how important is the sought-after evidence in comparison to the cost of production?" *Id.* at 322–23. Only when the

cost of production is high relative to the importance of the evidence can the responding party overcome the presumption and shift the cost of production.[3] *Zubulake I* sets out seven factors to guide this inquiry, listed from most to least important in a typical case[4]:

> (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information.

*Id.* at 324.

In its 2015 amendments to Rule 26, the Advisory Committee recognized this existing cost-shifting framework. It made explicit what courts had previously read

---

[3] The *Zubulake* court set out an additional, threshold determination before the court would even reach this question: "A court should consider cost-shifting only when electronic data is relatively inaccessible, such as in backup tapes." *Zubulake I*, 217 F.R.D. at 324. This threshold determination, too, would exclude the discovery expense at issue here from cost-shifting because the expense stems from processing information rather than collecting inaccessible information. However, some district courts have found this threshold determination not to apply and cost-shifting to properly "extend[] beyond merely inaccessible ESI." *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 240 (S.D. Cal. 2015). Petitioners therefore focus their showing of clear error on the second step of the *Zubulake* analysis: the seven-factor test that courts uniformly apply and that the opinion below plainly violates.

[4] The sixth factor (the importance of the issues at stake in the litigation) appears relatively low on the list because it "rarely comes into play," but when it does apply, it "has the potential to outweigh all other factors." *Lifetouch Nat'l Sch. Studios, Inc. v. Moss-Williams*, No. C10-05297 RMW (HRL), 2013 WL 11235928, at *3 (N.D. Cal. Oct. 15, 2013). Thus, in cases like this one, which involve issues of significant social importance, this sixth factor can outweigh factors appearing higher in the list.

into Rule 26(c): that the district court may "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by "specifying … the allocation of expenses" of responding to discovery. Fed. R. Civ. P. 26(c)(1)(B). The Advisory Committee Notes for this amendment explained that this rule merely made explicit an authority already "included in the [former] rule." Fed. R. Civ. P. 26 (2015 Advisory Comm. Note to Rule 26(c)(1)(B)). The chair of the Advisory Committee, Judge David Carter, likewise explained: "I think I can state with absolute confidence that the Committee does not view the amendment to Rule 26(c)(1)(B), which will make the possibility of cost allocation explicit in the rule, as working any sort of significant change in how discovery is to proceed in civil cases." Judicial Roundtable, *The Nuts and Bolts*, 99 Judicature 26, 30 (2015), available at https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/judicature-99-3_rules-roundtable.pdf. The Advisory Committee Notes also explained that under this revised rule—as under the previous rule—"a responding party ordinarily bears the costs of responding," so the change did "not imply that cost-shifting should become a common practice." Fed. R. Civ. P. (2015 Advisory Comm. Note to Rule 26(c)(1)(B)). As Judge Carter explained, "Cost shifting is now and should be in the future a rare occurrence." Judicial Roundtable, *supra*, at 31.

### B. The Court Below Clearly Erred in Its Cost-Shifting Analysis.

The court below made three clear errors. First, it failed to account for the presumption established by the Supreme Court that the responding party pays for discovery. *Oppenheimer Fund*, 437 U.S. at 358. Instead, it clearly erred by assuming—with no substantive analysis—that it could shift a discovery cost simply

because it viewed it as an inconsequential, “low cost.” Exhibit 3 at 6:19. Second, it failed to account for this Court’s case law from the context of cost-shifting under Rule 54(d)(1). There, even though the presumption is in *favor* of cost-shifting, a district court abuses its discretion if it shifts costs without considering indigency and the potential chilling effect of cost-shifting. The court below failed to consider either of these factors. Third, it ignored Rule 26(c), which implicitly endorses the prevailing *Zubulake* framework because the Rules Committee and Supreme Court amended it to explicitly incorporate existing cost-shifting law.

#### i. At a Minimum, the Court Should Apply Its Rule 54(d)(1) Cost-Shifting Precedent and Find Clear Error in the District Court’s Failure to Consider Petitioners’ Indigency and the Chilling Effect of Cost-Shifting

This Court has held in addressing cost-shifting under Rule 54(d)(1) that a “district court abused its discretion” when it “fail[ed] to consider two factors: [the] indigency [of the party onto which costs were to be shifted], and the chilling effect of imposing such high costs on future civil rights litigants.” *Stanley*, 178 F.3d at 1079. Here, the district court failed to consider either factor. First, it deliberately ignored Petitioners’ indigency. When the magistrate judge *sua sponte* raised cost-shifting at a hearing without briefing or a request from either party, Petitioners’ counsel requested “a chance to brief [cost-shifting] partly because our clients are indigent clients and we believe the case law indicates there needs to be analysis regarding their indigent status.” Exhibit 3 at 6:2-6. The magistrate judge rejected this request for briefing. *Id.* at 7:5-6. Second, the district court improperly brushed aside concerns about the chilling effect. Petitioners raised this chilling effect, too, before

the magistrate judge, who refused to engage with it. *Id.* at 6:15-19 ("Also worried about the fact that [cost-shifting] may set a precedent that could backfire and force other indigent plaintiffs - - THE COURT: It won't; it won't. This is a one-off on this specific ruling based on the low cost of the threading."). Compounding the error, the district judge provided zero written analysis of either issue in affirming the magistrate. Exhibit 1. The district court thus clearly erred in failing to analyze two factors identified in this Court's Rule 54(d)(1) law. At a minimum, this Court should apply *Stanley* and should remand to the district court to consider these two factors.

#### ii. The Better Approach Is to Hold that the *Zubulake* Standard Governs Cost-Shifting in Discovery

Although this Court could apply *Stanley* and remand on that basis alone, the better course is to provide guidance to district courts by holding that the *Zubulake* standard governs cost-shifting in this Circuit. There are several reasons why this Court should apply the *Zubulake* standard.

First, the *Zubulake* standard tracks this Court's Rule 54(d)(1) precedent as set out in *Stanley*. That case identified two considerations that, when present, the district court must weigh: "indigency" and the "chilling effects" of a cost award "on future civil rights litigants." *Stanley*, 178 F.3d at 1079. The *Zubulake* analysis accounts for both considerations. Its fourth factor weighs indigency by requiring district courts to analyze "the total cost of production, compared to the resources available to each party." *Zubulake I*, 217 F.R.D. at 324. District courts across the country that have applied this factor to a request to shift costs onto an indigent litigant have found it to weigh strongly against cost-shifting. *John B.*, 879 F. Supp. 2d at 887 ("As to the

parties' resources, the class consists of 550,000 children whose economic resources are non-existent. For the Defendants to argue that Plaintiffs should pay the costs of production is outrageous."); *McPherson v. Fla. Dep't of Corr.*, No. 4:19CV156-MW/CAS, 2019 WL 11271430, at *3 (N.D. Fla. Oct. 9, 2019) (finding "there can be no dispute that the 'relative resources' factor favors [indigent incarcerated] Plaintiff over [a prison]" and denying cost-shifting). The sixth *Zubulake* factor accounts for the chilling effects of cost-shifting on future civil rights litigants when it examines "the importance of the issues at stake in the litigation." *Zubulake I*, 217 F.R.D. at 324. This "critical consideration … weighs heavily in favor of permitting extensive discovery" without cost-shifting for cases with "the potential for broad public impact." *Id.* at 321.

Second, endorsing the *Zubulake* test will faithfully apply Rule 26. The *Zubulake* court based its seven-factor test on a careful analysis of the proportionality factors of Rule 26. *Zubulake I,* 217 F.R.D. at 321. District courts around the country adopted the *Zubulake* test, and by 2015 *Zubulake* had become the "seminal" opinion on cost-shifting. *Guardiola,* 2015 WL 5056726, at *2. Against this background, the Advisory Committee and Supreme Court revised Rule 26 in 2015 to make explicit the cost-shifting authority recognized in *Zubulake*. This revision made no attempt to modify the prevailing *Zubulake* framework. In fact, the Advisory Committee made explicit that this revision left intact the existing legal framework for cost-shifting:

> Rule 26(c)(1)(B) is amended to include an express recognition of protective orders that allocate expenses for disclosure or discovery. Authority to enter such orders is included in the present rule, and courts already exercise this authority…. Recognizing the authority does not

> imply that cost-shifting should become a common practice. Courts and parties should continue to assume that a responding party ordinarily bears the costs of responding.

Fed. R. Civ. P. (2015 Advisory Comm. Note to Rule 26(c)(1)(B)). The Advisory Committee and Supreme Court's decision to revise Rule 26 without altering the prevailing *Zubulake* cost-shifting framework thus endorses this *Zubulake* framework. *See Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338-39 (1988) (holding that, since "courts have held with virtual unanimity over more than seven decades that prejudgment interest is not available under" a statute that "Congress has amended … on several occasions," the fact that none of these amendments expressly altered the prevailing rule implied that Congress intended to endorse that prevailing rule).

Third, this Court can best assist the district courts it supervises by endorsing the test that they already widely apply. In doing so, this Court will correct errors by outlier courts, such as the court below. But it will not disturb the large majority of courts that analyze this issue properly. It will also allow district courts to continue to rely on the large body of authority interpreting the *Zubulake* factors.

This Court should therefore apply the *Zubulake* factors to this case.

#### iii. The *Zubulake* Factors All Weigh Against Cost-Shifting in this Case

The undisputed factual record shows that all seven *Zubulake* factors weigh against cost-shifting, some very strongly.

### a. The Extent to Which the Request Is Specifically Tailored to Discover Relevant Information

Petitioners' requests for ESI were specifically tailored to discover relevant information. In a prior hearing, Petitioners had proposed a framework to target a limited set of especially relevant ESI, which the magistrate judge implemented. Exhibit 10 at 1-2. Under this framework, Petitioners proposed a set of custodians and search terms that would result in a production of 8,000-10,000 documents (after de-duplication). Exhibit 2 at 16:3-13; 20:19-21:5. The Jail agreed at the hearing that this approach was "reasonable." *Id.* at 21:6-8. Petitioners complied with this order, and the Jail has produced these documents. The threading that is at the center of this dispute further tailors the request to remove duplicate emails that both parties would otherwise need to waste time reviewing. District courts regularly find that targeted email searches such as those here weigh against cost-sharing. *See, e.g.*, *Zubulake II*, 216 F.R.D. at 285 (finding a request narrowed to particular individuals' emails over a 29 month period to be "a relatively limited and targeted request"); *Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, No. CIV.A. 12-3427 JLL, 2013 WL 541972, at *4 (D.N.J. Feb. 11, 2013) (finding this factor to weigh against cost-shifting because the "requested searches are reasonable").

### b. The Availability of Such Information from Other Sources

Petitioners and the Jail have collaborated to ensure that email evidence is drawn from whatever source is most readily accessible. The Jail has never contended that there is any other source for the information in the email data at issue here. This factor thus weighs against cost-shifting.

#### c. The Total Cost of Production, Compared to the Amount in Controversy

The district court's own factfinding shows this factor to weigh against cost-shifting. The magistrate judge explicitly balanced the cost of production against the size of the case in finding the Rule 26(b) proportionality test satisfied: "[T]his is a significant case. There are a lot of allegations, large. So I don't think that this [is an] undue burden for either party and the cost of the threading is low." Exhibit 3 at 17:4-7. This Court should not disturb the magistrate judge's factfinding on this question, which is correct. Petitioners seek injunctive relief that will protect thousands of people incarcerated in the Jail, and the $700 cost that the district court shifted onto Petitioners is small relative to the scope of that relief. The district court's error, however, lay in failing to apply the *Zubulake* test and thus failing to recognize that this fact weighs against cost-shifting. This Court should correct that error.

#### d. The Total Cost of Production, Compared to the Resources Available to Each Party

This factor requires an inquiry into the total costs of production, compared to the resources available to each party.[5] This Court's precedent in the related context of cost-shifting under Rule 54(d)(1) further supports the crucial role that this inquiry plays in civil rights cases. This Court has held in that context that a district court abuses its discretion when it fails to "consider the financial resources of the plaintiff and the amount of costs in civil rights cases." *Stanley*, 178 F.3d at 1079 (citing *Wrighten v. Metropolitan Hosps., Inc.*, 726 F.2d 1346, 1358 (9th Cir.1984); *Moore*

[5] The district court did not specify how the cost was to be allocated between Petitioners. Each Petitioner thus individually faces contempt unless the full $700 cost that was shifted is paid, so each Petitioner seeks relief from that full cost.

*v. Hughes Helicopters, Inc.*, 708 F.2d 475, 486 (9th Cir.1983)). This Court has also warned that litigants challenging their conditions of confinement often "have virtually no resources," so that "a large cost award [in an Eighth Amendment case] could chill similar lawsuits challenging Eighth Amendment violations in jails and prisons." *Draper v. Rosario*, 836 F.3d 1072, 1088-89 (9th Cir. 2016) (holding a district court abused its discretion by imposing Rule 54(d)(1) costs); *see also Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1249 (9th Cir. 2014) ("[E]ven modest costs can discourage potential plaintiffs who … earn low wages.").

The inquiry focuses on the burden that this cost poses on the parties themselves—not their counsel. *Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405 CM JCF, 2012 WL 6732905, at *4 (S.D.N.Y. Dec. 27, 2012); *see also Guerra v. W. Los Angeles Coll.*, No. CV 16-6796-MWF (KSX), 2019 WL 7881616, at *2-*4 (C.D. Cal. June 18, 2019) (rejecting an argument that the court should consider "Plaintiffs' counsel's resources" in determining whether to shift fees under Rule 54(d)(1)), and instead finding it "inequitable to award costs against Plaintiffs") (citation and quotation omitted). The text of Rule 26 requires the Court to consider the "parties' resources" and never mentions other sources of funding such as counsel. Fed. R. Civ. P. 26(b)(1). There is simply no legal authority to look to counsel's resources. When the Rules contemplate that costs may be imposed on counsel, they say so explicitly. *See* Fed. R. Civ. P. 37(a)(5)(A) (describing sanctions on the "attorney advising th[e] conduct" at issue). And even Rule 37 does "not contemplate[] that expenses will be imposed upon the attorney merely because the party is indigent." Fed. R. Civ. P. 37 (Advisory Committee's Note to 1970

Amendments). This rule makes sense: "if the assets of counsel were to be taken into consideration, the ability of clients to engage an attorney of their choice would likely be hampered." *Fleisher*, 2012 WL 6732905, at *4. This consideration is particularly important in cases such as this one, where counsel include non-profits and firms donating *pro bono* services. Cost-shifting in such cases would impose a disincentive against providing indigent clients with *pro bono* services.

Here, this factor weighs so heavily against cost-shifting that it is essentially dispositive. The resources available to each party in this case are wildly imbalanced. Courts regularly find in cases where one party's resources "dwarf" the other that this factor weighs decisively against cost-sharing. *E.g.*, *Guardiola*, 2015 WL 5056726, at *11 (quotation omitted). The district court's decision caused indigent incarcerated people and a small nonprofit to face a significant charge simply because they decided to selflessly pursue important civil rights claims. This result is unconscionable and generates serious policy concerns.

Defendant Maricopa County is a municipal entity with an annual budget of $3.4 billion. Maricopa County, *FY 2022 Adopted Budget*, 3, https://www.maricopa.gov/ArchiveCenter/ViewFile/Item/5266. The $700 discovery cost shifted represents only 0.00002% of this budget. *See Nehad v. Browder*, No. 15-CV-1386 WQH NLS, 2016 WL 3769807, at *4 (S.D. Cal. July 15, 2016) (finding this factor to weigh against shifting costs from municipal defendants when "the cost of production may only amount to about .0004% of Defendants' $3.2 billion budget"—20 times greater than the percentage here). In fact, counsel for the Jail "agree[d]" that "it is not a high cost" for the Jail. Exhibit 3 at 10:2-3.

In contrast, the $700 cost that the district court shifted represents an enormous financial burden for Petitioners. For example, one petitioner was incarcerated in the jail for months because he was unable to pay a $500 bond. Exhibit 4. That this Petitioner could not afford $500, even when it would buy his freedom, shows that $700 is a burden he cannot bear. Another Petitioner has no income and remained in the jail through his entire criminal case because he could not afford bond. Exhibit 6. Two Petitioners are now incarcerated in state prison, where they work for 25 cents per hour. Exhibit 4, 5. And they cannot. Incarcerated people rely on what meager earnings they have—plus, if they are lucky, the generosity of family and friends—to buy soap, toothpaste, calls with their family, and other basic necessities. Exhibit 7.[6] Upon release, many will need to pay significant fines and fees. One Petitioner, for example, was ordered to pay $2,700 as part of his sentence, has a "gate fee" taken out of his earnings by the prison, and will need to pay community supervision fees upon release. Exhibit 4.

---

[6] An incarcerated person working for 25 cents per hour would have to work 2,800 hours (more than a year and a half) to earn $ 700, assuming that there were no deductions for restitution, room and board, utilities, or the myriad other charges imposed by their prison or jail system.

By way of comparison, the 2021 salary paid to U.S. Magistrate Judges was approximately $ 201,112 per year. *See* United States Courts, Judicial Compensation, available at https://www.uscourts.gov/judges-judgeships/judicial-compensation (last accessed Oct. 26, 2021); 28 U.S.C. § 634(a) (magistrate judges' salaries are 92% of district judge salary). Breaking down that judicial salary to 40 hours per week, 52 weeks per year, is $ 96.69 per hour. Accordingly, to put the 2,800 hours needed to earn $ 700 to cover the "low cost" burden, as the magistrate characterized it, *see* Exhibit 3 at 6:19, would be the equivalent of $ 270,728 on a magistrate judge's salary.

A district court has recognized these financial strains, noting that "it would be manifestly unjust to award costs or attorney's fees against" an indigent incarcerated plaintiff because he "would suffer great and severe hardship, presumably for the rest of his life, if he could not provide for himself through his prison wages at least some modicum of simple life comforts." *Shapiro*, 250 F. Supp. 3d at 780–81 (also noting "the negative impact an award of costs and fees against a prisoner . . . might have on public interest work and the [pro bono] program in general"); *see also Little*, 452 U.S. at 14 n.10, 16-17 (holding that a $250-500 discovery cost posed enough of a barrier to an indigent, incarcerated litigant that it violated due process).

Puente is also a Petitioner. Puente, too, is ill-equipped to pay the County's litigation costs. Puente's $1.2 million budget must fund a wide array of programs—including advocacy and educational programs, a food bank, free legal services, and COVID-19 vaccine education. Exhibit 8 at 1. Some of Puente's funding is earmarked for specific purposes and could not be used to pay litigation costs. *Id.* If Puente were to pay litigation costs from its general funds, it could do so only by diverting funding from its other crucial programming. *Id.* at 2.

It is "outrageous" to expect these Petitioners to pay the government's costs. *John B.*, 879 F. Supp. 2d at 887 ("As to the parties' resources, the class consists of 550,000 children whose economic resources are non-existent. For the Defendants to argue that Plaintiffs should pay the costs of production is outrageous."); *see also McPherson*, 2019 WL 11271430, at *3 (finding "there can be no dispute that the 'relative resources' factor favors [incarcerated] Plaintiff over [a prison]" and denying cost-shifting).

#### e. The Relative Ability of Each Party to Control Costs and Its Incentive to Do So

This factor weighs against cost-shifting because the Jail could limit both parties' discovery expenditures by efficiently de-duplicating the documents at issue. The Jail sought to review a larger, duplicative set of documents than the district court ordered, which would have required it to spend more taxpayer money for its counsel's time. Petitioners' counsel, too, would have needed to spend more time reviewing the larger, duplicative production.

#### f. The Importance of the Issues at Stake in the Litigation

This factor weighs strongly against cost-shifting. The *Zubulake I* court explained:

> "[T]he importance of the issues at stake in the litigation" is a critical consideration, even if it is one that will rarely be invoked. . . . [I]f a case has the potential for broad public impact, then public policy weighs heavily in favor of permitting extensive discovery. Cases of this ilk might include . . . so-called "impact" or social reform litigation. . . .

217 F.R.D. at 321. This case—which seeks to establish safeguards that will protect the health of a large class of people incarcerated at the Jail—is exactly the type of impact case that the *Zubulake* court envisioned for this rare but "critical" factor. *See Hawa v. Coatesville Area Sch. Dist.*, No. CV 15-4828, 2017 WL 1021026, at *2 (E.D. Pa. Mar. 16, 2017) (rejecting cost-shifting because the case involved retaliation claims against a public entity that were of importance to the public). This Court has similarly recognized that "Eighth Amendment cases are important for safeguarding the rights and safety of prisoners" and held that a district court abused its discretion by awarding costs under Rule 54(d)(1) against an indigent incarcerated

Eighth Amendment plaintiff. *Draper*, 836 F.3d at 1088 (9th Cir. 2016). This case raises similar conditions-of-confinement claims under the Eighth Amendment and related law. Congress, too, has recognized the importance of incentivizing civil rights plaintiffs to pursue their claims: It established fee-shifting in civil rights cases such as this one to "ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94–1558, p. 1 (1976)). The magistrate judge's cost-shifting order ignores this crucial consideration and "may chill civil rights litigation." *Stanley*, 178 F.3d at 1080.[7]

**g. The Relative Benefits to the Parties of Obtaining the Information**

This factor also weighs against cost-shifting. The *Zubulake I* court explained that this factor generally supports cost-shifting, but "in the unusual case where [incurring the cost] will also provide a tangible or strategic benefit to the responding party, that fact may weigh against shifting costs." 217 F.R.D. at 323.[8] The threading

---

[7] The magistrate judge recognized this chilling potential, stating that his ruling "is a one-off" that will have no precedential value. Exhibit 3 at 6:10-19. But that disclaimer will not prevent a chilling effect on potential litigants who might reasonably fear that they will find themselves in the same position as Petitioners. Likewise, this "one-off" disclaimer is of small comfort to litigators—especially those from nonprofit civil rights legal organizations—who fear that they may end up shouldering the discovery costs on behalf of their indigent clients.

[8] The *Zubulake* test considered whether "production" would benefit the responding party because that case dealt with a cost of producing additional evidence. *Zubulake I*, 217 F.R.D. at 323. At a more general level, however, this factor considers how the parties benefit from incurring the cost. Here, where the cost at issue relates to processing rather than production, this factor should look to the benefits of this processing.

expense at issue here benefits the Jail as well as Petitioners because it simplifies both parties' document review. *See supra* at 23. This factor weighs against cost-shifting.

All seven *Zubulake* factors weigh against cost-shifting in this case, some very strongly. The district court thus clearly erred when it ordered cost-shifting despite the overwhelming weight of these factors.

Having established clear error, Petitioners now turn to the four remaining *Bauman* factors, three of which also support granting mandamus.

## III. PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO ATTAIN RELIEF

Petitioners have no mechanism besides mandamus to challenge this order. Petitioners lack an opportunity to directly appeal this discovery order. "Discovery orders are not final appealable orders under 28 U.S.C. § 1291." *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1490 (9th Cir. 1989). And this court has "refused interlocutory review of [discovery] orders under the collateral order doctrine." *Id.*

Nor is any other mechanism available to appeal this discovery order. Petitioners cannot seek certification pursuant to either Fed. R. Civ. P. 54(b) or 28 U.S.C. §1292(b). Certification under Fed. R. Civ. P. 54(b) would be appropriate only if final judgement had been "entered as to some but not all claims or parties." *SG Cowen Sec. Corp. v. U.S. Dist. Ct. for N. Dist. of CA*, 189 F.3d 909, 913-14 (9th Cir. 1999). No final judgement has yet been entered as to any claim or party. Likewise, certification under 28 U.S.C. §1292 would require "a controlling question of law whose determination would materially advance the termination of the litigation."

*Medhekar v. U.S. Dist. Ct. for the N. Dist. of California*, 99 F.3d 325, 326-27 (9th Cir. 1996). The district court's error of law on this discovery issue has no bearing on the merits and would not advance the termination of this litigation. *See id.* Thus, Petitioners cannot obtain certification for interlocutory appeal. Petitioners also cannot disobey the order, accept an order of civil contempt, and then appeal that order. This Court has noted that "civil contempt of a party … generally is not immediately appealable." *Admiral Ins. Co.*, 881 F.2d at 1491 (citing *David v. Hooker, Ltd.,* 560 F.2d 412 (9th Cir. 1977)).

Petitioners are left with no other option but to petition this Court for mandamus. The first *Bauman* factor is thus satisfied.

## IV. PETITIONERS WILL BE DAMAGED OR PREJUDICED IN A WAY NOT CORRECTABLE ON APPEAL

"[T]he second [*Bauman* factor] is closely related to the first." *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1068 n.3 (9th Cir. 2007). It similarly weighs in favor of issuing a writ here.

As explained above, the harm Petitioners seek to avoid—a $700 bill from the Jail's discovery vendor—is not directly appealable and cannot be rectified by an appeal from final judgment. *See supra* at 25-26.

Regardless, Petitioners also independently meet the second *Bauman* factor because the district court's imposition of discovery costs on indigent plaintiffs represents an immediate hardship to Petitioners and to the public interest. *See In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1303 (9th Cir. 1982) (holding that mandamus relief may properly be used to prevent "hardships" that

litigants are "forced to bear as a result of erroneous interlocutory orders"), *aff'd sub nom. Arizona v. U.S. Dist. Ct. for Dist. of Arizona*, 459 U.S. 1191, 103 S. Ct. 1173, 75 L. Ed. 2d 425 (1983), and *supplemented sub nom. State of Ariz. v. U.S. Dist. Ct. for Dist. of Ariz.*, 709 F.2d 521 (9th Cir. 1983). In *Varsic v. U.S. Dist. Ct.*, a defendant whose sole source of income was his and his wife's social security benefits sought mandamus relief from a denial of a motion to dismiss on *forum non conveniens* grounds. 607 F.2d 245, 251-52 (9th Cir. 1979). This Court held that the second *Bauman* factor favored mandamus relief—even though the defendant could eventually appeal the issue after a final judgment—because he would face a hardship traveling 3,000 miles from his home to litigate his claim. *Id.* As explained above, the cost shifted here represents a serious financial strain for Petitioners. *See supra* at 21-22.

This *Bauman* factor encompasses not only this financial hardship but also "the substantial costs imposed on the public interest." *Perry*, 591 F.3d at 1158. In *Perry*, the Court recognized that a district court's erroneous First Amendment privilege ruling would have a "potential chilling effect on political participation." *Id.* Consequently, because "[d]eclining to exercise [its] mandamus jurisdiction … would imperil a substantial public interest or some particular value of high order," the Court found the *Perry* plaintiffs had met the second *Bauman* factor. *Id.* (internal quotations and citations omitted). Here, too, the district court's order imperils a substantial public interest because it imposes costs on civil rights plaintiffs that "may chill civil rights litigation." *Stanley*, 178 F.3d at 1080.

The second *Bauman* factor thus favors mandamus relief as well.

## V. THE DISTRICT COURT'S ORDER RAISES NEW AND IMPORTANT PROBLEMS OR ISSUES OF FIRST IMPRESSION

"The fourth and fifth *Bauman* factors are rarely, if ever, present at the same time." *Admiral Ins. Co.*, 881 F.2d at 1491. Although the fourth factor is absent here, the fifth factor is present: the district court's order raises both (1) "issues of first impression" and (2) "new and important problems." *Perry*, 591 F.3d at 1156.

First, the district court's order raises an issue of first impression for this Court. Although the Supreme Court has spoken to the presumption against cost-shifting in *Oppenheimer Fund* and this Court has listed factors that district courts must consider in shifting costs under Rule 54(d)(1) in *Stanley*, Petitioners are unaware of any opinion of this Court addressing what analysis to use for shifting of discovery costs under Rule 26(c). The district court's clear error thus provides this Court with an opportunity to establish, for the first time, that the *Zubulake* test is the law of this Circuit. *See Perry*, 591 F.3d at 1158 (holding that this *Bauman* factor is met when the Court is "faced with the need to resolve a significant question of first impression") *Id.* at 1158.

Second, the district court's order raises a new and important problem. This Court has found discovery orders that could create chilling effects to constitute an "important question" under this *Bauman* factor. *E.g., Perry*, 591 F.3d at 1158-59. The district court's order here may similarly chill suits by future civil rights litigants of limited means. And the importance of this issue is further elevated because this petition involves a "question [that] may repeatedly evade review because of the collateral nature of the discovery ruling." *Id.* at 1159. Orders shifting costs are not

directly appealable, and most parties of limited means cannot pursue mandamus as a vehicle to challenge a cost-shifting order. This case presents a rare opportunity for review because, although Petitioners have few resources, they are represented by non-profit and pro-bono counsel who can seek this mandamus relief. The Court should issue mandamus relief on this important issue to provide guidance because it will have no such opportunity in most cases of cost-shifting onto parties of limited means.

## CONCLUSION

For the reasons set forth above, this Court should correct the district court's erroneous decision to shift routine discovery costs onto civil rights litigants of limited means. It should therefore grant the petition for a writ of mandamus.

Dated: October 27, 2021 Respectfully submitted,

<u>*/s/ Jared G. Keenan*</u>

Corene T. Kendrick
Kyle A. Virgien
ACLU NATIONAL PRISON PROJECT
39 Drumm St.
San Francisco, CA 94111

David C. Fathi
ACLU NATIONAL PRISON PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005

Jared G. Keenan
Victoria Lopez
ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011

Larry Wulkan
ZWILLINGER WULKAN PLC
2020 North Central Avenue, Suite 675
Phoenix, AZ 85004

*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE

I am an attorney for Petitioners. This brief contains 8184 words, excluding the items exempted by Fed. R. App. P. 32(f) and Cir. R. 21-2(c). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 21-2(c) and 32-3(2).

Date: October 27, 2021

*/s/ Jared G. Keenan*

Jared G. Keenan

*Attorney for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that on October 27, 2021, a notice of the filing of the foregoing (including a complete copy of the foregoing) will be filed in the underlying proceeding in the United States District Court for the District of Arizona in compliance with Federal Rule of Appellate Procedure 21(a)(1), and that all parties to the proceeding will be served with that notice through the district court's CM/ECF system. In addition, a courtesy copy of the foregoing has been provided via email to the following counsel for Defendants in the underlying proceeding:

Daniel Struck
Rachel Love
Nicholas Acedo
Ashlee Hesman
Kevin Nguyen
Anne Orcutt
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226

*Attorneys for Real Parties in Interest Sheriff Paul Penzone and Maricopa County*

Date: October 27, 2021

*/s/ Jared G. Keenan*
Jared G. Keenan

*Attorney for Petitioners*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Fenty, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Paul Penzone, et al.,<br><br>Defendants. | No. CV-20-01192-PHX-SPL (JZB)<br><br>**ORDER** |

Before the Court is Plaintiff's Objection (Doc. 135) to Judge Boyle's August 11, 2021 Order (Doc. 126) requiring the parties to evenly split the cost of threading responsive emails.

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, a District Court Judge may modify or set aside the order of a Magistrate Judge on a non-dispositive matter when it is "clearly erroneous or contrary to law." The Court has reviewed Judge Boyle's Order. Nothing contained therein could be characterized as clearly erroneous or contrary to law.

///
///
///
///
///
///

**IT IS ORDERED** that Plaintiff's Objections (Doc. 135) are **overruled** and the August 11, 2021 Order (Doc. 126) is **affirmed**.

Dated this 23rd day of September, 2021.

Honorable Steven P. Logan
United States District Judge

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____________

| | | |
|---|---|---|
| **Jason Fenty, Appointed as representatives of the Pretrial Class, Pretrial Medically Vulnerable Subclass and Pretrial Disability Subclass per Order 67, et al.,** | ) | |
| Plaintiffs, | ) | CV20-01192-SPL-JZB |
| vs. | ) | Phoenix, Arizona<br>July 22, 2021<br>10:59 a.m. |
| **Paul Penzone, in his official capacity, et al.,** | ) | |
| Defendants. | ) | |

**BEFORE: THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC DISCOVERY HEARING**

Transcriptionist:
**Elaine Cropper**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street, SPC 35
Phoenix, Arizona 85003-2150
602.322.7245

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**APPEARANCES**

(All appearances are telephonic)

For the Plaintiffs:
**TIMOTHY LY, ESQ.**
Dechert, L.L.P. - New York, NY
3 Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
212.698.3500/(fax) 212.698.3599

For the Plaintiffs:
**BENJAMIN SADUN, ESQ.**
Dechert, L.L.P. - Los Angeles, CA
633 W. 5th St., Ste. 4900
Los Angeles, CA 90071
213.808.5700/(fax) 213.808.5760

For the Plaintiffs:
**LAWRENCE J. WULKAN, ESQ.**
Stinson, L.L.P.
1850 North Central Avenue, Ste. 2100
Phoenix, AZ 85004-4584
602.279.1600/(fax) 602.240.6925

For the Defendants:
**ASHLEE B. HESMAN, ESQ.**
Struck, Love, Bojanowski & Acedo, P.L.C.
3100 W. Ray Rd., Ste. 300
Chandler, AZ 85226
480.420.1600/(fax) 480.420.1695

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings begin at 10:59 a.m.)

COURTROOM DEPUTY: We're on the record in civil case number CV-20-1192, *Jason Fenty v. Paul Penzone*, set before the Court before a telephonic discovery hearing.

THE COURT: All right. Good morning, counsel. This is Judge Boyle.

If you could please announce for the plaintiff, Mr. Ly.

MR. LY: Good morning, Your Honor. This is Timothy Ly along with Benjamin Sadun and Larry Wulkan on behalf of the plaintiffs.

THE COURT: All right. Good morning.

And on behalf of defense?

MS. HESMAN: Good morning, Your Honor. Ashley Hesman for defendants.

THE COURT: All right. Good morning.

All right. I received the joint report. I have reviewed the exhibits. I would like to address the ESI question first and then we'll talk about the interrogatory RFP half of the joint report.

If for any reason we get cut off or it's not clear, do your best to let me know. And, obviously, we've talked before. I hope the jail tour issue worked out well. So before

I dive into the ESI question, is there anything else that I need to know, Mr. Ly, from plaintiffs before I dive into the ESI question?

MR. LY: Not right now Your Honor. I think what you have is the most up-to-date version of report which includes our citations to the (indiscernible).

THE COURT: Right. I do have that. Thank you.

Ms. Hesman, anything that is not in report that you need to add right now?

MS. HESMAN: No, Your Honor.

THE COURT: Okay. All right.

So, generally, we have a problem with the breadth of the disclosure, 80,000 emails is both expensive, time-consuming and I don't know how helpful it is. Obviously there's a question of potential cost-sharing and whether or not we can target the ESIs in a different way. Another thought I have is whether or not you want to have initial discovery on the ESI and then hold off on the rest of it. And I'm happy to work with you on those deadlines. I don't want to delay the overall case deadlines but we can talk about that.

But I have to say that I don't know how helpful all of these emails are going to be. Certainly one of them or two of them or a hundred of them might be, but we have an issue regarding how to do this in a proportional way and a cost-effective way as normal.

So I read the -- everything you have in the joint report. Let me just tell you this, Mr. Ly, I'm going to turn to you. Can you think of a more targeted way to get what you need or a way that you can ask for initial disclosure now and then get the rest of it later on and talk about cost-sharing, because I'm not ordering 80,000 emails.

MR. LY: Understood, Your Honor. And, you know, throughout this process, you know, we have been trying to narrow it down and just have what we're looking for from defendants. Our last proposal we had stuck with two of the search terms and we had noted there one of the particular search terms produced I think, like, a bulk or upwards of 50 percent of the hits. So we asked defendants if they could provide -- again, they are the ones that have access to these documents, if they could provide a proposal by looking at some of those documents and figuring out is there some pattern that we can use to exclude some of those -- some of those documents. So that's, you know -- we stopped and you can tell we stopped negotiating at a certain point when they told us that they felt that no discovery was warranted.

And I don't know what their position is right now, whether they have backtracked on it. But they continually held -- first of all, they delayed in terms of trying to produce these items. But, again, at the very last meet and confer, they told us that, you know, they would not -- they

didn't feel that production was warranted given the vaccine. So we didn't feel like we could negotiate in good faith with them over that. So that's where we stand, Your Honor.

THE COURT: Right. I don't believe they have delayed.

Ms. Hesman, you don't have to address that issue and I do think that discovery is warranted in some degree. So let's just move past those two issues.

Secondly, Mr. Ly, you're telling me you want defendants to try and pick what they think you need as far as discovery? You want them to pick the search terms? If that's the case, let me just -- that's all right. Let me just finish one more thing. You're going to have to give me an idea of what number of emails you think might be proportional. Do you think 10,000 is enough? Do you think 50,000 is enough? Even if you -- they propose a search term, how many emails do you think is enough?

Mr. Ly?

MR. LY: Your Honor, I don't have an exact number off the top of my head; but certainly, you know, it's hard to tell what documents are responsive at this point in time. And part of the proportionality and the reasonableness of the discovery would be -- would hinge on what proportion of the documents are really responsive. And, you know, again, we don't have the documents in our hand. We did make a proposal as I mentioned

previously. I think you saw an email chain where we struck some of those terms and we asked for -- and they -- again, we've come to some tentative -- I call it agreement but certainly proposal on some of the search terms as a negotiating point.

And so -- and we've also asked defendants to provide not necessarily further search terms but they -- producing one those search parameters that we believe may be causing the bulk of the issues in terms of the high number of documents.

THE COURT: So what is that? You're asking me to rule. What is it you would like me to order them to do? Tell me the search term or the quantity.

MR. LY: Understood. Let me pull up the email that we sent last to them. Give me one second here.

Yes. Okay. They there's an email dated July 15 sent from me at 11:17 a.m. And this is Exhibit-- or Attachment D. And you see there are certain items that we have struck out in red which essentially we agree that we will eliminate that from the search terms that were previously proposed. And then you also see that just under that box, it states that one of the search terms, COVID-19 or COVID, or Coronavirus, and mask or masks, that one seems to account for the bulk of the hits of the search term hits.

And so our request is for them, because they have the documents, to do some type of search or analysis -- you know,

this is something that our firm does all the time. If we have a set of documents and we notice that there's a high number of hits for one particular search term, we go through and see is there a pattern to this such that it's bringing up a lot of false hits? There needs to be some type of analysis around that. And then once we have some something to look at, I believe we can propose an appropriate number.

THE COURT: All right.

Ms. Hesman, your thoughts and perhaps we're narrowing it down to that Exhibit D.? Go ahead.

MS. HESMAN: Thank you, Your Honor. As an initial matter, I think that plaintiffs are conflating our position that no ESI is proportional. However, we've agreed to produce a more narrow set of ESI to the extent we can get it in the 10,000 range as detailed in the briefing.

I'm a little confused by Mr. Ly's position that their proposal is contained on pages three and four of Exhibit D because that's what we were running last week. We sent that proposal to our vendor and then two days ago I received an email from Mr. Ly saying that the issue was now going to be taken to the Court.

I asked him whether or not he still wanted us to run that proposal with our vendor. I asked him twice, and I still have not received a response.

So if that is what they are looking to do is run this

proposal through the vendor, I'm not sure why we're in front of you, Your Honor. More importantly, I don't know what it is that they are looking for? As the Court indicated at the beginning of hearing, they did put the onus on defendants to propose search terms and custodians. While we disagreed with that, we did it. And then we further tried to narrow and pull in the scope which they rejected. To date other than this proposal that we just received that they then went back on, we've never received a proposal from them.

Another point that Court made earlier, and which we agree with, I don't know what relevant information they think that they are going to get from the ESI. To date the defendants have produced almost 6,000 documents, Your Honor. They have also had the opportunity to tour all six of our facilities.

So certainly I do not think that 80,000, 60,000 emails are relevant or proportional to this case. But if what they are looking for is for us to run this proposal through our vendor, then we will do so just as we had agreed to do last week before those talks were cut off by plaintiffs.

THE COURT: All right.

Mr. Ly, I'm looking at Attachment D and the email that you referred to. I see there is a reference there to an agreement by defendants to produce -- and to be clear, this is Ms. Hesman's Friday, July 16, 7:39 p.m. response to you. Are

you asking the Court to compel them to do the search consistent with what they agreed to on July 16?

MR. LY: No. Not just do the search but to agree to some type of production. We have been pushing this for five months. And all we get -- let me also step back also to address one point.

THE COURT: Hold on. They will search it and then produce it?

MR. LY: Yes. Produce it, that would be --

THE COURT: Is that enough?

MR. LY: Yes. Perfect.

THE COURT: Ms. Hesman, do you agree?

MS. HESMAN: I don't agree, Your Honor. What we've agreed to do is run the search. I don't know how much the search is limited by what they proposed on July 15. By looking at it and not having the actual report from the vendor, I don't think that we get much further than 60,000 emails. So I don't think that that proposal narrows it in a manner that would allow us to produce documents that are proportional to the case. I'm happy to run it, see what comes back, and then come back to the table with them, which is what I proposed we do, to see how we can further cull the search. But, no, we have not agreed to produce anything because I don't know what the number is of this proposal.

THE COURT: Okay. That's fair and I agree. I am

initially inclined to agree that this ought to be limited at this point to 10,000 documents.

And then after that, Mr. Ly, if you think that you are entitled to additional searches and additional production, then we need to talk about cost-sharing.

Do you have any time points regarding at least that approach here? Because the second stage of this is whether you need me to be involved in that 10,000 document search, you need an order in that regard or I let you all work it out. Stated differently, if I say to you that the Court finds that a 10,000-document search is sufficient, I'll let you all go through the numbers and find out what you think is -- will comply with that and defendants can -- plaintiffs can decide what kind of search they want and then if you want more than that, we can address cost-sharing.

Mr. Ly, tell me if you disagree or agree?

MR. LY: I just -- one clarification question. In terms of the initial 10,000 documents, at this point, that initial 10,000, we're not talking about cost-sharing; but after 10,000, is that where we would begin to talk about cost sharing? Is that right?

THE COURT: That is my thought but I'll hear more on that, yes.

MR. LY: I would say I think that's an appropriate approach. At this point, we're just looking to get any ESI

documents.

And so if we can at least get 10,000 in the door for us to start reviewing, that would be great for us.

THE COURT: Ms. Hesman, I'm not opening the floodgates here. I'm not saying that you give them 10,000 and you pay 90 percent of the next 85,000. What I'm saying is, I'm trying to set this so that there can be an initial disclosure of some kind, a production that is not too onerous for you and then if plaintiffs want more, they are going to heavily bear the burden of receiving more unless they come forth with some reason why they think that this is absolutely necessary for their case. I don't think that these email issues are going to be integral to the decision in this case. But I do think that discovery is appropriate in some regard.

Okay. Ms. Hesman, this question for you. Is a production of fewer than 10,000 emails onerous for the defense?

MS. HESMAN: No, Your Honor, and that is exactly what we said. We said if we can get this to 10,000 documents, however plaintiffs want to get there by removing custodians, by altering search terms, however we get there, we agree that 10,000 documents is reasonable. What we disagree, that it is relevant for other reasons, but that's exactly what we proposed so, yes, I have no objection to that.

THE COURT: Now, how do we do this in a timely way? Because I assume, Ms. Hesman, you have to get the search terms

they request or come up with terms you think will come up with 10,000 documents they might agree to. I don't know that I need to get involved in those details. I can let the two of you work it out, but I think I need to give you a time frame so that the plaintiff doesn't complain that you're delaying but also give you enough time to comply.

Ms. Hesman, how do you propose I set some type of deadline in this regard? Do I require you all to confer every three days? Do I set just an overall deadline? What do you propose?

MS. HESMAN: Well, my proposal, Your Honor -- and our ability is dependent on our vendors running searches. So what we had done before plaintiffs took the issue to Court was sent their proposal to our vendor. We then stopped that because they said that they no longer -- our understanding was they were no longer interested in it. So I think that if we can meet and confer with plaintiffs to cull down -- it probably takes on average -- and this is a truly guess -- on average five business days for our search to run a search, if we can come up with a new search that eliminates things that are just low-hanging fruit, like all email invites, all audio emails, things from outside agencies, things like that, if we can reach an agreement, I anticipate it would take five days for our vendor to come back with a total hit count. Hopefully the first time we do it, it's under 10,000; but if not, we will

probably be getting into another five-day period to run a new search. So that's the time frame we're looking at.

THE COURT: All right. Secondly --

MR. LY: Your Honor.

THE COURT: I'll goat to you in one second, Mr. Ly, because the second point I want to make is this. You've listed custodians. Is there also a way to produce these documents as to some of the more relevant custodians first?

Ms. Hesman, is that an option here?

MS. HESMAN: My understanding, Your Honor, is yes. I believe we can prioritize production either by custodian or by terms. My understanding is yes.

THE COURT: Okay.

Mr. Ly, that was my point, which is, these delays in going back and forth and finding the right number and right search terms can take time. However, you may think there are three or four custodians you are the most interested in. You don't want to eliminate everybody else but you would really like to get the emails on some of them and then, you know -- and then maybe broaden it from there. This is just a suggestion.

What were you going to say, Mr. Ly?

MR. LY: I just wanted to make two points. The first, that in terms of -- in terms of the number of documents, we just want to be clear that the 10,000 documents should be

unique documents. In other words, they should be deduplicated so that we're not receiving duplicate versions of the same document and counting that as a separate document as part of the 10,000 count. So that's one item.

And then the second item, as an officer of the Court, I've never met a vendor that takes five days to run search terms. And I say that from my personal experience working with our own vendors. We have been able to get it done within one day and I think the three days that you propose, that's a fair and conservative estimate. So I'm not quite understanding why it takes five business days to run these search terms.

THE COURT: Well, then what do you propose? I need to lay out something that is -- that gives you all deadlines. Do you want me to require you all to meet and confer and within three business days of that to have the production done by the defendant's vendor?

MR. LY: I believe three business days is quite reasonable. Again, that's a conservative estimate.

THE COURT: Ms. Hesman, I don't know how to draw the line between three days, four days and five days. I can order it and have you come back if you can't comply. What works.

MS. HESMAN: Your Honor, that is fine. Five was my estimate. If you want three or four, I believe that is also reasonable. I have no objection to that.

THE COURT: All right. I'll order four. At least

that way if you start on a Monday, you might get something back you can confer on a Friday.

And I would ask, Ms. Hesman, that you act in good faith to try and get your vendor to work more quickly than four days. So I'll let you handle that. But certainly four days is the deadline; and if you can work this out more quickly, that would be acceptable to the Court, obviously, and to make your best efforts to deduplicate emails. It's not an absolute requirement. I'll just require best efforts. Okay.

Finally, I'm willing to let you both work out the details on how you think this should be searched and what terms would work. The Court will say that the initial production will not exceed 10,000 emails or documents.

So you both can work that out. Is that sufficient enough, Ms. Hesman, for you, emails or documents? I think we're just talking about emails.

MS. HESMAN: Yes, Your Honor.

THE COURT: Okay.

MS. HESMAN: That is sufficient.

THE COURT: Mr. Ly, from you?

MR. LY: Yes. I think the 10,000 works for us. I do want to add in terms of timing, as you noted before, your orders, we have been pushing back the discovery deadline in part because there's one particular deadline. The deadline is the last day to propound discovery requests. And the reason

that we have been pushing it back is that we wanted to be able to review the ESI and then if we need to make further requests, we can make that happen.

And so I am wondering and hoping that the Court might be able to place some type of deadline for when the documents, 10,000 documents, will be produced to us in enough time that we can review them and then if we need to, propound further discovery requests.

THE COURT: How long do you think this will take? What deadline do you propose?

MR. LY: Give me one second here.

If I recall the Court's order correctly, fact discovery ends on October 5, 2021, and then we have 45 days prior to then, so when the last discovery request will be propounded.

I would be seeking somewhere between -- if it's 10,000 documents -- at a minimum of two and a half weeks to review. So let me see what that looks like. Give me one second.

If we could receive the documents the fifth, that would work great for us.

THE COURT: What date did you state?

MR. LY: August 5.

THE COURT: I don't think that's enough time but let me hear from Ms. Hesman.

MS. HESMAN: It's not, Your Honor. As I detailed on page four of the joint dispute, the Department of Justice estimates that it takes a reviewer one hour to review 30 documents. In all honesty, I think that's a little low. I think we can probably do closer to 50 or 60 documents an hour. Even at that rate, it's going to take a couple hours to review -- or a couple hundred hours, excuse me, to review 10,000 documents.

So I think at least we're going to need a month, a month and a half after we receive the batch from our vendor to review 10,000 documents.

Now, what I can propose is that we start production on a rolling basis. I think that has been helpful in some of our other cases. You know, every Friday we produce what we have completed for that week, so at least as far as reviewing things on rolling basis rather than producing all 10,000 documents at once.

THE COURT: Right.

So, again, I'll have to rely on defense to do the best efforts to do the rolling basis discovery. I don't want to get too far into that, but I do need at some point to give you a deadline.

So from my perspective, I'm looking at potentially September 7, at the latest September 13. Fact discovery does close on October 5.

MS. HESMAN: September 13 seems reasonable to defendants, Your Honor.

THE COURT: All right.

Mr. Ly, I'm likely to set this hard deadline of September 13 but if you find you're not getting reasonable compliance in the interim, contact the Court and I'll get you both on the phone and we'll talk about it.

It's really difficult for me to set these intermediate deadlines without knowing the search terms, without knowing what you all have talked about. And I think I can rely on you both now to work this out diligently. And if you need, because of the discovery, an additional extension of a week or two, you know, I'll listen to that. Your deadlines are fairly tight after fact discovery but, you know, they can be somewhat amended. But this process is going to take some time and I don't want to delay it.

Let me do this then. At least some of these initial email disclosures should be going out long before September 13. So is there a way I can put an interim deadline at just one of them, Ms. Hesman, as to at least some of the disclosure? Like at least one quarter of the disclosure has to be completed by, you know, August 16?

MS. HESMAN: Sure, Your Honor. I'm fine with that. I mean. It's largely dependent on how they want to prioritize custodians. I'm also fine with the Court ordering that there

needs to be a rolling production every one or two weeks. But, yes, if you want to say a fourth of the production by the end of August, I have no objection.

THE COURT: All right.

Mr. Ly, I would like to make sure you're getting some of this at least in August. So if I set a third of the email disclosures need to occur by August 23, and that way I know that defense is actively working on this and you're getting information -- they can produce more but at a minimum that's what you get -- does that work for you, Mr. Ly?

MR. LY: Yes, Your Honor. And I just want to -- I want to clarify that is 10,000 produced documents. I know that defendants will be doing some type of -- I assume defendants will be doing some type of -- I assume defendants will be doing some type of privilege review and will be withholding some documents based on that privilege review. So I just want to clarify that the 10,000 documents are actually produced documents.

THE COURT: They are not producing 10,000 documents on the nose to you. That's not happening. What they are doing is search terms that are reasonably related to give you an email dump that does not exceed 10,000. I would expect it to be more than 8,000. But you're going to have to come up with the search terms that you think are relevant that work for you that come up with about 10,000. If it comes up with 8500 or

9500, that's acceptable; you pick the search terms. They will tell you the approximate amount. Now, if it turns out you only get 2500 emails from that, then you can go back and say that's, obviously, insufficient. I expect you to get between 8 and 10,000 emails.

Let me just ask Ms. Hesman. Is that reasonable, that the production ought to be somewhere in that range?

MS. HESMAN: Yes, Your Honor, that's reasonable.

THE COURT: Okay. Yes.

So, Mr. Ly, I can't nail this down to 10,000 exactly. You'll get between 8 and 10,000 based on the search terms you request. There's no way to be more specific about it this early on in this broad of a search.

MR. LY: Understood, Your Honor.

THE COURT: Okay.

Anything else, Mr. Ly, regarding the ESI?

MR. LY: No, Your Honor.

THE COURT: Okay. Ms. Hesman, let me tell you what it is that I would order. The defendants are to confer with plaintiff to come up with search terms that are likely to produce no more than 10,000 emails for production. Secondly -- and that's to -- that final disclosure is to occur by September 13. Also, by August 23 at least a third of the disclosure should be produced to plaintiffs. Finally, the Court anticipates that the total number of emails to be disclosed

between 8 and 10,000. And if the parties need additional Court involvement, they are to contact Court diligently. I assume you can work through this now that we have these parameters.

Ms. Hesman, is there anything about that order that is problematic for the defense?

MS. HESMAN: No, Your Honor.

THE COURT: All right.

Secondly, I'm not ruling on this but I'm telling you both that if you think, Mr. Ly, that there's now more email that you are entitled to or that you want, you should be thinking that the plaintiffs are going to bear a significant cost in having the defense produce those. I'll hear more about that later. And if you ever request that, know this, you are going to have to convince me how emails are so critical to a case like this. Right now the case itself -- and I've read the documents that have been submitted, Judge Logan and his orders. I just don't think this is a critical part of the case. I think it's certainly relevant but I don't think that this is going to be where the case rises and falls. I just want to share that with you both in case this comes up and you want to investigate this more, you at least ought to know my thoughts on it now.

All right. Let's move to the RFP. First of all, I don't know that the plaintiffs are ready to discuss this. Second of all, I'll tell you that I don't know that I actually

have the interrogatories. The exhibits, G, H, I, J, the RFPs are in there but the joint report refers me to Attachment I and Attachment I think is the RFPs.

MS. HESMAN: Your Honor, when the link was sent to your law clerk this morning, an incomplete version of Attachment I was included inadvertently. I sent the complete version, I don't know, a couple hours ago and, obviously, you do not yet have that. It includes full both sets of RFPs as well as the interrogatories. So my apologies. That is our error.

THE COURT: That's fine. Just know that I did actually go through all of them, looking for them, and I don't fault you because I know we're doing this quickly, but I didn't see those.

So first I need to discuss or tell you both, let's address some of the main issues on the interrogatories and then talk about whether or not we're having a follow-up discussion about this because I don't know that plaintiffs are ready to go through interrogatories one at a time.

Mr. Ly, are you ready to talk about RFPs interrogatories today?

MR. LY: If Your Honor would like to, you know, we're happy to do that. If you think it may be more appropriate for us to provide a more full response to the extent that you want to discuss some of these in further detail.

THE COURT: So, yes, I would prefer not to have you do more work. If we can resolve some of these issues today, let's do it. We are here from -- my calendar, I have another 25 minutes and if I can save you all having to draft and brief and go through this, let's do it now.

With that, let me first address, Mr. Ly, defense in the joint report indicate that you did not respond in a timely manner and that the deadline was May 26 and you responded on the 27 and you were a day late regarding objections. Is that accurate?

MR. LY: Your Honor, that is -- we were, I believe, eight hours or so late and we provided some case law in one of our letters regarding how that should be treated; namely, that the -- as far as I can tell, the only time that we have been late in responding to any of these, they were not prejudiced by an eight-hour delay. And we did respond, again, within eight hours of that deadline.

THE COURT: You were late. I don't need to rule on this now but you were late. Just know that deadlines count and if you continue to miss them, that's not going to help you because you're on notice that there are deadlines and they count.

I know you're aware of this but I've given you fair warning if you miss deadlines in the future, at some point this does become cumulative as far as the Court's willingness to

forgive the late deadlines. I just have to say that as sort of a ministerial act so that you understand it.

Let's get to the interrogatories.

Maybe I should step back. What do we think the biggest issues are as far as interrogatories? So, Ms. Hesman, let me start with you. What do you think the biggest issues are for you that you would want to resolve today regarding RFPs, interrogatories?

MS. HESMAN: Sure, Your Honor. If I could start with the RFPs, we've propounded two sets of RFPs for a total of 22 requests for production.

THE COURT: Right.

MS. HESMAN: Plaintiffs have not produced one document in this case, not one. They have -- in response to nearly every single Request for Production, they have taken the position -- and I'm reading directly from their responses -- plaintiff has not attempted to respond and will not do so. I think that that is completely unreasonable. They have made no effort to work with us. They object -- they have filed frivolous objections to common words like "all" and "offer."

I just don't think that their responses have been made in good faith, Your Honor. We've produced, like I said, 5700 documents; and as we sit here today, we do not have any idea what the basis is for plaintiffs' claims other than the documents that they filed over a year ago in support of their

preliminary motion for -- or motion for preliminary injunction.

So that's the issue with the RFPs. The issue with the interrogatories --

THE COURT: Let's do the RFPs first. You sound correct. I'll hear from Mr. Ly. Let's say I find that they haven't acted in good faith. What do you want me to do today? What are you asking me to do after I make that decision?

MS. HESMAN: Your Honor, I would ask that you order them to supplement their Request for Production. They do not object to our Request for Production based on relevance, so they have conceded that all of the information that we're requesting is relevant. So I would ask that the Court order them to supplement their Request for Production, any Request for Production where they said they have made no attempt to even respond. By doing that, we don't know, are there responsive documents out there that they are withholding? And if so, why? They have not -- they have not done that despite Rule 26's requirement that they do that. So we're in the dark right now. That's what we would request that the Court order with respect to Request for Production.

THE COURT: Okay.

Mr. Ly, the contention is that you produced nothing in regard to the RFPs. Your response?

MR. LY: Your Honor -- sorry.

Sorry. Your Honor, I think I note two points. One

is that, you know, our clients are incarcerated in jail and so to the extent that they are -- there are documents, which we believe that there are -- as far as I can tell, I would like to confirm with my team 100 percent, there just simply aren't documents that discuss or talk about the practices and policies of the -- in our client's possession and discuss the practices and policies and procedures of the defendants. That's the first issue.

And the second issue, again, we are still waiting for further production from defendants in terms of ESI. And I know that they are seeking further answers that we believe at least partly will be found in those documents. So to the extent those documents are produced, we can point to those documents.

And then the final thing that I'll say is that, you know, the affidavits that we provided with the preliminary injunction, they outline a lot of the details that defendants -- I think they are looking for and we've discussed that to a certain degree and provided statements in response to their -- at least to the interrogatories based on those affidavits.

THE COURT: Okay. Well, I can go through these one at a time. One of the responses is, you are not producing documents because they haven't given you the emails?

MR. LY: I'm sorry.

THE COURT: I mean, they are asking you to produce

items in your possession. I don't know how them not yet producing emails to you is a defense to that.

MR. LY: Sorry. Let me just clarify a little bit further? We did make an initial disclosure I believe of 500-some documents. Again, these were documents that we believe were responsive. So it's not -- it's not no documents have been produced. These documents, again, they come from public disclosures.

Again, as I said before, in terms of documents that our clients may possess, as far as I know, I don't believe that we have any documents that relate or respond to the RFPs.

THE COURT: All right. Secondly, one of your responses was the plaintiffs are in jail and, therefore, producing documents might be difficult for you. Did I hear you correctly?

MR. LY: Are you saying something that has been written or something I have just said?

THE COURT: Well, for example, they want the medical records from your clients. Whether or not that's terribly relevant I'm not sure. But, I mean, if this were a medical malpractice case, you would be producing the records. It's not a defense to say, "My client is in custody." You would have to go get medical records.

MR. LY: So for that particular issue, I think it may be encompassed in the first three interrogatories, in our

response to that. So there's a combination of interrogatories and RFPs. We've stated almost what (inaudible) stated there, which is this is not a medical malpractice case. The issue of their medical records is not in play given that the classes have been certified.

And so what we understand to be happening is that the defendants are collaterally attacking Judge Logan's order which has essentially certified the class. And we can look at the cases that plaintiffs have cited. I believe one of them is *Townsend* and another one I believe is *Monster Energy*. They both involve precertification.

Now, the discovery related to the medical documents and the ten years of medical documents relate to determining whether or not the class should be certified. The class has already been certified so we believe these questions are irrelevant.

THE COURT: All right. Let me just state generally then, Mr. Ly, Ms. Hesman is asking that I direct you to respond to the RFPs. That's not an order that is clear enough. If I have to rule, I need to rule on whatever the specific objections are. You are already required to respond in good faith to the RFPs.

So are you standing on all of the answers that you've made regarding the RFPs where we stand right now? Do you want to amend them in any way.

MR. LY: To clarify, when you say the answers, do you mean anything that I said or the documents themselves?

THE COURT: Your responses to the RFPs which I show as I think I-- let me go back. Attachment I, for example, is your objections and responses. And it lists documents that have been purportedly disclosed.

So my question for you is, do you need to change any of your responses? Do you wish time to respond more fully to the RFPs or are you standing on what you've already answered to defense?

MR. LY: We'll take another look. Broadly speaking, you know, we are -- we believe that -- again, I would like to take another look but, obviously, I stand on our responses generally. Again, like I said before, I don't think there are records that are relevant to RFPs in our clients' possession but that's our belief but we'll confirm that and take a look and get back.

THE COURT: All right.

Ms. Hesman, what I would like to do is perhaps go through what you would think would be the most egregious nonresponse from plaintiffs on any RFP of your choosing. I don't think I can just order them to respond to the RFPs. They have already been required to do that and they are stating now there's not much they think they are changing. So then I have to specifically go through the RFPs and decide whether they

have acted in good faith, decide whether or not your position is correct.

So that seems to me the best way to do that is to have you pick what you think is the most egregious response on an RFP and I just want to do one of them and see where we stand.

MS. HESMAN: Yes, Your Honor. To clarify, my request would be that for every response where they respond that they have made no attempts, I mean, that's what they say, plaintiffs have made no attempt to respond to this request and will not do so without defendants narrowing it or a Court order, I don't know how they can state that the request is overly broad when they have made no attempt to respond to it. How do they know it's overly broad? What I would ask the Court to order today, understanding that the Court does not have the benefit of the Request for Production and that is my fault for with the attachment issue.

THE COURT: I have it now.

MS. HESMAN: Oh. Okay now. I would ask the Court that for every response where plaintiff indicated they haven't even attempted to respond, that they attempt to respond. And if there's a burden based on their attempt to respond, they outline what that burden is. If there are no responsive documents, they indicate there are no responsive documents.

If there are responsive documents but they are

withholding them due to burden issues or some other issue, then they indicate that in accordance with Rule 26. So that's what I would ask the Court to order today.

THE COURT: All right. I made a note of that. I do want to know if you are prepared to talk about any specific RFP in particular today that you think is particularly relevant or something that will help us break a logjam today.

MS. HESMAN: Sure, Your Honor. So I have Request for Production Number 6 in front of me, all evidence that plaintiff suffered serious harm as a result of the alleged conditions of confinement contained in plaintiffs' complaint. They have stated that they have made no attempt to respond to that request.

THE COURT: Hold on. Where is that? Which document?

MS. HESMAN: Attachment I.

THE COURT: Got it. What page?

MS. HESMAN: Page five but the pages are a little misleading, Your Honor. It's the second document in attachment, I mean.

THE COURT: I have it. I have it.

MS. HESMAN: Entitled Plaintiffs First Supplemental Responses and it's page five of that.

THE COURT: I have it. Thank you.

MS. HESMAN: And number seven, the same argument for number seven. We have no idea, none, what evidence they will

use to support their claims. What they can't do, and what they have continued to do, is rely on the attachments that they attached to their motion for preliminary injunction. A lot has changed since the summer of 2020, particularly in a case about COVID. We have no idea whether any of these individuals suffered harm. If so, what that harm was and what evidence they are going to use to support that.

As a result, we can't craft our defenses and it's a similar request for all of these production and, frankly, the interrogatories as well. We're simply looking for what evidence they are going to use to support their claims. And right now we have none. So if they will just attempt to respond to these interrogatories where they state they have made no attempt and let us know what the results of that attempt were and whether there is an actual burden -- they object to burden but I'm not clear what the burden is, because they have made no attempt to respond -- then I think we can assess whether or not there's additional supplementation required. But right now I can't do that because I don't have the information.

THE COURT: Would these be more than medical records?

MS. HESMAN: Yes. I mean, if they are using more than medical records to support their claims. I don't know what they are going to use to support their claim. I would assume some of it may be medical records, including previous

medical records that we're not in possession of --

THE COURT: All right. Let me --

MS. HESMAN: -- just by way of example.

THE COURT: Go ahead, please.

MS. HESMAN: We do think that the medical records are relevant in this case, Your Honor. They are alleging that the plaintiffs' class is medically vulnerable. In order to assess whether or not they are medically vulnerable when they met the definition of medically vulnerable, we need to have their medical records, including previous medical records for which we do not have. If they are alleging that they have been harmed as a result of our policies, practices and procedures, we need to know, what did you look like before you came into our facility?

If there is some kind of lung issue that they are claiming that a particular plaintiff has that makes this individual medically vulnerable, well, what was his lung issue before? Did we really cause the injury or has he always had this injury? That's relevant, Your Honor, and we're simply asking for -- medical records is a piece of it but also any other evidence that they will use to support their claim. We have nothing.

And if the responses -- as I think Mr. Ly indicated, they have no responsive documents, then indicate there are no other responsive documents other than the medical records or

that there are none. We're just looking for a good-faith basis in responding to these requests.

THE COURT: All right. One of the issues I'll have to resolve, then, is I have to go back and read Judge Logan's ruling so far to this point regarding the class. Your point does make sense, some relevance sense, to the Court. On the other hand, are there going to be people over 55? Are there going to be medically vulnerable in the jail? You know, how essential is this to the case? But I don't want to get into all of that right now. We don't have time either. If I'm going to go through all of these interrogatories and RFPs, I want to do it well. I wanted to get this ESI adjudicated quickly.

Let me do this. I do want to get this answered.

Mr. Ly, on RFP 6, are you telling the Court that there are no documents, medical or otherwise, that tend to show that plaintiff suffered serious harm?

MR. LY: RFP Number 6 -- again, our objection again relates to the fact that the class has already been certified and so production of these documents is not relevant in this case.

THE COURT: Any other objection other than relevance?

MR. LY: I mean, I can review these again and supplement according to the way that Ms. Hesman can describe. Yeah, I mean that seems -- that's something we can do for now.

THE COURT: All right. Let me go to interrogatory number 11. This is the contention interrogatory requesting that plaintiffs advise what steps should have been taken. Are you going to respond to that interrogatory?

MR. LY: Give me one second. I'm trying to track it down.

Your Honor, I think we did respond. We provided -- let's see here.

I believe we have responded to that. I mean, to the extent they want us to -- again, I believe that interrogatory 11 is tied to some of the -- several other interrogatories but we maintain that, again, what the CDC says regarding those particular factors. For example -- let's see. CDC states that they can modify the COVID-19 prevention measures if facility vaccination coverage is high, transmission rates are low, population vulnerability is low, and the facility layout and procedures allow for physical distancing.

And we talk about that, again, in the previous other -- other interrogatories regarding that. There still needs to be social distancing. There needs to be proper -- and social distancing in all of the congregate areas in which incarcerated individuals are being held.

THE COURT: Okay. I get it. Let me stop you for just a minute before I go too much further on this.

Ms. Hesman, I do thinking this interrogatory is

something we might address today. I do think plaintiffs are required to answer this. They filed the case. They are asking for relief. You ought to know what the relief is they are asking for. Do you think it's been answered, interrogatory 11?

MS. HESMAN: No, Your Honor, I do not think that it has been answered. And I agree that this interrogatory is crucial for several reasons. First, it's our position that plaintiffs' claims are now moot and that they lack standing due to the widespread availability of vaccines. I attached an order from another district court that found that --

THE COURT: I saw it.

MS. HESMAN: -- plaintiffs have indicated -- yes. Plaintiffs have indicated that they disagree. I am not sure what the basis is for their disagreement because they didn't respond to my email. But my hope for this interrogatory was for them to tell me, okay, we've vaccinated or offered the vaccine to every single inmate in Maricopa County's custody. What else are you saying that we have to do to provide conditional -- constitutional conditions of confinement? This interrogatory doesn't answer that.

Their response provides copy-and-pasted information from the CDC. That is not responsive. What is responsive is telling me particularly in this case what Maricopa County, based on their policies and procedures and practices, which we've already produced to plaintiff, how those need to be

altered and why after we've offered the vaccine.

THE COURT: I agree. I agree.

MS. HESMAN: And this is a perfect example, Your Honor -- if I could just finish really quickly.

THE COURT: Go ahead.

MS. HESMAN: -- in their joint report they state that we need to do all of these other things because of the Delta variant. But that's not in this response and that's why we need complete responses, is to avoid a trial by ambush where every month it's something new and it's this ever-changing story of what we need to do. They can't criticize us for not doing anything and then not tell us what it is that we are supposed to do. So, yes, I think it needs to be supplemented.

THE COURT: And do you think -- well, I know I have to come back on the rest of this. So first we'll have to set up a time and I'll have my staff -- my judicial assistant contact you to set up going through those interrogatories and RFPs. It's going to take time. I need to review it and I need to review Judge Logan's prior rulings. So next -- and I'm out for ten days starting next Wednesday. Are you all prepared to do this by Tuesday or do you want the delay it for two weeks?

Sorry. Mr. Ly, go ahead.

MR. WULKAN: Your Honor, this is Larry Wulkan for the plaintiff. (Inaudible)

THE COURT: Sorry. I only heard you announce. Can

you repeat that?

MR. WULKAN: Yes, Your Honor. This is Larry Wulkan for the plaintiff. Can I suggest a proposal?

THE COURT: Oh. Go ahead, please.

MR. WULKAN: Thank you, Your Honor.

Because we were prepared to address the ESI issues today, unfortunately you don't have the benefit of briefing on this discovery dispute. There are some overarching issues. This is a conditions of confinement case. The harm that is suffered is the fact that there's a constitutional deprivation when people are pretty serious -- when incarcerated individuals are put at serious risk as a result of not following things like the guidelines which is evidence of deliberate indifference.

THE COURT: I understand.

MR. WULKAN: So when Ms. Hesman says we can't be criticized for doing that, that's exactly what they are criticizing us doing. They are criticized because they are not following the guidelines. And when she said it was a moving target, because there are things that are happening, such as the Delta variant, which results in the constant revision of the CDC guidelines.

THE COURT: Hold on. Hold on. Mr. Wulkan, I could listen to this for a while, but I have a noon meeting. What I need to do is just address the specific question now of, are

you all prepared to come back by Tuesday, which I doubt, so I think we're coming back in two weeks. Do you agree with that?

MR. WULKAN: I think it's best to come back in two weeks, after we've briefed the issue and given the Court the benefit of our suggestions and (indiscernible).

THE COURT: All right. Okay.

Ms. Hesman, I'm likely to have you all come back on issues regarding the interrogatories and RFPs in about two weeks and let you meet and confer and briefly list the issues. I don't want 15 pages per side. I expect a paragraph at most, more like two or three sentences per interrogatory objection.

So is two weeks sufficient for you?

MS. HESMAN: Your Honor, I am actually out of town for the beginning of August. I can address this on Tuesday but I understand plaintiffs are not prepared to do so on Tuesday. I can -- I can schedule something the week of August 16th.

THE COURT: Okay. Okay. I'll let my staff work with both of you but we're not doing this on Tuesday and maybe you can work out some of the answers.

I'll tell you generally, Mr. Ly and Mr. Wulkan, that you better have better answers than, "We don't have to produce anything." I am sympathetic to the idea that perhaps ten years of medical records is too much. I'm not even sure necessarily a year's is relevant. I have to look at Judge Logan's order, but I expect you to have a very straightforward response, not a

boilerplate full paragraph response. You need to have a pointed response if you're not going to provide anything regarding an RFP.

Secondly, regarding interrogatory 11, you are going to have to convince me as to why you should not have to detail everything you want defendants to do. This is a contention interrogatory. You want them to perform. You want Judge Logan to rule for you. You better be prepared to tell the Court what it is specifically they are not doing that you are requesting. I'm not ruling on that now but you better be spending time on that because I'm highly inclined to grant defendant's request. We don't have to discuss that any more.

I need to adjourn now so you'll get my order regarding the ESI as I described and that will go out today. My staff will contact you and we'll go through the interrogatories and RFPs when Ms. Hesman's back from her being out of town.

All right. Mr. Ly, for today, anything else?

MR. LY: Okay. Thank you very much, Your Honor.

THE COURT: Ms. Hesman, anything else today?

MS. HESMAN: No, Your Honor. Thank you.

THE COURT: All right. Thank you, both, for your information.

We are adjourned. Thank you.

(Proceedings concluded at 12:00 p.m.)

C E R T I F I C A T E

I, ELAINE M. CROPPER, court-approved transcriber, certify that the foregoing is a correct transcript, to the best of my skill and ability, from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 24th day of July, 2021.

s/Elaine M. Cropper

______________________________

Elaine M. Cropper

# EXHIBIT 3

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Fenty, et al., | ) |
| | ) CV-20-01192-SPL |
| Plaintiffs, | ) |
| | ) Phoenix, Arizona |
| vs. | ) August 10, 2021 |
| | ) 3:30 P.M. |
| County of Maricopa, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

BEFORE: THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY HEARING

APPEARANCES:

For the Plaintiffs:

Dechert, LLP
By: TIMOTHY LY, ESQ.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

For the Defendants:

Struck Love Bojanowski & Acedo, PLC
By: ASHLEE B. HESMAN, ESQ.
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Transcriptionist:
Barbara H. Stockford
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona 85003-2151
(602) 322-7247

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

THE COURTROOM DEPUTY: We're on the record in civil case number CV-20-1192. Jason Fenty versus Paul Penzone. Set before the Court for a telephonic discovery hearing.

THE COURT: Mr. Ly, if you would announce.

MR. LY: Yes, Your Honor. This is Timothy Ly on behalf of the plaintiffs. I am not sure if my other colleagues are on the line. I tried to do a conference call to get them on the line. So I'm not 100 percent sure, but if they are on the line, it would be Jared Keenan, Larry Wulkan, Benjamin Sadun, Olga Akselrod. That's it.

THE COURT: All right. Thank you. Good afternoon.

MS. HESMAN: Good afternoon, Your Honor. Ashlee Hesman on behalf of defendants.

THE COURT: All right. Good afternoon. I received your email. First, let me apologize for the delay. I know you sent this earlier, but I was out of town. So I returned yesterday; we set it today. I apologize for the delay. I have no other trips planned. So any issues come up, I can address them more readily.

Let me tell you my preliminary thoughts and then I'll hear from both of you and we'll resolve the issues. The goal from the Court was always to have an email discovery that would be about 8,500 to 10,000 documents. And there now appears to be this issue regarding de-duplication and threading. Seems to me that I ought to order the threading. If, in fact, it

reduces it by 30 percent, that would be significant. The thought has been that this has already been done, but the cost of it is $1,400. I'm inclined just to have the parties split that in half. We're already spending more on attorney's fees than we are on the actual process itself. So each party would bear $700.

Regarding the privilege log, not inclined to order a privilege log. (A) They're expensive. (B) It seems to me that emails with Struck Love and defendants ought to probably be attorney-client, and going through those would be expensive. And I am glad to hear about the MCAO emails. I'm not sure why those wouldn't be presumptively attorney-client as well.

So let me hear from you, Mr. Ly, and then I'll turn to Ms. Hesman.

MR. LY: Your Honor, with respect to the issue of the threading -- sorry, excuse me -- the privilege issue, we just received an email an hour ago from defendants in which they explained that the number of documents at issue is no longer -- and, again, if I'm wrong, defense counsel can correct me. The number of documents at issue is no longer 1,049. It's only 171. And so we would maintain that, you know, under the Federal Rules of Civil Procedure, they do have an obligation to carry out privilege review in order to claim the privilege. And that allows us again to respond and determine whether or not their claims of privilege should be challenged.

THE COURT: Why would you think that emails between defendants and Struck Love would be anything other than privileged?

MR. LY: Well, we can't tell at this point in time. And we don't -- we don't know anything about the nature of the documents other than Struck Love is copied on to there. It may be the case that there are other parties that are copied who may break privilege or they may not actually be seeking legal advice. So, at this point if time, we don't have any way to tell whether or not there is a true claim of privilege.

THE COURT: Is that your assessment regarding the Maricopa County Attorney's office as well? The same analysis?

MR. LY: It is, but, again, my understanding is that, based on the email I received an hour ago from defense counsel, they are doing a privilege review on those documents. Again, we would -- I'd confirm that with defense counsel.

THE COURT: All right. Well, let me just ask you the question: Is there any reason to believe they would be something other than privileged? I know you've said, well, why don't we have them look at them and make sure they're privileged, but I have still not heard why you think an email from defendants to Struck Love would be anything other than privileged.

What type of an email would there be that would not be privileged?

MR. LY: Possibly an email in which -- again, this is not clear based on the information we currently have, but it could be an email which a third party is copied in which case there may be a break in the privilege.

THE COURT: All right. Going back to the first issue then, threading.

MR. LY: Oh, yes, Your Honor. Threading, in terms of cost, my thought, again, is that the Court's discussion last year indicated that anything below the 10,000 documents would be -- would be borne by defendants as an initial matter. And, second, to the extent that the Court is looking to do cost sharing, I don't think it's appropriate at this time, one, because we haven't discussed the issue at this point. So we would like a chance to brief the issue. And, with that said, we believe that cost sharing is also inappropriate because, though the $1,400 actually ends up saving both plaintiffs and defendants attorney time in terms of reviewing, say, 30 percent of those 10,000 documents, approximately 3,000 documents -- and, if that's the case, that's actually a cost savings by putting in $1,400 at the front end and a cost estimate savings, based on some numbers that defense counsel hasn't given us about their estimated costs of reviewing documents and the amount of time it takes to review the documents, of more than $5,000. So I'm not quite sure why the cost sharing is appropriate at this point in time.

THE COURT: All right. Any other points?

MR. LY: Again, in terms of the cost sharing, if we're going to go down that route, we would like a chance to brief partly because our clients are indigent clients and we believe the case law indicates there needs to be analysis regarding their indigent status.

THE COURT: Hold on. We're talking about a $1,400 split here. So $700 per side. We're just talking about the threading costs. The briefing alone would cost more than that.

MR. LY: Your Honor, I'm not sure about that. You may be right. As a general matter, I do think that, down the briefing route, we would like the opportunity to put into writing at least some case law that we can point to showing the indigent status should be considered in terms of determining cost sharing. Also worried about the fact that it may set a precedent that could backfire and force other indigent plaintiffs --

THE COURT: It won't; it won't. This is a one-off on this specific ruling based on the low cost of the threading.

You've suggested that this threading will reduce the amount of discovery by 30 percent. That's a significant amount. You get a benefit, if you are in fact correct, of having proved to this court that you've actually received fewer documents than you are entitled to. So I think, in that regard, since you've raised that threshold of 30 percent,

you're entitled to bear some of that cost to override the defendant's statement that they've already de-duplicated these and it's not needed. So that's why you bear the cost. It's only $700 per side. So it won't affect a future case.

We can move on from that point. Anything else, Mr. Ly?

MR. LY: That's it, Your Honor.

THE COURT: Okay, Ms. Hesman, those two issues. Your thoughts.

MS. HESMAN: Yes, thank you, Your Honor.

With respect to the privilege log, as I stated in my email and as well in the joint statement to the Court, we are only removing documents that are to or from our office, not documents where we would merely be a cc line.

Now that the universe is only 171 documents as a result of plaintiff's narrowing the search, I really don't think that it's necessary to go through simply procedural hoops of producing a privilege log when we're really trying to narrow the scope here and reduce costs for discovery that is really not necessary to prove the meat of plaintiff's claims.

THE COURT: I agree.

MS. HESMAN: Thank you. With respect to Maricopa County Attorney's Office, if the Court is inclined to rule that a privilege log is unnecessary, we would apply the same logic to Maricopa County Attorney's Office so that we could narrow

these documents even further.

With respect to threading --

THE COURT: Let me ask you about that. Are these emails to attorneys at the MCAO or are they to individuals who are involved with inmates and coordination of housing and other issues potentially?

MS. HESMAN: They are emails in which the custodian has an mcao.gov email address.

THE COURT: So let me ask you. You wouldn't have to disclose a log, but, if, in fact, there are emails to MCAO staff who are not lawyers, then it would seem that those aren't covered. You still wouldn't have to produce a log, but you could go through the MCAO emails and determine whether or not they are to lawyers. What are your thoughts on that issue?

MS. HESMAN: I agree, Your Honor. However, staff -- depending on what type of staff, if it's a paralegal, my position would still be that it's still privileged.

THE COURT: I agree.

MS. HESMAN: So it depends on what kind of staff member, what kind of role they are playing and how they're acting. Merely eliminating all of the MCAO documents was a proposal we had before plaintiffs narrowed their search to this sort of 11,000. I think we're getting in the ballpark, but the exercise of going through a privilege log, whether it be from my office or MCSO, I just don't think is a great use of

anyone's time.

THE COURT: I agree with that. I don't want to spend that money. But I'm asking you, if you could -- first, if you know the number of MCAO emails that we're talking about of this 171. And, secondly, let's say it's half, is it as easy just to look at those 85 emails and determine that 80 of them went to lawyers, so you don't have to disclose them, five of them went to people who were handling inmate transfers and those get disclosed?

MS. HESMAN: The answer is yes. The 171, Your Honor, is just emails to my office. That does not account for MCAO.

THE COURT: Oh, okay.

MS. HESMAN: So there is a separate number that would be attributed to MCAO. I am fairly confident we can filter that out and then look at the custodian names and determine are they attorneys or are they someone who -- a paralegal, and then only review the ones that don't fall into that category. I am fine with that.

THE COURT: Seems reasonable.

MS. HESMAN: That seems like a reasonable proposal to me.

With respect to the threading, Your Honor, yes, the emails have already been de-duplicated. And the Court's order from the last discovery dispute hearing stated defendants need only make reasonable efforts to avoid producing duplicate

emails. We've done that.

My concern with the threading -- I agree it is not a high cost. My concern is that plaintiffs want threading and then, when the threading produces only -- I'm just pulling a number out -- 2,000 emails, they're going to want to go back, conduct a new search and redo this process over.

THE COURT: Let's address that then. The idea here was to give them enough disclosure that they could have a universe of discovery to review. If the threading revealed that they only had 500 emails that were disclosed, then they're not really getting the discovery I had contemplated.

So do you think the threading is going to reduce this 10,000 number to a number below 8,000?

MS. HESMAN: I don't know the answer to that, Your Honor. The threading is done by a third-party vendor. It would also -- if we decide to go the threading route, it would require that this database be managed offsite rather than being managed at our office which would also incur a monthly fee. I understand that that fee is rather nominal, but we wouldn't be managing the documents at our office.

And threading is just eliminating near duplicates. It's not eliminating duplicate documents. So the search terms that they proposed and we've narrowed is giving them information that hits and is relevant to the search terms that they have proposed. I don't think that it's fair to have us go

through this entire process and then, with the threading, we start back over. And my fear is that's what's going to happen.

THE COURT: Well, it could. If the threading actually reduces from 10,000 to 500, I'd certainly -- then on board with the plaintiff's complaint that they weren't getting much disclosure. Don't you think that would be a fair concern?

MS. HESMAN: I disagree that it's a fair concern, Your Honor, because I think it's eliminating things that is relevant to them. They just want more of it.

THE COURT: I thought the idea of threading was to just eliminate duplicates that haven't already been culled.

MS. HESMAN: It's not to eliminate duplicates. It's to eliminate near duplicates. So if you forward an email and then someone else takes that email, provides some kind of analysis and forwards it, it's going to filter out those near duplicates. They -- if we just produce it as-is, they are still getting this 8,500-to-10,000 range, but what they want to do is get a sample of this and then go back and use new terms and new custodians to get additional -- an additional sample. That, I don't think, is reasonable.

THE COURT: Okay. Why is it not reasonable if they only receive 500? This is my analogy. But if they only have received 500 emails at the end of this, if they had done the threading themselves, why would that -- that's not a whole lot of discovery in a case like this.

MS. HESMAN: Because they've chosen to remove the near -- the near duplicates that would have hit and that are responsible. So then they want to go back and add new custodians and new terms to get a different type of set of data whereas that should have just been done up front. They're trying to double-dip.

THE COURT: Well, they're trying to do it up front, I think in good faith, to try to get it down to around 10,000. And what you're saying is they picked the search terms and, if the search terms they picked had 10,000 but, after threading, they're 500, then their search terms were too narrow.

I get your point, but the threading, it seems to me, could have someone say -- could have an email from one person saying "Hey, you should review this document. Send it on." The next person says "I agree. We got to send this on." Now you have four or five people all not commenting on it and just sending it on and it's the same email five times.

MS. HESMAN: Right, but the same email has already been -- we've already pulled out the same email. That's been removed. That was removed at the beginning.

They want -- our position, Your Honor, is that they want to create more work. You heard Mr. Ly concede they don't even want to pay for half of it.

THE COURT: Forget about that.

MS. HESMAN: They just want to engage in this exercise

so that when it comes back with only a few thousand or whatever -- I don't know what that number is -- and we have to incur the cost of hosting it offsite, then they want to start this process over again and get additional ESI.

THE COURT: Then I need to understand what the difference is then between threading and de-duplication. My understanding was that threading was an additional way to eliminate duplicates, was a more precise way to eliminate people forwarding duplicate emails.

MS. HESMAN: It is not going to -- true duplicates, the same email, we've already taken those off.

THE COURT: Correct.

MS. HESMAN: What it's going to eliminate is near duplicates. So if the email is substantially similar and has been forwarded on several times, despite the fact that there may be additional analysis or comment or text in that email, it's going to eliminate that. And so what they want to do is thread it so that they get a flavor of the search terms they've used to cull this down and then come back in a few months, do new search terms, new custodians, and get a flavor of that rather than just -- I'm sorry, go ahead.

THE COURT: Okay. It does seem to me still, though, that, by threading it, you are, in a way, de-duplicating. You've already de-duplicated, in one sense, that it's sent to several people, there's only one copy. But the threading,

seems to me, eliminates people forwarding the same email, and that you haven't done.

MS. HESMAN: It makes it easier for them to review. That's why they want it. I mean, when you pull it up on their screen, they're not getting a long string of forwards. They're getting one email. It makes it easier for them to review. That is why they want it.

THE COURT: That's one thing. And I thank you for having the conversation that we're talking and I appreciate that, but it does also help understand the number of basically new emails that they're reviewing. Essentially, when they thread this, we are going to see now you actually have 7,500 different emails and that we don't necessarily know now.

MS. HESMAN: We do know now that the universe that has hit, it's 11,000, they are all different emails. Every single one of them is different in some way, shape or form.

Another concern that I have is this is not going -- if this only comes back with 3,000 emails -- I have no idea what the hit is -- we're going to have to go back and run new search terms. None of that can be done on the Court's timetable.

The Court's order required us to avoid -- to make best efforts to avoid de-duplication. We have completely de-duplicated the entire universe. So we have complied with the Court's order and we are on track to produce between 8,500 and 10,000 documents to them.

What they're trying to do is start back from the beginning with get a piece of this and then do new search terms with custodians and get a piece of that, and that simply can't be done within the Court's timeframes.

THE COURT: Okay. Can you do the threading within the Court's timeframe?

MS. HESMAN: Within which timeframe? The threading -- so the Court's order lays out different timelines for production.

THE COURT: Correct.

MS. HESMAN: I don't think the threading takes that long. I don't know, as I stand here today, exactly how long the vendor has proposed that it will take. But, certainly, if they want to go back and propose new search terms and custodians, that's what's going to take longer.

THE COURT: We'll deal with that later.

MS. HESMAN: Yes, correct.

THE COURT: Okay. Any other points?

MS. HESMAN: No, Your Honor. Thank you.

THE COURT: Okay. I understand both your arguments. The goal here was to have substantial discovery within a reasonable parameter. The thought was always between around 8,000 to 10,000 documents.

There's a dispute about how much threading will reduce the universe of disclosures. We don't know that answer yet.

It could be as much as 30 percent. I don't know.

I don't want to open the door to additional searches in the future and I'm not telling you I'm going to do that now, but I do want to know how many different emails are out there. I understand the issue now. I am going to order the threading. I am going to order that the parties split the cost of the threading.

The defendants will not have to provide a privilege log, but I will order that they review the MCAO emails and, if there are emails that are clearly not privileged, they're to disclose them. They will use good faith in doing that. I'm not going to review all of those. I'm not sure that these really are all that significant regarding the issues that are brought by the plaintiffs in the case in the first place, but the whole point here was to at least allow some discovery to see what these emails might show. Each party has made its point clearly, but I want to understand what plaintiffs are receiving, and so I think the threading is appropriate.

I think defendants have a good point that the de-duplication efforts that have been done have complied with the Court orders. They certainly have, but it does seem to me that, if the threading somehow reduced these emails by 80 percent, which is unlikely, that is something I would want to know. And if I have to, we'll talk more.

I think the parties have acted generally in good faith

at least in these discussions, leaving aside the prior discussions. I'm trying to resolve the issue, and I am not necessarily inclined to re-opening this whole process, but at least then we'll have the answer. And this is a significant case. There are a lot of allegations, large. So I don't think that this undue burden for either party and the cost of the threading is low. So, again, the threading will be done. The parties will split the cost of the threading. There will be no privileged log, but defendants will review the MCAO emails and any non-lawyer emails will be reviewed for privilege and disclosed if, after a good faith review, there's no privilege determination by defendants.

All right. Mr. Ly, anything else to address today?

MR. LY: No, Your Honor. Thank you so much. Appreciate it.

THE COURT: Do we need to talk about deadlines now or is this something you all can resolve?

Mr. Ly, do you need a deadline? I think the Court already set its original ones.

MR. LY: Yes. I think Your Honor set an original one. I believe it's August 23rd for the first third of the production; is that what you are referring to, Your Honor?

THE COURT: Right. Any requests from you regarding that?

MR. LY: Not at this time assuming that defendants can

meet that timeline.

THE COURT: Ms. Hesman, really, this falls on you, right? You have more of the work to do than plaintiffs. If you need additional time, you can contact the Court. I'll likely grant you several days if you need it.

At this point, do you think you need more time?

MS. HESMAN: I don't, Your Honor. And I'm certainly happy to provide both plaintiffs and the Court, if the Court is interested, in the timeframe it would take to conduct the threading and the number of documents that threading reduces the count by. At a minimum, I can email Mr. Ly with that number.

THE COURT: I don't need it.

MS. HESMAN: Okay.

THE COURT: If there's a further issue, we'll resolve it and we'll do it promptly. And if you need more time because of issues you haven't thought of, let me know. I'm glad to extend them as needed within reason.

Okay. Ms. Hesman, anything else to discuss today?

MS. HESMAN: No, Your Honor. Thank you.

THE COURT: Okay. Mr. Ly, thank you. You can go ahead and hang up now, and we are adjourned.

MS. HESMAN: Thank you.

MR. LY: Thank you.

(Proceedings adjourned at 3:54 p.m.)

C E R T I F I C A T E

I, BARBARA H. STOCKFORD, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 16th day of August 2021.

s/Barbara H. Stockford
Barbara H. Stockford

# EXHIBIT 4

**DECLARATION OF DOUGLAS CROUGH IN SUPPORT OF OBJECTION**

I, Douglas Crough, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1. I am currently detained at Arizona State Prison Tucson in Pima County, Arizona.

2. I was detained at Maricopa County Jail from February through November of 2020. I was held on a $500 bond, which I could not afford to pay until November of 2020, when a friend posted my bond.

3. When I was detained at Maricopa County Jail, I was mostly held in the infirmary and did not have a job or any other income.

4. I was sentenced in April of 2021. As part of this sentence, I was ordered to pay about $2,700 in fines and fees. I will also need to pay community supervision fees when I am released.

5. At Arizona State Prison Tucson, I work as a porter. I make 25 cents per hour in this job. I have been working in this job for almost two weeks. I work four hours per day, seven days per week. I have no other income currently. The prison takes out a gate fee from my income, and I have used the rest of my income to pay for soap, shampoo, and toothpaste.

6. I would not be able to pay any costs related to litigation in *Fenty v. Penzone*.

I, Jared G. Keenan, certify that I reviewed the information contained in this declaration with Douglas Crough by telephone on August 25, 2021, and that he certified that the information contained in this declaration was true and correct to the best of his knowledge.

Executed this 25th day of August, 2021.

/s/ Jared G. Keenan

# EXHIBIT 5

**DECLARATION OF EDWARD REASON IN SUPPORT OF OBJECTION**

I, Edward Reason, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1. I am currently detained at Arizona State Prison Kingman in Mojave County, Arizona.

2. When I was detained at Maricopa County Jail, I worked in the kitchen for around two months. I had no other income when I was detained at the Maricopa County Jail.

3. At Arizona State Prison Kingman, I work in the kitchen. I make 25 cents per hour in this job. I have been working in this job for almost a month. I have no other income currently.

4. I would not be able to pay any costs related to litigation in *Fenty v. Penzone*.

I, Kyle A. Virgien, certify that I reviewed the information contained in this declaration with Edward T. Reason by telephone on August 24, 2021, and that he certified that the information contained in this declaration was true and correct to the best of his knowledge.

Executed this 24th day of August, 2021.

/s/ Kyle Virgien

# EXHIBIT 6

**DECLARATION OF ANTHONY SCROGGINS IN SUPPORT OF OBJECTION**

I, Anthony Scroggins, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1. I am currently detained at the 4th Avenue Jail in Maricopa County, Arizona.

2. I have been held in the Maricopa County Jails since December 2019 because I cannot afford to bond out.

3. I do not have a job at the Maricopa County Jail. I do not have any income.

4. I would not be able to pay any costs related to litigation in *Fenty v. Penzone*.

I, Jared G. Keenan, certify that I reviewed the information contained in this declaration with Anthony Scroggins by telephone on August 25, 2021, and that he certified that the information contained in this declaration was true and correct to the best of his knowledge.

Executed this 25th day of August, 2021.

/s/ Jared G. Keenan

# EXHIBIT 7

**DECLARATION OF BRIAN STEPTER IN SUPPORT OF OBJECTION**

I, Brian Stepter, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1. I am currently detained at the Watkins Jail in Maricopa County, Arizona. I have been detained by Maricopa County since September 18, 2019.

2. I currently have no source of income. Prior to my incarceration, I received Supplemental Security Income ("SSI") due to my disability. SSI was my sole source of income. My SSI was cut off due to my incarceration.

3. As a result of my lack of income, I have not paid any court or litigation expenses. My family and friends pay for my phone calls and sometimes pay for my commissary, but I do not have money to pay for them myself.

4. I would be unable to pay any costs related to litigation in Fenty v. Penzone.

I, Olga Akselrod, certify that I reviewed the information contained in this declaration with Brian Stepter through a video visit on August 25, 2021, and that he certified that the information contained in this declaration was true and correct.

Executed this 25th day of August, 2021.

/s/ Olga Akselrod

# EXHIBIT 8

# DECLARATION OF JOVANA RENTERIA IN SUPPORT OF OBJECTION

I, Jovana Renteria, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1. I am the Co-Executive Director of Puente Human Rights Movement ("Puente"), a grassroots nonprofit membership organization based in Phoenix, Arizona.

2. Puente has an annual operating budget of $1.2 million. This budget includes grants and donations from individual donors that are earmarked for a specific goal or program. For example, one grant specifies that the funding it provides must be used for youth, and another specifies that the funding it provides must be used for awareness related to COVID-19 and vaccines. This earmarked funding cannot be used to pay costs related to litigation that Puente pursues.

3. Puente organizes with a Closed Hand/Open Hand philosophy. The Closed Hand portion of our work stands against harmful laws and policies through direct action, civic engagement, education, advocacy, and civil disobedience. This lawsuit is part of this Closed Hand strategy.

4. The Open Hand portion of our work involves serving, building, and healing our community. Through this work, we provide a space for community members to come together as one people, despite legal status and past criminal conviction. Part of this work has included a campaign to support people incarcerated in the Maricopa County jails. This work also includes a clinic providing free legal services on immigration and criminal cases, women's workshops, the Puente Human Rights Center, a food bank, a community garden and education program, an educational program, an internship program, youth workshops, a community art collective, and a traditional Aztec dance collective.

5. If Puente must pay costs related to the *Fenty v. Penzone* litigation, we would need to divert funding from its other work to pay those costs. This would diminish our ability to pay for our important Open Hand community work.

Executed this 25th day of August, 2021.

Jovana Renteria
Co-Executive Director
Puente Human Rights Movement

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Jason Fenty, et al.,

Plaintiffs,

v.

Paul Penzone, et al.,

Defendants.

No. CV-20-01192-PHX-SPL (JZB)

**ORDER**

On August 10, 2021, the parties appeared before the Court for a telephonic discovery dispute hearing. (Doc. 121.) At issue is a subset of approximately 11,000 to 12,000 emails responsive to narrowed-discovery search terms crafted by the parties in compliance with the Court's July 22, 2021 Order. (*See* Doc. 111.) Specifically, Plaintiffs seek to have the responsive subset of emails "threaded" to further de-duplicate the results, and seeks a privilege log for emails sent or received from both Defendants' counsel's law firm, Struck Love Bojanowski & Acedo PLC, and the Maricopa County Attorney's Office. Defendants oppose Plaintiffs' requests.

After discussion with the parties at the hearing, the Court directed on the record that the discovery proceed as follows.

**IT IS ORDERED**:

1. Defendants shall conduct threading of the responsive emails as discussed at the hearing.

2. The parties shall evenly split the cost of threading the responsive emails (estimated to be $1400).

3. Defendants are not required to create and produce a privilege log for emails sent to or received by Struck Love Bojanowski & Acedo PLC, or the Maricopa County Attorney's Office.

4. Defendants shall in good faith review the responsive emails to or from Maricopa County Attorney's Office domains and disclose any non-privileged emails to Plaintiffs.

Dated this 10th day of August, 2021.

Honorable John Z. Boyle
United States Magistrate Judge

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Jason Fenty, et al.,

Plaintiffs,

v.

Paul Penzone, et al.,

Defendants.

No. CV-20-01192-PHX-SPL (JZB)

**ORDER**

On July 22, 2021, the parties appeared before the Court for a telephonic discovery dispute hearing. (Doc. 110.) Broadly stated, there are two disputes at issue.

(1) Plaintiffs want Defendants to produce various Electronically Stored Information (ESI) pursuant to Plaintiffs' February 3, 2021 Request for Production. Defendants argue Plaintiffs' requests are overbroad, burdensome, and not proportional.

(2) Defendants argue that Plaintiffs provided deficient answers and responses to Defendants' First and Second Requests for Production, and First Set of Interrogatories. Defendants seek to compel Plaintiffs to supplement those deficient answers and responses.

Based on discussions held at the hearing, the Court enters the following Order.

**IT IS ORDERED**:

1. Defendants shall produce to Plaintiffs a limited amount of ESI discovery, not to exceed 10,000 responsive documents and emails.

a. On or before **July 23, 2021**, the parties shall meet and confer to

develop narrowed search terms and criterion sufficient to comply with this Order.

b. On or before **July 29, 2021**, Defendants shall provide Plaintiffs with the updated vendor analysis of the responsive ESI based on the parties newly developed search terms and criterion.

c. On or before **August 23, 2021**, Defendants shall produce to Plaintiffs no less than one-third of the responsive ESI outlined in the updated vendor report.

d. On or before **September 13, 2021**, Defendants shall produce to Plaintiffs the entire[1] amount of responsive ESI outlined in the updated vendor report.

e. Defendants shall engage in best efforts to avoid production of duplicate documents and emails.

2. On or before **July 28, 2021**, the parties shall contact the Court's Staff to schedule a hearing on Defendants' request to compel Plaintiffs to provide supplemental discovery responses.

3. On or before **August 6, 2021**, the parties shall submit a joint report via email[2] to the Court summarizing their respective positions on Defendants' requests for supplemental responses.

a. Therein, Defendants shall list each request or interrogatory at issue,[3] provide the basis for their objection to Plaintiffs' answer or response, and detail the relief sought from the Court. Plaintiffs shall provide their response to each of Defendants' requests and arguments.

//

//

//

//

---

[1] Only if responsive ESI to the new search terms does not exceed the limit set by the Court. In the event the updated vendor report shows that responsive ESI to the new search terms exceeds the Court's limit, the parties must meet and confer to further narrow their search terms to ensure compliance with this Order.

[2] The parties shall send their joint summary to boyle_chambers@azd.uscourts.gov and travis_wheeler@azd.uscourts.gov.

[3] In their joint report, the parties may attach and cite to "Exhibit I," which the parties' provided to the Court prior to the July 22, 2021 hearing.

b. The Court emphasizes that the joint report is to contain a **brief discussion** of the requests and interrogatories at issue – typically no longer than two or three sentences from each party on each objected request or interrogatory – to guide discussion at the next hearing. The parties are encouraged to exercise restraint.

Dated this 22nd day of July, 2021.

Honorable John Z. Boyle
United States Magistrate Judge

# EXHIBIT 11

MGD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Jason Fenty, et al.,

Plaintiff,

v.

Paul Penzone, et al.,

Defendants.

No. CV 20-01192-PHX-SPL (JZB)

**ORDER**

On June 16, 2020, Plaintiffs/Petitioners Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Avenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa, who are each confined in a Maricopa County Jail, and the Puente Human Rights Movement (hereafter, "Plaintiffs"), filed a "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief" (hereafter, "Complaint"). (Doc. 1.) Pending before the Court is Plaintiffs' Ex Parte Application for Temporary Restraining Order (TRO) (Doc. 14), which the Court has construed as a request for injunctive relief. Also pending is Defendants/Respondents' (hereafter, "Defendants") Motion to Dismiss filed as part of their Response to Plaintiffs' request for injunctive relief. (Doc. 32.)

**I. Complaint**

Plaintiffs allege in their Complaint that six of them have underlying medical conditions that make them vulnerable to severe adverse consequences if they contract COVID-19 while in jail and that one Plaintiff has contracted COVID-19 but has received

inadequate medical care.[1] (Doc. 1.) Plaintiffs bring this case as a putative class action on behalf of two proposed classes: (1) a Pretrial Class, which includes a Pretrial Medically Vulnerable subclass and a Pretrial Disability subclass; and (2) a Post-Conviction Class, which includes a Post-Conviction Medically Vulnerable subclass and a Post-Conviction Disability subclass.[2] (*Id.* ¶¶ 22-31.)

Six Plaintiffs—Jason Fenty, Dale Perez, Anthony Scroggins, Brian Stepter, Douglas Crough, and Tamara Ochoa—are pretrial detainees seeking to represent the Pretrial Class and several of them seek to represent the Pretrial Medically Vulnerable subclass, which is defined as all current and future detainees who are 50 years or older and those of any age with conditions that place them at heightened risk of severe illness or death from COVID-19, such as lung disease, heart disease, chronic liver or kidney disease, diabetes, hypertension, compromised immune systems, developmental disability, severe obesity, and moderate to severe asthma. (*Id.* ¶¶ 23-26.) In addition, Fenty, Stepter, Crough, and Scroggins also seek to represent the Pretrial Disability subclass because all are over 50 years old and have disabilities that put them at increased risk of serious illness or death if they contract COVID-19.[3] (*Id.* ¶¶ 25-26.) Three Plaintiffs—Edward Reason, Jesus Tequida, and Ramon Aveneti—are post-conviction prisoners and seek to represent the Post-Conviction Class, with Reason and Tequida seeking to represent both the Post-Conviction Medically Vulnerable subclass and the Post-Conviction Disability subclass.[4]

---

[1] COVID-19, a disease caused by a novel strain of coronavirus (SARS-CoV-2), was declared a global pandemic by the World Health Organization on March 11, 2020. *See Timeline: WHO's COVID-19 response*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline#! (last accessed Aug. 4, 2020).

[2] Plaintiffs' Motion to Certify Class (Doc. 11) is also pending before the Court and will be addressed in a separate Order.

[3] Fenty is 48 years-old and has stage 2 hypertension, chest pain, PTSD, and adjustment disorder with anxiety. (Doc. 1 ¶ 9.) Stepter is 61 years-old and has chronic respiratory problems that require oxygen to clear his lungs and high blood pressure requiring medication. (*Id.* ¶ 10.) Crough is 55 years-old and has a heart condition, chronic obstructive pulmonary disease (COPD), hepatitis, and chest pain caused by stable angina. (*Id.* ¶ 11.) Scroggins is 44 years-old and suffers asthma and schizophrenia. (*Id.* ¶ 15.)

[4] Reason is 62 years-old and has severe asthma. (Doc. 1 ¶ 12.) Tequida is 64 years-old and has high blood pressure, kidney failure, cardiomyopathy, cardiomegaly, heart

(*Id.* ¶¶ 27-30.) Plaintiff Puente Human Rights Movement ("Puente") is a grassroots nonprofit organization based in Phoenix, Arizona, that has launched a public campaign "to support incarcerated people at the Maricopa County jails and raise public awareness about COVID-19 for incarcerated people and their families." (*Id.* ¶ 18.) Puente seeks declaratory and injunctive relief in this case to protect the rights of people incarcerated in the Maricopa County jails. (*Id.*)

Plaintiffs allege that there has been an explosion of COVID-19 cases in the Maricopa County Jails and Defendants have failed to provide, among other things: adequate COVID-19 testing or screening of newly booked detainees; adequate COVID-19 testing or screening of prisoners with symptoms or those exposed to someone known or suspected of having COVID-19; proper cohorting and quarantine; adequate protections for medically vulnerable and disabled prisoners; adequate social distancing; adequate cleaning, hygiene, and decontamination procedures; adequate personal protective equipment (PPE); and timely and adequate prisoner education about COVID-19 and prevention methods. (*Id.* ¶ ¶ 63-158.)

Plaintiffs assert the following claims:

- Counts One, Three and Five assert Fourteenth Amendment conditions-of-confinement claims on behalf of Puente and the Pretrial detainees pursuant to 42 U.S.C. § 1983. (*Id.* ¶¶ 159-168, 178-80, 189-194.)

- Count Two asserts an Eighth Amendment conditions of confinement claim on behalf of the Post-Conviction prisoners pursuant to 42 U.S.C. § 1983. (*Id.* ¶¶ 169-177.)

- Count Four seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on behalf of Fenty, Stepter, Crough, and Scroggins from the Pretrial Medically Vulnerable subclass for their release or "enlargement." (*Id.* ¶¶ 181-188.)

- Counts Six and Seven assert claims under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the

---

failure, hepatitis, and liver and prostate problems. (*Id.* ¶ 13.)

Rehabilitation Act (RA) on behalf of the Pretrial and Post-Conviction Disability subclasses and Puente. (*Id.* ¶¶ 195-215.)

Plaintiffs seek declaratory and injunctive relief and/or writs of habeas corpus requiring Maricopa County Jails to release the Pretrial Medically Vulnerable and Disability Subclass members who are incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to, and a process for considering the release or enlargement of the remaining members of those subclasses; and injunctive relief "to abate the risk of the spread of COVID-19" and to provide for the release of information regarding the ongoing COVID-19 outbreak at the Maricopa County jails, among other measures. (*Id.* at 47-50.)

Upon screening, the Court ordered service and required Defendants Maricopa County and Maricopa County Sheriff Paul Penzone, in his official capacity, to answer the Complaint. (Doc. 5.)

Following screening, Plaintiffs filed their Ex Parte Application for TRO. (Doc. 14.) In an Order dated July 2, 2020, the Court found that Plaintiffs had not demonstrated that they will suffer irreparable injury before Defendants can be heard in opposition and thus failed to meet their burden of demonstrating they were entitled to immediate ex parte injunctive relief. (Doc. 15 at 3.) The Court therefore construed Plaintiff's Ex Parte Application for TRO as a motion for injunctive relief and set an expedited briefing schedule. (*Id.*)

**II. Motion to Dismiss**

Defendants argue in their Motion to Dismiss that Defendant Penzone should be dismissed; Plaintiff Reason's claims are moot; Plaintiff Puente lacks standing; no Plaintiff has standing to pursue ADA or RA claims at the Towers, Estrella or 1280 Jails; no Plaintiff has standing to pursue constitutional claims at the 1280 Jail; and the Post-Conviction Plaintiffs lack standing to pursue constitutional claims at Towers and Estrella Jails. (Doc. 28 at 52.) Defendants also appear to move for dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' factual allegations fall short of establishing

punitive intent, deliberate indifference, or reckless disregard, and fail to demonstrate disability-based discrimination. (*Id.*) And, Defendants argue that Plaintiffs have failed to exhaust their state-court and administrative remedies. (*Id.* at 21-26.)

**A. Sufficiency of the Allegations**

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In deciding a Rule 12(b)(6) motion, the court takes all allegations of material fact as true and construes them in the light most favorable to the nonmoving party. *Marcus v. Holder*, 574 F.3d 1182, 1184 (9th Cir. 2009). The court will "presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (quotation omitted).

A Rule 12(b)(6) motion to dismiss is almost never an appropriate response when the Court has already screened a prisoner complaint pursuant to 28 U.S.C. § 1915A(b) and directed the defendants to respond. The standard for dismissal under Rule 12(b)(6) is identical to the standard under 28 U.S.C. § 1915A(b) ("fail[ure] to state a claim upon which relief may be granted"). After the Court has screened a prisoner complaint pursuant to § 1915A(b), a Rule 12(b)(6) motion to dismiss should be granted only if the defendants can convince the Court that reconsideration is appropriate. When the challenged order is not a final judgment or appealable interlocutory order, the Court will grant a motion for reconsideration if:

> (1) There are material differences in fact or law from that presented to the Court and, at the time of the Court's decision, the party moving for reconsideration could not have known of the factual or legal differences through reasonable diligence;
>
> (2) There are new material facts that happened *after* the Court's decision;
>
> (3) There has been a change in the law that was decided or enacted *after* the Court's decision; or

> (4) The movant makes a convincing showing that the Court failed to consider material facts that were presented to the Court before the Court's decision.
>
> No motion for reconsideration shall repeat in any manner any oral or written argument made in support of or in opposition to the original motion.

*Motorola, Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 586 (D. Ariz. 2003).

As noted, the Court screened the Complaint and determined that Plaintiff's allegations sufficiently stated claims for relief against Defendants. (Doc. 5.) Defendants present nothing that warrants reconsideration of the Screening Order. Accordingly, dismissal under Rule 12(b)(6) is not appropriate, and the Court will deny Defendants' Motion to Dismiss on this basis.

**B. Exhaustion under the PLRA**

Under the PLRA, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934–35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The "failure to exhaust is an affirmative defense under the PLRA, . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). In a limited number of cases, the failure to exhaust may be clear from the face of the complaint; however, "such cases will be rare because a plaintiff is not required to say anything about exhaustion in his complaint." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014); *see Jones v. Bock*, 549 U.S. 199, 216 (2007) (failure to exhaust is an affirmative defense and a prisoner is not required to plead or demonstrate exhaustion in the complaint). In the rare case where failure to exhaust is clear from the

face of the complaint, the defendant may move to dismiss under Rule 12(b)(6). *Albino*, 747 F.3d at 1169. To properly be considered on a Rule 12(b)(6) motion, the nonexhaustion defense must raise no disputed issues of fact. *See Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (affirmative defense may be raised by motion to dismiss only if "the defense raises no disputed issues of fact"). Typically, to show that a prisoner has failed to exhaust remedies, a defendant will have to present probative evidence on a motion for summary judgment under Rule 56. *Albino*, 747 F.3d at 1169.

Here, the Court cannot conclude from the face of the Complaint that administrative remedies were made available to Plaintiffs and that they failed to exhaust those remedies. In support of their Motion, Defendants have included several grievances Plaintiffs filed while in MCSO custody, a copy of the MCSO Rules and Regulations for Inmates, a copy of the MCSO Inmate Grievance Procedure, and a signed declaration from MCSO Commander/Executive Lieutenant B. Williams attesting to MCSO's grievance procedures and Plaintiffs' grievance histories. (Doc. 30.) Defendants argue that these exhibits show that Plaintiffs did not fully exhaust their claims prior to filing their Complaint. But if the Court considers these documents, which are not incorporated by the Complaint, it is going beyond the face of the Complaint to determine whether Plaintiffs properly exhausted their claims. This is not permitted on a Rule 12(b)(6) motion for non-exhaustion. *See Albino*, 747 F.3d at 1169. At this early stage of the litigation, the Court declines to convert Defendants' Motion to Dismiss into a summary judgment motion.

For the above reasons, this is not one of "those rare cases where a failure to exhaust is clear from the face of the complaint." *Id*. Accordingly, Defendants' Motion to Dismiss based on failure to exhaust will be denied. Defendants may renew their exhaustion argument in a properly supported summary judgment motion.

**C. Defendant Penzone**

Defendants argue that Penzone should be dismissed because the official capacity claims against him are duplicative of the policy or practice claims against Maricopa County. (Doc. 28 at 36.) Plaintiffs respond that to the extent the County is acknowledging

that it is a proper Defendant for Plaintiffs' municipal liability claims, they agree that the Court may dismiss Penzone as a Defendant for the conditions of confinement claims but that Penzone is a necessary party for Plaintiff's habeas claim, which Defendants conceded in their Response. (Doc. 42 at 4, citing Doc. 32 at 2 n.2 ("The proper Respondent for purposes of Petitioners' Habeas Petition is Sheriff Penzone . . . .").)

Based on these averments, the Court will dismiss Penzone as to Plaintiff's Eighth and Fourteenth Amendment conditions-of-confinement claims only.

**D. Plaintiff Reason**

Defendants argue that Plaintiff Reason's claims are moot because he was released from custody on July 11, 2020. (Doc. 28 at 36.) Plaintiffs agree that Reason's individual claims are moot, but argue that has no effect on the viability of his claims for the class as a whole, on any other Plaintiff individually, or as a class representative. (Doc. 42 at 3 n.1.)

The Court will deny Defendants' motion to dismiss Reason at this time because the Court has not yet ruled on the motion for class certification and "mooting the putative class representative's claims will not necessarily moot the class action." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011).

**E. Plaintiff Puente**

Defendants argue that Puente lacks standing in its own right as an organization because it does not claim it was deprived of any personal right guaranteed by the Fourteenth and Eighth Amendments and the ADA/RA with respect to jail conditions and that prudential limitations bar Puente's ability to directly sue in their own right for the alleged injuries of third parties. (Doc. 28 at 32.) Defendants also contend that Puente cannot establish direct standing because it has failed to show that the conditions of confinement and alleged ADA/RA discrimination impaired its organizational purpose, that its primary purpose is promoting the healthcare of inmates or other confinement conditions in jails or accommodating inmates with disabilities, and because Puente cannot manufacture its own injuries. (*Id*. at 33-34.)

Plaintiffs respond that Puente has both organizational and associational standing. (Doc. 42 at 7.) Plaintiffs assert that Puente has organizational standing based on its allegations that Puente diverted resources away from other programming in order to raise public awareness about COVID-19 in Maricopa County jails, that its mission involves educating, advocating for, and empowering immigrants, including those who are incarcerated, and that the immigrant community it serves is impacted by the spread of COVID-19 in the Maricopa County jails. (*Id*. at 8.) Plaintiffs also argue that Puente has associational standing based on its allegations that some of Puente's members have family who are incarcerated in the Maricopa County jails and the family members can bring habeas claims.

A "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—" is sufficient to confer direct (i.e., organizational) standing on an organization. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the [effects of the particular law] in question." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.2002)). An organization cannot, however, "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) (citation and internal quotation omitted).

In this case, the Complaint alleges that Puente's membership is made up of "hundreds of individuals across Arizona, including undocumented and mixed status immigrant households, [and] people who have been incarcerated as well as their impacted families, and youth members." (Doc. 1 ¶ 18.) In addition to developing, educating, and empowering immigrant communities, Puente also conducts programs and advocacy on

behalf of detained people across Arizona. (*Id.*) Plaintiffs allege that "[a]s a result of Defendants' failure to adequately protect individuals incarcerated at the Maricopa County jails from the dangers of COVID-19, Puente has launched a full-fledged public campaign to support incarcerated people at the Maricopa County jails and raise public awareness about COVID-19 for incarcerated people and their families." (*Id.*) To do so, Puente alleges that "[t]his effort has come at the expense of other programming, requiring Puente to divert resources to this campaign while scaling down other campaigns," including by "setting up a hotline to monitor conditions inside of the jails and respond to the concerns of incarcerated people and their families, organizing regular protests, creating petitions, drafting letters to public officials, and producing communications materials." (*Id.*)

These allegations are sufficient to support that Puente has suffered injury in fact such that Puente has standing in its own right. *See E. Bay Sanctuary Covenant v. Barr*, 950 F.3d 1242, 1265 (9th Cir. 2020) ("We have read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.")

Accordingly, the Court will deny Defendants' motion to dismiss Puente for lack of standing.

**F. Standing Regarding Conditions at Towers, Estrella or 1280 Jails**

Defendants argue that the Pretrial Plaintiffs lack standing to challenge the conditions at the 1280 Jail because no Pretrial Plaintiff is incarcerated at the 1280 Jail and the Post-Conviction Plaintiffs lack standing to challenge the conditions at the Towers and Estrella Jails because no Post-Conviction Plaintiffs are incarcerated in those jails. (Doc. 28 at 31-32.) Defendants therefore argue that the ADA/RA claims should be dismissed with respect to the conditions at all three jails, the Fourteenth Amendment claims should be dismissed with respect to the 1280 Jail, and the Eighth Amendment claims should be dismissed with respect to the Towers and Estrella Jails. (*Id.* at 32.)

Plaintiffs respond that Defendants have failed to account for the fact that detention officers and incarcerated persons move between the jails. (Doc. 42 at 5.) Plaintiffs cite to

the Declarations of Fenty, Aveneneti, Boykins, Lewis, Ochoa, Perez, Stepter, who describe the fluidity of their housing and contacts with detainees/prisoners from other jails. For example, Plaintiff Fenty describes being moved from the Towers Jail to medical isolation at the Fourth Avenue Jail and that, during the transport, people were picked up from the Lower Buckeye and 1280 Jails for nightly cleaning shifts at the Fourth Avenue Jail. (*Id.*) Plaintiff Aveneneti was also moved from Towers Jail to the Fourth Avenue Jail where he was in medical isolation with people from the 1280 and the Lower Buckeye Jails. (*Id.*) Plaintiff Boykins was held in a crowded waiting room at a courthouse with people from other facilities and no ability to remain six feet away from anybody. (*Id.*) Plaintiff Ochoa describes people housed at Estrella Jail being taken to the Fourth Avenue Jail for rebooking and then returned the following day to Estrella Jail. (*Id.*) Plaintiff Perez explains that meals at the Towers Jail are served by trustees from the 1280 Jail. (*Id.*) Plaintiff Stepter describes being transported in a crowded van from the Towers Jail to the Lower Buckeye Jail in mid-May, dropping off some prisoners at the Durango Jail, and that none of the prisoners had masks or their temperatures checked and some were coughing. (*Id.* at 5-6.)

Plaintiffs also argue that whether Plaintiffs in certain classes are housed at a particular jail is immaterial because Plaintiffs are alleging statutory and constitutional violations and injury across all facilities. (*Id.* at 6.) And they contend that Defendants confuse standing and class certification, and that an alleged dissimilarity between the claims of named and unnamed plaintiffs is not a question of standing, but of class certification. (*Id.* at 6-7.)

In this case, Plaintiffs' claims are not about the specific facilities where each is housed, but about Defendants' policies and practices with respect to COVID-19 at all Maricopa County jails. Moreover, because of the high turnover at the jails and the movement between jail facilities, it would be unreasonable to limit Plaintiffs' claims to a specific facility when all facilities are subject to the same policies and practices. Finally, to the extent Defendants are arguing that the named Plaintiffs are not proper class representatives, they may make that argument in their Response to Plaintiffs' Motion for

Class Certification. Accordingly, the Court will deny Defendants' Motion to Dismiss on this basis.

### G. Exhaustion of State Court Remedies

#### 1. Post-Conviction Plaintiffs

Defendants argue that Post-Conviction Plaintiffs Reason, Tequida, and Aveneti may only bring a habeas action pursuant to 28 U.S.C. § 2254, not § 2241, and that a § 2254 petition may not be granted unless it appears that the applicant "has exhausted the remedies available in the courts of the State." (Doc. 28 at 21 (quoting 28 U.S.C. §§ 2254(b)(1)(A), and 2254 (c)).)

Only Count Four of the Complaint seeks a writ of habeas corpus and that is pursuant to 28 U.S.C. § 2241 on behalf of Pretrial Plaintiffs Fenty, Stepter, Crough, and Scroggins from the Pretrial Medically Vulnerable subclass. (Doc. 1 ¶¶ 181-188.) Because Plaintiffs are not seeking habeas relief on behalf of the Post-Conviction Plaintiffs, Defendants' argument is without merit and the Court will deny the motion to dismiss on this basis.

#### 2. Pretrial Plaintiffs

Defendants argue that while the Pretrial Plaintiffs may seek habeas relief under 28 U.S.C. § 2241, they did not exhaust their state-court remedies prior to filing their request for habeas relief in this Court, which bars their petition. (Doc. 28 at 22.) They argue that while pretrial detainees may seek to modify their release conditions, none of the Pretrial Plaintiffs in this action have exhausted their claims through this state-court remedy. (*Id.* (citing Arizona Rule of Criminal Procedure 7.2 and Ariz. Rev. Stat. § 13-3967).) Defendants further argue that none of the narrow exceptions to the *Younger* abstention doctrine apply here and this Court must therefore abstain from interfering with the Pretrial Plaintiffs pending criminal proceedings in state court. (*Id.* at 23-24.)

Plaintiffs respond that courts have discretion to waive compliance with the exhaustion process when administrative remedies would be inadequate, futile, or pursuit of those remedies would cause irreparable injury. (Doc. 40 at 31-32 (citing *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012).)) Plaintiffs argue that any delay in judicial

review would clearly result in irreparable injury to the medically vulnerable prisoners who are at high risk of serious illness or death should they contract COVID-19 in the jails where cases are rising exponentially. (*Id*. (citing *McPherson v. Lamont*, 2020 WL 2198279, at *7 (D. Conn. May 6, 2020).))

Challenges to pretrial incarceration may be properly brought pursuant to 28 U.S.C. § 2241. *McNeeley v. Blanas*, 336 F.3d 822, 824 n.1 (9th Cir. 2003). Section 2241(c)(3) provides that "the writ of habeas corpus [extends to persons who are] . . . in custody in violation of the Constitution or laws or treaties of the United States . . . ." "As an exercise of judicial restraint, however, federal courts elect not to entertain habeas corpus challenges to state court proceedings until habeas petitioners have exhausted state avenues for raising [a] federal claim." *Carden v. Montana*, 626 F.2d 82, 83 (9th Cir. 1980). Nevertheless, "[t]his exhaustion requirement is subject to waiver in § 2241 cases because it is not a 'jurisdictional prerequisite.'" *Ward*, 678 F.3d at 1045 (quoting *Castro-Cortez v. INS*, 239 F.3d 1036, 1047); *see also Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) ("The exhaustion requirement is prudential, rather than jurisdictional, for habeas claims."). And, exhaustion can be waived "if pursuing those [administrative] remedies would be futile." *Ward*, 678 F.3d at 1045 (quoting *Fraley v. U.S. Bureau of Prisons*, 1 F.3d 924, 925 (9th Cir. 1998)). The court may require prudential exhaustion when:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Hernandez*, 872 F.3d at 988 (quoting *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (citations omitted).)

In this case, exhaustion under § 2241 is not necessary because the constitutional claims Plaintiffs present do not require development of an administrative record, waiver of exhaustion in this extraordinary circumstance of a pandemic would not encourage future habeas petitioners to bypass the administrative scheme, and administrative review of

Plaintiffs' claims would be futile because of the length of time it would take to complete the process in the state courts.

While the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971) ordinarily prevents a federal court in most circumstances from directly interfering with ongoing criminal proceedings in state court, a federal court may entertain a pretrial habeas corpus petition in certain "extraordinary circumstances where irreparable injury can be shown." *Carden*, 626 F.2d at 84 (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)).

In this case, the Court finds that the pandemic and the possibility of irreparable harm to the medically vulnerable Pretrial Plaintiffs who are at high risk of contracting and dying from COVID-19 is an extraordinary circumstance potentially warranting this Court's intervention. Accordingly, the Court will deny Defendants' Motion to Dismiss on this basis.

## III. Motion for Preliminary Injunction

### A. COVID-19

Because of the rapidly changing nature of the COVID-19 pandemic, the Court will set forth what is currently known about the situation. As of August 6, 2020, 4,870,367 individuals have been confirmed as positive for COVID-19 in the United States, of which 159,864 have died.[5] In Arizona, 182,203 confirmed positive cases have been identified, of which 3,932 have died.[6] As of August 6, 2020, 1,420 positive cases have been identified in Maricopa County Jails out of 6,046 tests, with 322 cases awaiting results, one hospitalization, and no reported deaths.[7]

The United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") reports that individuals who contract and transmit COVID-19 experience symptoms that range from negligible, with some individuals

---

[5] *Coronavirus Resource Center*: *COVID-19 Dashboard*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu (last accessed Aug. 6, 2020).

[6] *Id.*

[7] Maricopa County, *COVID- 19 In County Jails* https://www.maricopa.gov/5574/COVID-19-in-County-Jails (last accessed Aug. 3, 2020). When Plaintiffs filed their motion on June 30, 2020, there were 565 positive cases identified. (Doc. 14 at 9.)

remaining entirely asymptomatic, to mild, such as fever, coughing, headache, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock, and multi-organ failure, or even death.[8] The risk of suffering severe illness or death from COVID-19 increases with age with older adults at greatest risk.[9] In addition, individuals of any age with underlying medical conditions including cancer, chronic obstructive pulmonary disease, an immunocompromised state, obesity, a serious heart condition such as heart failure, coronary artery disease, or cardiomyopathies, sickle cell disease, and Type II diabetes mellitus are at an increased risk for severe illness, and individuals with other conditions such as moderate to severe asthma, hypertension, liver disease, pulmonary fibrosis, Type 1 diabetes mellitus, cerebrovascular disease, neurologic conditions such as dementia, pregnancy, and smoking may be at an increased risk for severe illness from COVID-19.[10]

While the CDC is still learning how the virus spreads, "COVID-19 is thought to spread mainly through close contact from person-to-person," through respiratory droplets produced when an infected person coughs, sneezes, or talks, and some people without symptoms may be able to spread the virus.[11] Symptoms may appear 2 to 14 days after exposure to the virus.[12] There is currently no vaccine to prevent COVID-19, and the CDC recommends that to avoid exposure and transmission, the public should maintain a physical

---

[8] CDC *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed July 31, 2020).

[9] CDC *Coronavirus Disease 2019 (COVID- 19), Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed July 31, 2020).

[10] CDC *People With Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical- conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed June 1, 2020).

[11] CDC, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed July 31, 2020).

[12] CDC, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed July 31, 2020).

distance of at least six feet from others, cover the nose and mouth with a mask, frequently wash hands with soap and water for at least 20 seconds or use hand sanitizer, and disinfect frequently touched surfaces daily.[13] High-risk individuals should take additional "special precautions," such as continued active treatment of their underlying medical conditions, obtaining vaccinations against other diseases like influenza and pneumococcal illness, staying home, and remaining away from others as much as possible.[14]

**B. Detention Facility COVID-19 Guidance**

The CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Guidance"),[15] updated as of July 14, 2020, provides guidance to healthcare and non-healthcare administrators in correctional and detention facilities "to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities." (CDC Guidance at 1.) The guidance reports there is a heightened risk of transmission of COVID-19 to and among individuals within correctional and detention facilities due to, among other things, the number of sources which can introduce them into a facility's population, including facility staff, visitors, contractors, vendors, legal representatives, court staff, new detainees, and high turnover; the congregate environment in which detainees "live, work, eat, study, and participate in activities"; and limited medical isolation options, hygiene supplies, and dissemination of accurate information among detainees. (*Id*. at 2.)

The guidance states that "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." (CDC Guidance at 6.) It recommends

---

[13] CDC *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed July 31, 2020).

[14] CDC *People at Increased Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed July 31, 2020).

[15] CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Aug. 3, 2020).

implementing social distancing strategies to increase the physical space between detained persons, "ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic," maintaining at least 6 feet between bunks, minimizing the number of individuals housed in the same room, staggering meal times and rearranging seating to increase space between individuals, providing meals inside housing units or cells, choosing recreation spaces where individuals can spread out and staggering time in those spaces; limiting the size of group activities and increasing space between individuals during group activities. (*Id.* at 6, 16-17.) It further recommends that facilities should house quarantined individuals who have had close contact with a COVID-19 case, or individuals in medical isolation who are suspected or confirmed positive with COVID-19, in order of preference, separately in single cells or as a cohort, although "[c]ohorting should only be practiced if there are no other available options." (*Id.* at 24- 15-20.)[16] "If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the increased-risk individuals." (*Id.* at 31.) The guidance cautions that facilities should ensure that medical isolation for COVID-19 "is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice." (*Id.* at 24.)

CDC Guidance also recommends that facilities implement intensified cleaning and disinfecting procedures and provide education on, and reinforcement of, hygiene practices. (CDC Guidance at 14-15.) Facilities should, among other things, provide adequate supplies to support intensified cleaning and disinfection practices, clean and disinfect surfaces that are frequently touched several times a day, and have a plan to rapidly restock supplies. (*Id.* at 14.) Facilities should encourage all staff and incarcerated/detained persons to wear a cloth face covering as much as possible, with education on their purpose and use, continually restock hygiene supplies throughout the facility, provide detainees and staff no-cost access to soap, running water, hand drying machines or disposable paper towels, tissues, cloth face coverings, and alcohol-based hand sanitizer with at least 60% alcohol

---

[16] "Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." (CDC Guidance at 4.)

where security restrictions allow. (*Id.* at 15.) The guidance underscores that because the virus can be transmitted from contagious, yet asymptomatic individuals who are present within the facilities, "[g]ood hygiene practices, vigilant symptoms screening, wearing cloth face coverings (if able), and social distancing are critical in preventing further transmission." (*Id.* at 12.)

**C. MCSO Facilities**

There are five jails in the Maricopa County Jail System: Fourth Avenue, Estrella (housing only female detainees/prisoners), Lower Buckeye, Towers, and 1280. (Doc. 28 at 6, citing Roska Decl. (Doc. 29 at 1-30) ¶ 6, 10, 16.)[17] As of July 15, 2020, MCSO had 4,598 detainees/prisoners, which is 52.4% of the total design capacity of the Maricopa County Jail system. (*Id.* at 9, citing Roska Decl. ¶ 8.) All but the Towers Jail have a combination of dormitories and cells; the Towers Jail has only cells. (*See id.* at 6-9, citing Roska Decl. ¶¶ 7, 10-12, 14-16.)

Due to the pandemic, the MCSO worked with the Maricopa County Attorney's Office to reduce the jail population and has reduced the average daily bookings from 250 daily bookings in January 2020 to 100 to 150 bookings per day as of July 16, 2020. (*Id.* at 9, citing Roska Decl. ¶ 9.) MCSO employs 1,744 Detention Officers, 214 Sergeants, 61 Lieutenants, and 14 Captains. (Roska Decl. ¶ 21.) As of July 15, 2020, 101 Detention Officers had tested positive for COVID-19. (*Id.*)

**D. MCSO's Response to COVID-19 Pandemic**

On June 30, 2020, Plaintiffs filed their motion for injunctive relief, which is supported by Declarations from the named Plaintiffs and Plaintiffs' expert, Dr. Robert Cohen, M.D. (Doc. 8, Exs. 1-15), regarding alleged deficiencies in MCSO's response to the pandemic. Defendants responded with Declarations from B. Roska, G. Phillips, M.D., the Medical Director of the Maricopa County Correctional Health Services (CHS) (Doc.

---

[17] B. Roska is currently Executive Chief of Custody of the MCSO. (Doc. 29 at 1 ¶2.)

31 at 1-34), and B. Williams, Commander/Executive Lieutenant of ancillary and institutional services (Doc. 30 at 1-14.)

**1. MCSO and CHS Management Plan for COVID-19**

At the start of the pandemic, MCSO stopped jail access for volunteer and supplemental services, suspended in-person visitations, with the exception of attorney visits, has followed court directives that allow detainees/prisoners to make court appearances telephonically, and has contacted private suppliers to obtain additional PPE and cleaning supplies. (Doc. 28 at 10, citing Roska Decl. ¶¶ 24, 26.) CHS also created a Management Plan for COVID-19 in early March 2020, which is continuously revised to reflect the CDC's most updated guidelines, and Defendants assert that MCSO and CHS operate in compliance with CDC's Interim Guidance for correctional and detention facilities. (*Id*. at 10-11, citing Roska Decl. ¶¶ 29, 85-87; Phillips Decl. ¶¶ 19-20, 179-187.)

In March 2020, MCSO developed and implemented a Supplemental Screening Form for intake that allows CHS staff to immediately identify and isolate detainees with symptoms or those considered at risk for COVID-19. (*Id*. at 13, citing Phillips Decl. ¶ 55.) CHS screens all new intakes for symptoms of COVID-19 using a verbal screening process and the Supplemental Screening Form, they screen all new intakes for other medical conditions based on the patient's self-report for problems such as hypertension, diabetes, thyroid disease, cancer, lung problems, and heart disease, and they obtain the patient's temperature and vital signs, including blood pressure, pulse rate, respiratory rate, and oxygenation level. (*Id*., citing Phillips Decl. ¶ 56.)

The Management Plan also has a verbal screening process to screen detainees/prisoners for COVID-19 symptoms; those at risk of having COVID-19 are identified as Persons Under Investigation ("PUI"). (*Id*. at 14, citing Phillips Decl. ¶¶ 57-58.) A PUI is someone who exhibits symptoms such as fever at 100.4 or above, lower respiratory illness such as cough or shortness of breath, or close contact with a laboratory-confirmed COVID-19 individual within 14 days of onset. (*Id*.) Detainees/prisoners with a chronic disease or other significant health conditions or disabilities "receive ongoing

multidisciplinary care aligned with management-based standards, including those recommended by the CDC." (*Id.*, citing Phillips Decl. ¶¶ 59-64.) CHS staff are required to wear surgical masks and gloves during intake screening, and wash their hands, sanitize workstations, and change gloves between every encounter. (*Id.*, citing Phillips Decl. ¶ 65.)

**2. Intake Process and Cohorting**

In March 2020, MCSO began cohorting new arrivals to protect against asymptomatic carriers infecting the established population. (*Id.* at 14-15, citing Roska Decl. ¶¶ 37-38; Phillips Decl. ¶¶ 103-104.) They remain in Cohort Housing for 14 days from admission, unless they present with symptoms of possible COVID-19, in which case isolation/testing protocols are employed. (*Id.* at 15, citing Phillips Decl. ¶¶ 104-106.) MCSO staff are to report to CHS when they observe symptomatic detainees/prisoners. (*Id.*)

Plaintiffs assert that new intakes to the jails are only isolated and tested for COVID-19 if they exhibit certain symptoms or report direct contact with someone who is COVID-19 positive and that other newly booked individuals simply go through the booking procedures and a court appearance while being held in holding tanks of 10 to 20 people where there is no ability to socially distance and where masks are the exception. (Ex. 17 (Doc. 14 at 17, citing MCSO SOP J-02-023; Perez Dec. ¶¶ 30-31.) New intakes who are not tested are not always placed in a 14-day cohort and some new intakes are placed directly into the general population. (*Id.*, citing Ex. 19 (letter from Penzone to Keenan); Dupont Decl. ¶ 15; Ochoa Decl. ¶ 7; Scroggins Decl. ¶ 7; Aveneti Decl. ¶ 6.) Without universal testing of all new intakes, the cohorting process is insufficient because individuals who are asymptomatic or pre-symptomatic can unknowingly infect other people or staff. (*Id.*, citing Cohen Decl. ¶¶ 92-93.) And, some people already in jail are rebooked on new charges and taken to the Fourth Avenue booking facility, where they spend around 24 hours in a holding cell with new intakes, and then return back to their original dorm, which undermines any benefit of the 14-day cohorting. (*Id.* at 17, citing Dupont Decl. ¶ 15; Ochoa Decl. ¶ 7; Player Decl. ¶ 17.)

On July 27, 2020, Defendants submitted a Supplemental Declaration from Dr. Phillips who states that beginning July 27, 2020, MCSO would begin mass testing of all detainees/prisoners for COVID-19 over a five-week period. (Doc. 36-1 at 4 ¶¶ 23-25.) After all five MCSO jails are tested, new arrivals, who will continue to be placed in Cohort Housing and monitored for 14 days, will be tested twice for COVID-19 on days 5 and 14. (*Id*. at 4 ¶ 26.) Dr. Cohen responds that waiting until all the other jails are tested "poses an unreasonable danger of allowing for weeks of transmission of the virus inside the cohorted pods and the introduction of COVID-19 to the general population if they are transferred after cohorting to the general population without first being tested," especially since there have been 100-150 new bookings daily over the past few months. (Doc. 41-1 at 82 ¶ 24.)

**3. Testing**

Prior to MCSO's announcement of mass COVID-19 testing, Plaintiffs state that testing was not happening consistently, even for people housed in pods that were quarantined due to direct contact with a person who tested positive for COVID-19 or recreating with units in which someone tested positive. (Doc. 14 at 9, citing Boykins Decl. ¶¶ 7-12; Player Decl. ¶ 4; Perez Decl. ¶ 9.) Also, when individuals have informed staff they were suffering from symptoms of COVID-19, or that they were exposed to individuals with COVID-19 or symptoms, they were not tested. (*Id*. at 10, citing Boykins Decl. ¶ 6; Fenty Decl. ¶¶ 5-6; Ochoa Decl. ¶ 5; Perez Decl. ¶ 5, 9; Reason Decl. ¶¶ 5-6; Dupont Decl. ¶ 4; Tequida Decl. ¶ 8; Scroggins Decl. ¶ 6; Stepter Decl. ¶ 7.)

Universal testing, particularly of all new intakes, is required to identify those who are infected and to institute timely initial isolation, medical monitoring, and treatment for those who test positive. (*Id*., citing Cohen Decl. (¶¶ 67, 72.) In his Supplemental Declaration, Dr. Phillips asserts that the recently implemented widespread testing over a five-week period would begin in week one with the Estrella Jail, move to the Towers Jail in week two, the 1280 Jail in week three, the Fourth Avenue Jail in week four, and the Lower Buckeye Jail in week five. (Phillips Suppl. Decl. (Doc. 36) ¶¶ 19, 23-25.) Dr. Cohen responds that the decision to broaden testing is a positive step, but given the existing

outbreak, the five-week delay will allow the virus to spread rampantly in the remaining facilities, and there is no explanation why the testing will take five weeks or any indication that testing of the medically vulnerable detainees/prisoners will be prioritized. (Cohen Suppl. Decl. (Doc. 41-1 at 82) ¶ 23.) In a third Declaration, Dr. Phillips states that CDC Interim Consideration for SARS-CoV-2 Testing in Correctional and Detention Facilities does not require mass testing for COVI-19 among incarcerated populations, but rather recommends testing for individuals with signs of symptoms of COVID-19 or asymptomatic individuals who have come into close contact with COVID-19 infection. (Doc. 49 ¶ 13.) Therefore, the current mass testing by MCSO and CHS exceeds the CDC's recommendations. (*Id.*)

**4. Isolation and Quarantine**

If a detainee/prisoner screens as affirmative for possible COVID-19 infection, they are immediately isolated in a private room, placed on "droplet precautions, contact precautions, and standard precautions, only essential healthcare personnel may enter the room to evaluate or care for the patients, and they must wear PPE, including a surgical mask, gown, gloves, face shield and/or eye protection. (Doc. 28 at 15, citing Phillips Decl. ¶¶ 70-71.) Those suspected of having COVID-19 are evaluated by a healthcare provider, and if they have objective findings of cough, shortness of breath, or other signs of acute illness, they are prioritized for COVID-19 testing, which is done using the nasopharyngeal swab test, and results are usually received within two to five days. (*Id.*, citing Phillips Decl. ¶¶ 71, 74.) Other patients with symptoms of acute illness are considered for testing based on guidelines from the CDC, and detainees/prisoners requesting COVID-19 testing are assessed by a nurse and if symptoms warrant, a healthcare provider determines whether COVID-19 testing is indicated. (*Id.*, citing Phillips Decl. ¶¶ 72-73.) Patients designated as PUI or who test positive for COVID-19 are transferred to Medical Observation Housing. (*Id.*, citing Phillips Decl. ¶ 75.) Medical co-pays are waived for COVID-19 testing so as not to discourage detainees/prisoners from disclosing symptoms. (*Id.*, citing Phillips Decl. ¶ 82; Roska Decl. ¶ 32.)

Detainees/prisoners who display symptoms of COVID-19, meet PUI criteria, are confirmed positive, were in close contact with an individual with COVID-19, or who previously recovered from and present with symptoms of COVID-19 are housed in medical isolation in a designated Medical Observation Unit ("MOU"). (*Id*. at 15-16, citing Roska Decl. ¶¶ 32, 36; Phillips Decl. ¶ 76.) MOUs are cell design, not dormitory style, and a detainee/prisoner who meets PUI criteria, is housed alone so as not to expose others, and those who test positive may be housed in the same cell. (*Id*. at 16, citing Phillips Decl. ¶¶ 77-78.) Those who have tested positive are housed in the MOU until 10 days have elapsed since the positive test and at least 72 hours have passed since the resolution of fever and improvement of respiratory symptoms. (*Id*., citing Phillips Decl. ¶ 84.) Detainees/prisoners in MOUs are on restricted movement status, which means they must stay within their housing unit, except in case of a medical emergency or release from custody, and they are not permitted to go to court. (*Id*, citing Phillips Decl. ¶ 92.)

CHS staff assess MOU patients daily, including temperature checks, and if a MOU patient is at higher risk for COVID-19 complications, they can be housed in the Infirmary, where they receive 24-hour nursing care and frequent assessments. (*Id*., citing Phillips Decl. ¶¶ 82, 85-86; Roska Decl. ¶ 34.) A patient is deemed "higher risk" if they are over 60 years-old, have diabetes, heart or lung problems, or other conditions "that can lead to immunocompromise." (*Id*. at 16-17, citing Roska Decl. ¶ 34; Phillips Decl. ¶ 85.) Those who test negative for COVID-19 may be released from MOU to general population if at least 72 hours have passed since the resolution of fever and improvement of respiratory symptoms. (*Id*. at 17, citing Phillips Decl. ¶¶ 98-99.) Medical Observation cells and common areas in a Cohort are fully sanitized between occupants. (*Id*. at 18, citing Phillips Decl. ¶ 51.)

When a detainee/prisoner tests positive for COVID-19, their housing unit is placed on 14-day quarantine status, and beginning June 1, 2020, mass COVID-19 testing of detainees/prisoners in quarantine status began. (*Id*. at 17, citing Roska Decl. ¶ 39; Phillips Decl. ¶¶ 111-113.) Quarantine status detainees/prisoners are also offered COVID-19

testing on the next business day after someone in their unit tests positive and on or after day 14 of the quarantine. (*Id.*) Those in quarantine are on movement restriction, which prohibits their movement outside of the housing unit, including for court dates, except in case of emergency or release from custody. (*Id.*, citing Phillips Decl. ¶ 119.)

Despite these measures, Defendants have not taken other protective measures to ensure infected people are not infecting others in quarantine, which is necessary because COVID-19 testing has a false negative rate as high as 29%. (Doc. 14 at 15, citing Cohen Decl. ¶ 77.) Medical staff generally do not visit quarantined pods to check for symptoms of COVID-19 in order to remove symptomatic people from the pod and, when they do visit, they are not taking basic precautions such as changing gloves between each person they examine and sterilizing oral thermometers between uses. (*Id.*, citing Boykins Decl. ¶¶ 8-9; Player Decl. ¶ 5.) Dr. Phillips disputes these assertions, stating that CHS staff do sanitize medical equipment and change their gloves in between seeing patients, but that there is no need to change gloves when distributing medications to patients because they do not directly touch the medications. (Doc. 49 ¶ 24.) Plaintiffs also contend there is inadequate social distancing in quarantined units, no specific cleaning procedures or PPE for quarantined units, and no steps are taken to ensure cells and bed spaces are cleaned after a confirmed or suspected COVID-19 person is removed from the unit. (Doc. 14 at 15, citing Boykins Decl. ¶¶ 7-8, 19-24, 28; Player Decl. ¶¶ 7, 12-13, 16.)

Because those removed from housing units due to confirmed or suspected COVID-19 are sent to punitive conditions akin to disciplinary segregation (known as "the hole") without proper medical care, detainees/prisoners are deterred from reporting symptoms, which means symptomatic people will potentially remain in general population units. (*Id.*, citing Boykins Decl. ¶ 5; Lewis Decl. ¶ 4; Suggs Decl. ¶¶ 6-9; Cohen Decl. ¶ 116.) The only difference between the punitive isolation units where people testing positive are sent and punitive segregation units is that COVID-19 positive people are placed in cells together. (*Id.*, citing Lewis Decl. ¶ 19.) Those who have tested positive are sent to isolation units and left in filthy cells 24 hours a day except for shower time (once every three days

for one person and once a week for another) and video visits, all their property is taken, they are denied access to commissary, and they are left to wear the same clothes, despite being sick with the virus. (*Id.* at 16, citing Lewis Decl. ¶ 19; Aveneti Decl. ¶ 14.) Williams disputes these assertions, stating that undergarments are normally exchanged at least twice a week but, to limit movement, two items are delivered at the same time each week; he also states that there was a problem at the Lower Buckeye Jail between July 1-15 when patients in the MOU were unable to use the commissary, but that issue has been resolved. (Doc. 50 ¶¶ 6, 12.) Dr. Phillips disputes that medical isolation housing units are punitive in nature and asserts that medical isolation is widely used in the medical community to reduce the risk of transmissions of COVID-19, and that detainees/prisoners in medical isolation have their tablets for entertainment and reading materials and they have access to commissary purchases. (Doc. 49 ¶ 19.)

Dr. Cohen asserts that patients with known or suspected COVID-19 require close clinical monitoring of their condition twice daily to assess whether they are clinically deteriorating and need more assertive treatment. (Doc. 14 at 16, citing Cohen Decl. ¶¶ 16, 111.) According to Plaintiffs, those who test positive for COVID-19 receive inadequate medical care, and staff, who are not necessarily medically trained, only visit once a day for a symptoms and temperature check, but do not normally check oxygen intake, and it can take up to three and a half days to get basic medicine such as Tylenol. (*Id.*, citing Cohen Decl. ¶ 113; Aveneti Decl. ¶¶ 8-13; Lewis Decl. ¶¶ 19, 20, 22.) Dr. Phillips disputes that those who test positive receive inadequate medical care, asserting that pulse oximetry is only necessary where the patient exhibits symptoms such as difficulty breathing and shortness of breath, in which case, CHS staff will check a full set of vital signs, including pulse oximetry. (Doc. 49 ¶ 21.) Dr. Phillips states that Plaintiff Aveneti did test positive for COVID-19 and was moved to medical observation on June 7, 2020, where he was seen daily by CHS staff, received regular temperature checks, which ranged from 97.6 to 98.2 degrees, his blood pressure was taken four times and was normal each time, and he has recovered from COVID-19 and was moved back to general population on June 17, 2020.

(*Id.* ¶ 22.) Plaintiff Crough is housed in the Infirmary and his four blood pressure checks in mid-July were all normal except one, when it was slightly low, and his oxygen levels were in the normal range. (*Id.* ¶ 23). Plaintiff Ochoa, who tested positive for COVID-19, had normal temperatures when checked 8 times between July 10 and July 17, 220, and she was discharged from medical observation on July 17, 2020 after being symptom-free for 72 hours. (*Id.* ¶ 28.)

Plaintiffs contend that the medically vulnerable are also not receiving sufficient medical monitoring, even though they face higher hospitalization and death rates. (Doc. 14 at 16-17, citing Cohen Decl. ¶ 88; Lewis Decl. ¶ 20.) Defendants have failed to waive fees when detainees/prisoners seek care or diagnosis for COVID-19 symptoms, which also deters people from reporting symptoms and for the jails to identify people infected with COVID-19. (*Id*. at 17, n.23, citing Suggs Decl. ¶ 10; Fenty Decl ¶ 5; Reason Decl. ¶ 5.) Dr. Phillips asserts that Plaintiff Fenty was erroneously charged on June 25 and June 26, 2020 for medical care and that those charges have now been reversed and that Plaintiff Ochoa may have also been erroneously charged and those charges may be reversed once verified. (Doc. 49 ¶¶ 26, 28.)

Plaintiffs also dispute that the medical observation cells receive full sanitation between occupants, with some Plaintiffs observing that the floors of those cells were covered in dust and trash upon their arrival, including orange peels, milk cartons, and other trash, and that some Plaintiffs were given no means of cleaning the cell. (Doc. 40 at 19, citing Fenty Suppl. Decl. ¶ 6; Suggs Decl. ¶ 7; Aveneti Decl. ¶ 8; Lewis Decl. ¶ 19.) Dr. Phillips states in a supplemental Declaration that the allegation that the medical tank is not sanitized between uses is false. (Doc. 49 ¶ 30.)

**5. Social Distancing**

Despite the reduction in the jail population since the start of the pandemic, Plaintiffs contend that there is no policy for social distancing and that social distancing “has not been noticeably implemented,” with some individuals sleeping in units that are nearly full, and in cells with two or three people and in dorms with dozens of other people on beds that are

inches apart. (Doc. 14 at 11-12, citing Boykins Decl. ¶¶ 14-16; Crough Decl. ¶¶ 13-14; Fenty Decl. ¶¶ 8; Ochoa Decl. ¶¶ 7-8; Scroggins Decl. ¶¶ 7-8; Stepter Decl. ¶ 8; Suggs Decl. ¶ 12; Tequida Decl. ¶ 11.) Some units are increasingly on lockdown, which means individuals are confined to their sleeping areas without social distancing, common areas such as dining rooms and recreation spaces are not operated with social distancing, and mealtimes are not staggered, so individuals are frequently standing close together in lines and sitting elbow-to-elbow. (*Id*., citing Boykins Decl. ¶¶ 15-18, Player Decl. ¶¶ 8-9; Lewis Decl. ¶¶ 6, 8-9; Dupont Decl. ¶¶ 6-7; Fenty Decl. ¶¶ 9-11; Ochoa Decl. ¶¶ 9-12; Perez Decl. ¶¶ 11,16-18, 20; Reason Decl. ¶¶ 7-10; Scroggins Decl. ¶¶ 8-10; Tequida Decl. ¶¶ 13-15; Suggs Decl. ¶¶ 11-15.)

Defendants have food delivered by incarcerated persons who travel pod to pod, thereby increasing the risk of spreading the virus, and sometimes multiple people may touch the same food as it is transferred. (*Id*. at 12, citing Boykins Decl. ¶ 17; Player Decl. ¶ 8; Ochoa Decl. ¶ 9; Perez Decl. ¶ 17; Scroggins Decl. ¶ 9; Tequida Decl. ¶ 14.) During recreation, multiple units sometimes use the same facility at the same time, and when receiving medications, detainees/prisoners must line up side by side. (*Id*., citing Boykins Decl. ¶ 18; Player Decl. ¶¶ 5, 8; Dupont Decl. ¶ 6; Lewis Decl. ¶ 8; Fenty Decl. ¶ 10; Perez Decl. ¶ 19; Scroggins Decl. ¶ 9; Stepter Decl. ¶¶ 10, 12; Aveneti Decl. ¶ 20.)

Defendants respond that detainees/prisoners are encouraged to practice social distancing and are educated on the importance of trying to maintain at least a six-foot distance from others, if possible, and MCSO has taken measures to reduce its population to allow detainees/prisoners to socially distance. (Doc. 28 at 20, citing Roska Decl. ¶ 76.) The day room areas in all the jails are large and allow ample space to socially distance and no one is forced to remain within six feet of another person, even when lining up for meals, medication, to use a telephone or watch television. (*Id.*, citing Roska Decl. ¶ 79.) Detainees/prisoners are often voluntarily less than six-feet apart and are reminded that they should not do so by detention officers. (*Id.*) Detainees/prisoners are not triple celled and although some cells have bunks stacked three high, these cells are only occupied by one or

two detainees/prisoners. (*Id.*, citing Roska Decl. ¶ 80.) According to Defendants, "[t]he solid metal beds provide an adequate barrier to allow inmates to sleep in the bunks without the risk of infecting one another, in the event one of the inmates has the virus." (*Id.*)

COVID-19 education is provided to detainees/prisoners in English and Spanish via the inmate tablet system, which those in the general population have access to, and they receive one-on-one counseling during medical and mental-health checks, which can include education on social distancing, proper hygiene, and mask use. (*Id.* at 11, citing Phillips Decl. ¶¶ 28-30.) Education materials are also posted throughout the facility and in all housing units regarding COVID-19 symptoms, what to do if you become sick, hand washing, sanitation and cleanliness, mask use, and steps to reduce exposure. (*Id.*, citing Roska Decl. ¶ 75.)

Plaintiffs reply that as to COVID-19 education, detainees/prisoners have only recently been given access to materials that provide information about COVID-19 symptoms and precautions via the inmate tablet system, but that information does not mention social distancing, and the tablet system is inadequate for people who are illiterate or not adept at technology. (Doc. 40 at 10, citing Doc. 29-1 at 40.) Plaintiffs assert in their original and supplemental Declarations that, contrary to Defendants' assertions, they are not given frequent verbal communications from detention officers or during medical visits about the need to wear masks and remain socially distant. (Perez Suppl. Decl. ¶ 12; Tequida Suppl. Decl. ¶ 13; Ochoa Suppl. Decl. ¶¶ 2-3; Fenty Suppl. Decl. ¶¶ 20-21; Stepter Suppl. Decl. ¶¶ 13-14; Aveneti Suppl. Decl. ¶ 10; Boykins Decl. ¶ 27; Player Decl. ¶ 14; Aveneti Decl. ¶ 4; Fenty Decl. ¶ 20; Crough Decl. ¶ 25; Ochoa Decl. ¶ 18; Perez Decl. ¶¶ 14, 27; Scroggins Decl. ¶ 19; Stepter Decl. ¶ 18; Tequida Decl. ¶ 24.)

Plaintiffs also dispute that they are able to socially distance either in their cells or dorms or in the common areas, stating, for example, that the day rooms have tables and chairs that are bolted to the ground and allow only about a foot between seats, that the bunks are bolted down and close to each other or touching, making it impossible to sleep six feet apart, that detainees/prisoners wait in line for food right next to each other and

because the tables and chairs are bolted down, they are close together when eating, and detention officers do not instruct prisoners to stay six feet apart. (Doc. 14 at 11-12 and Doc. 40 at 12-13, 17-18, citing Boykins Decl. ¶¶ 14-15; Dupont Decl. ¶ 5; Ochoa Decl. ¶ 8; Lewis Decl. ¶ 8; Fenty Suppl. Decl. ¶ 11; Stepter Suppl. Decl. ¶¶ 7-8; Aveneti Suppl. Decl. ¶ 4.) Plaintiffs contend that "[t]he fact that the bunk beds are made of metal does nothing to mitigate the fact that cellmates are in constant close proximity with each other, touch the same common surfaces as each other, and breath the same air in the exceptionally limited common areas of each cell, including while sleeping." (Doc. 40 at 13, citing Cohen Suppl. Decl. ¶ 40.)

**6. Sanitation Procedures**

The Maricopa County jails rely on incarcerated persons to clean facilities and the post-COVID-19 cleaning routine is nearly identical to the pre-COVID-19 cleaning routine and, in general, jail staff do not ensure that cleaning is done at all, much less safely and adequately to kill the virus. (Doc. 14 at 13, citing Boykins Decl. ¶¶ 20-21; Player Decl. ¶ 11; Aveneti Decl. ¶ 18; Lewis Decl. ¶ 11; Dupont Decl. ¶ 8; Fenty Decl. ¶ 13; Perez Decl. ¶¶ 22-23; Reason Decl. ¶ 7; Scroggins Decl. ¶ 15; Stepter Decl. ¶ 15; Tequida Decl. ¶ 17; Suggs Decl. ¶ 17; Ochoa Decl. ¶¶ 11-13.) Twice a day, Defendants provide entire housing units with one bottle of watered-down disinfectant and glass cleaner and possibly another substance to clean the common surfaces and individual cells, but the supplies often run out and staff often refuse to provide additional supplies. (*Id*., citing Boykins Decl. ¶ 21; Player Decl. ¶¶ 9, 11; Lewis Decl. ¶ 11; Fenty Decl. ¶ 13; Perez Decl. ¶ 22; Scroggins Decl. ¶¶ 14-15; Stepter Decl. ¶ 15; Tequida Decl. ¶ 18; Suggs Decl. ¶ 18; Aveneti Decl. ¶ 18; Dupont Decl. ¶ 8; Perez Decl. ¶ 22.) Williams disputes that the cleaning supplies provided to detainees/prisoners are inadequate, and asserts that MCSO keeps inventory of cleaning solutions in concentrated form, which is mixed with water according to the manufacturer's instructions. (Doc. 50 ¶ 17.)

Defendants do not usually provide detainees/prisoners with gloves or sufficient protective equipment for cleaning, even when tasked with cleaning cells where infected

persons or persons quarantined at intake were located. (Doc. 14 at 13, citing Fenty Decl. ¶ 13; Stepter Decl. ¶ 16; Boykins Decl. ¶¶ 7-8; Player Decl. ¶ 4; Aveneti Decl. ¶ 5; Lewis Decl. ¶ 10; Reason Decl. ¶ 13.) Detainees/prisoners share numerous high-touch surfaces such as telephones, tablets, tables, chairs, and railings, and Defendants have not implemented any system to ensure they are property cleaned; some people wrap socks or a towel around phones to protect themselves from COVID-19. (*Id*., citing Crough Decl. ¶ 16; Fenty Decl. ¶¶ 11, 13; Ochoa Decl. ¶¶ 10, 12; Perez Decl. ¶¶ 17-19; Stepter Decl. ¶¶ 11, 15; Boykins Decl. ¶ 25; Suggs Decl. ¶ 22.) Dr. Phillips asserts in a supplemental Declaration that the CDC's Interim Guidance does not require that detainees/prisoners receive gloves and that there is hot water and soap available for washing hands at any time, which is the most effective means to kill COVID-19. (Doc. 49 ¶ 25.)

Defendants assert that MCSO has implemented enhanced sanitation procedures, using OSHA-approved Waxie 764 Lemon Quat Disinfectant Cleaner and Triad-III Disinfectant, which are effective at disinfecting hard surfaces and destroying such viruses as MRSA, HBV, HIV, and Hepatitis B & C, as well as the SARS-COV-2 family of viruses. (Doc. 28 at 17-18, citing Roska Decl. ¶¶ 42, 44-45.) In a March 26, 2020 Briefing Notes Report on the enhanced sanitation procedures, MCSO staff were directed to implement extra cleaning of vehicles, work areas, high-touch areas in the offices, briefing rooms, and break rooms, and to use Triad-III cleaner for surfaces. (*Id*. at 18, citing Roska Decl. ¶¶ 46-49; Phillips Decl. ¶¶ 48-51.) Vehicles used to transport detainees/prisoners are to be cleaned with Triad cleaner between runs, and MCSO has dedicated certain vehicles to transport those who have tested positive for COVID-19 to eliminate the possibility of infection when transporting detainees/prisoners who are not positive. (*Id*., citing Roska Decl. ¶ 56.)

MCSO internal housekeeping staff have increased sanitization protocols since the end of March 2020, concentrating on sanitizing high touch surfaces such as door handles, knobs, handrails, intercoms, push buttons, tables, and showers. (*Id*., citing Roska Decl. ¶ 50.) MCSO has purchased Ryobi sprayers and pump sprayers for use with Triad III

cleaner to sanitize mattresses, holding cells, and living spaces. (*Id.*, citing Roska Decl. ¶ 51.) All housing units have their own cleaning supplies "for easy access by staff and detainees/prisoners to clean common areas and cells." (*Id.*)

CHS staff are to disinfect surfaces when indicated in patient care areas and in between patient contacts. (*Id.*) CHS has also developed a standard operating procedure for Cleaning/Disinfection of Unit Surfaces and Non-Disposable Instrument Equipment, which is designed to minimize incidents of communicable disease transmission among patients and staff. (*Id.*, citing Phillips Decl. ¶ 51.)

Plaintiffs reply that there is a marked difference in sanitation practices for staff and those incarcerated, noting that the only parts of the jails subject to janitorial cleaning are places exclusive to staff use and that janitorial staff are required to wear masks and gloves, that cleaning schedules only pertain to staff areas and vehicles, not areas used by the incarcerated, and that the incarcerated "are left to fend for themselves and are required to clean common areas—even areas recently vacated by people suspected or known to have had COVID-19—with limited disinfectant, no gloves, and without other basic cleaning supplies." (Doc. 40 at 9-10, citing Perez Suppl. Decl. ¶ 11; Tequida Supp. Decl. ¶ 11; Ochoa Suppl. Decl. ¶ 8; Fenty Suppl. Decl. ¶¶ 5, 15, 16; Stepter Suppl. Decl. ¶ 8; Aveneti Suppl. Decl. ¶ 10; Suggs Suppl. Decl. ¶ 3.) Williams responds that cleaning supplies are for the use of both staff and detainees/prisoners at each facility. (Doc. 50 ¶ 16.)

**7. Personal Hygiene and Masks**

Defendants do not generally provide individuals with personal hygiene products such as paper towels or hand sanitizer, and detainees/prisoners are forced to use the bathing towel they are given once a week to wipe down surfaces and dry their hands. (Doc. 14 at 14, citing Boykins Decl. ¶ 23; Ochoa Decl. ¶¶ 12-15; Player Decl. ¶ 11; Lewis Decl. ¶¶ 11-12; Perez Decl. ¶¶ 23-24; Scroggins Decl. ¶ 15; Tequida Decl. ¶¶ 18-20; Suggs Decl. ¶ 20.) Williams responds that towels are normally exchanged at least three times a week, but to limit movement at the facilities, three clean towels are delivered at once each week. (Doc. 50 ¶ 6.) Williams also asserts that cleaning rags are always available for

detainees/prisoners in the facility's cleaning supplies, and that a cleaning towel for personal use is exchanged once a week, and that an individual may request to exchange a towel in between deliveries. (*Id.*) No incarcerated person is required to wear a mask, but those who do want masks generally only receive one or two disposable paper masks over a period of months, even if housed in a unit that has been quarantined due to exposure to COVID-19 and even if the mask is lost, soiled or broken. (Doc. 14 at 14, citing Boykins Decl. ¶ 24; Player Decl. ¶ 12; Aveneti Decl. ¶ 19; Lewis Decl. ¶ 13; Fenty Decl. ¶ 14; Ochoa Decl. ¶ 16; Perez Decl. ¶ 25; Scroggins Decl. ¶ 17; Stepter Decl. ¶ 16; Tequida Decl. ¶ 22; Suggs Decl. ¶ 21.)

According to Defendants, detainees/prisoners have access to soap and personal hygiene products for personal use to mitigate the spread of COVID-19 and other infectious diseases. (Doc. 28 at 18, citing Phillips Decl. ¶ 53.) MCSO does not provide alcohol-based hand sanitizer for the incarcerated because it can be used as an accelerant or to make alcohol-based liquids for consumption, which could lead to intoxication and possibly serious injury to staff or detainees/prisoners. (*Id.* at 19, citing Roska Decl. ¶ 54.)

Beginning in late March, all detainees/prisoners were issued surgical masks without cost, they are advised on the most effective ways to ensure the mask stays clean, and if a mask is lost or damaged, the detainee/prisoner "simply need[s] to ask, and they will receive one." (*Id.* at 19, citing Roska Decl. ¶¶ 58, 60, 69.) Detainees/prisoners at the Fourth Avenue Jail receive a new surgical mask every Saturday morning. (*Id.* at 20, citing Roska Decl. ¶ 59.) Detainees/prisoners receive instructions in English and Spanish to wear their masks whenever possible and to always wear them to court, medical or anytime they are outside the housing unit. (*Id.*, citing Roska Decl. ¶ 60.) Detainees/prisoners who work in food preparation are provided gloves and masks. (*Id.*, citing Roska Decl. ¶ 62.)

Plaintiffs dispute that they can simply ask for a new mask when needed and assert that requests for new masks are typically rejected. (Doc. 40 at 16-17, citing Boykins Decl. ¶ 24; Crough Decl. ¶¶ 20-21; Fenty Suppl. Decl. ¶ 13; Crough Suppl. Decl. ¶ 7.)

. . . .

**8. Staff Instructions**

Staff who work at the jails travel to and from their homes and communities for work and are at risk of contracting the virus and transmitting it to those incarcerated or others who work in the jails, but there is no policy to test all staff or check for symptoms when staff enter the facility. (Doc. 14 at 19, citing Cohen Decl. ¶ 73.) Staff are merely instructed to stay home if sick with fever, cough, or difficulty breathing and to contact their healthcare provider. (*Id*., citing MCSO Press Release dated June 15, 2020, *COVID-19 FAQ*.) Asymptomatic carriers who are not identified can spread the virus, especially since staff do not consistently wear masks or wear their masks below the chin, which defeats the purpose of the masks, and staff do not change gloves between inspecting detainees/prisoners. (*Id*., citing Boykins Dec. ¶ 26; Player Decl. ¶ 13; Aveneti Decl. ¶ 20; Lewis Decl. ¶ 14; Dupont Decl. ¶ 11; Ochoa Decl. ¶ 17; Perez Decl. ¶ 26; Scroggins Decl. ¶¶ 11, 18; Suggs Dec. ¶ 23; Fenty ¶ 10; Reason ¶ 16; Tequida ¶ 23.)

Defendants assert that beginning in March 2020, MCSO began educating staff about COVID-19—issuing two detailed memos on March 18 and March 26—and informing staff how the virus is spread, common symptoms, how to protect oneself from exposure, appropriate PPE to use when around individuals with suspected or confirmed COVID-19, how to respond to detainees/prisoners with symptoms, disinfection and transportation protocols, and PPE requirements. (Doc. 28 at 11, citing Roska Decl. ¶¶ 67, 69.) When staff arrive at their assigned facility, they are screened with a series of questions or a health situation report which they must respond to when logging onto a computer at the beginning of the shift. (*Id*. at 12, citing Roska Decl. ¶ 72.)

All CHS staff must sign an Attestation declaring that if they are sick or have symptoms such as difficulty breathing, cough, or fever over 100.4 degrees, they will immediately notify their direct supervisor and staff, self-quarantine, and seek medical attention. (*Id*., citing Phillips Decl. ¶ 30.) CHS staff who test positive for COVID-19 must self-quarantine for 10 days and be symptom free for 72 hours before they can return to work. (*Id*., citing Phillips Decl. ¶ 32.) CHS Infection Control notifies employees if they

potentially came into contact with someone who tested positive. (*Id.*, citing Phillips Decl. ¶¶ 33-34.) As of May 2020, all CHS staff are required to wear masks while on duty, appropriate PPE when required, and practice proper hygiene, and they receive email communications several times a week with daily updates on COVID-19 statistics within the jail population, possible exposures, COVID-19 precautions, and mask use. (*Id.*, citing Phillips Decl. ¶¶ 36-37, 42-44.)

Detention officers have been issued N95 masks, along with a washable mask filter, and, as of June 29, 2020, they are instructed to wear the mask at all times while inside the common areas of jail or any place that interaction with detainees/prisoners may take place and while transporting detainees/prisoners. (*Id.*, citing Roska Decl. ¶¶ 33, 64-65.) All shift briefings that were conducted in-person prior to March 2020 have been changed to an email or telephone briefing when necessary. (*Id.*, citing Roska Decl. ¶ 73.) During transport, MCSO staff are required to wear a mask, gown, gloves, and face shield, and if a detainee/prisoner awaiting transport complains of fever, cough, shortness of breath or other symptoms of acute illness, MCSO staff are to contact the CHS facility nurse manager, who may contact an on-duty CHS healthcare provider, if needed. (*Id.*, citing Phillips Decl. ¶¶ 67-68.) If there is a high suspicion of a possible COVID-19 infection, CHS staff advise MCSO staff to provide the detainee/prisoner with a surgical mask during transport. (*Id.*, citing Phillips Decl. ¶ 68.) Upon arrival, CHS staff are notified and instruct MCSO personnel on where the detainee/prisoner's evaluation will take place. (*Id.*)

Plaintiffs reply that there is a significant gap between the policies designed to protect staff versus those designed to protect the incarcerated, such as the N95 masks with machine washable inserts that staff receive and are required to wear in jail common areas whereas incarcerated people are not required to wear any masks, much less N95 masks, even in common areas, and are only instructed to wear thin, surgical paper masks in limited situations like attending court, receiving medical care, or leaving their housing unit. (Doc. 40 at 2.) Moreover, the masks given to incarcerated people are intended only for a single use and should be replaced daily to be effective. (*Id.* at 8, citing Cohen Decl. ¶¶ 119-120;

Cohen Suppl. Decl. ¶ 51.) Even an internal MCSO memo to staff states that "[d]isposable face masks can only be used once." (*Id*. at 8-9, citing Doc. 28 at 17; Doc. 29-1 at 18.) And Defendants' evidence shows that only detainees/prisoners at the Fourth Avenue Jail are given new masks each week. (*Id*. at 8.) Plaintiffs assert that medical staff and detention officers still routinely fail to wear masks or wear them improperly. (*Id*. at 15-16, citing Fenty Suppl. Decl. ¶ 13; Perez Suppl. Decl. ¶ 6; Suggs Suppl. Decl. ¶ 5; Aveneti Suppl. Decl. ¶ 7.)

**E. Injunctive Relief Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a

mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**F. Discussion**

Plaintiffs assert claims challenging their conditions of confinement under the Eighth and Fourteenth Amendments. To succeed under either amendment, Plaintiffs must establish "deliberate indifference" on the part of Defendants. *Farmer v. Brennan*, 511 U.S. 825, 846, (1994) (Eighth Amendment); *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 2473–74 (2015) (Fourteenth Amendment). "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

To succeed on their Eighth Amendment claim, Plaintiffs need to prove both objective and subjective deliberate indifference. *Farmer*, 511 U.S. at 842. Their Fourteenth Amendment claim, however, requires only that they prove objective deliberate indifference. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018)

**1. Objective Deliberate Indifference**

To satisfy the objective prong, Plaintiffs must show an "objectively intolerable risk of harm." *Farmer*, 511 U.S. at 842. The Ninth Circuit has established a four-part test to determine objective deliberate indifference:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering

> serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Kingsley*, 135 S.Ct. at 2473; *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id*. (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986). Therefore, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.

The available evidence shows that the conditions in the jails present a risk of serious harm. At the time Plaintiffs filed their motion on June 30, 2020, there were 565 positive COVID-19 cases in the MCSO jails, but as of August 6, 2020, that number had risen to 1,420 positive cases. It is also undisputed that certain Plaintiffs have underlying mental and physical conditions and age that put them at higher risk of contracting COVID-19 and at increased risk of severe illness or death if they become infected. The parties dispute, however, whether Defendants have taken reasonable measures to abate that risk.

There is no dispute that Defendants have taken certain measures to abate the risk, which now includes universal testing, limiting access to the jails, reducing the jail population, instituting enhanced sanitation protocols, particularly in areas accessible only to staff, issuing masks to detainees/prisoners, and providing education on COVID-19. Plaintiffs dispute that those measures are uniformly followed or sufficient or comply with CDC standards. However, some of Defendants' measures, such as universal testing, go beyond what the CDC recommends. As such, Plaintiffs have not established, at this stage, that Defendants' measures are objectively unreasonable. Moreover, there are disputed issues of material fact as to the reasonableness of the measures implemented by MCSO

and whether those measures have been consistently carried out that preclude the Court from issuing a preliminary injunction, particularly since Defendants' measures to respond to COVID-19 appear to be evolving. *See Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973) (finding a preliminary injunction to be improper "[b]ecause of the disputed facts" and that "the matter should proceed to trial on the merits"); *see also Torres v. Milusnic*, No.: CV 20-4450-CBM-PVC(x), 2020 WL 4197285, at *13 (C.D. Cal. July 14, 2020) ("The disputed facts as to the safety measures implemented at Lompoc precludes the Court from issuing a temporary restraining order at this stage requiring Respondents to implement the specific safety measures to combat COVID-19 requested by Petitioners."); *Martinez-Brooks*, No. 3:20-cv-00569, 2020 WL 2405350, at *29 (D. Conn. May 12, 2020) (denying request for temporary restraining order because "factual disputes preclude [the court] from concluding at this stage that the Warden's implementation of measures to protect against the spread of COVID-19 exhibits deliberate indifference to the serious risks posed by the virus, and thus that the Petitioners are likely to succeed on the merits of this portion of their claim").

**2. Subjective Deliberate Indifference**

To succeed on their Eighth Amendment claim with regards to the Post-Conviction Plaintiffs, Plaintiffs must prove subjective deliberate indifference. The subjective prong requires "more than ordinary lack of due care for the prisoner' s interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted). To prove deliberate indifference, a plaintiff must show that the official knew of and disregarded an excessive risk to inmate safety. *Id.* at 837.

The spread of COVID-19 within the MCSO jails does not equate to subjective deliberate indifference to the safety of its detainees/prisoners. Courts across the country have struggled with the necessary showing for subjective deliberate indifference in light of COVID-19 in correctional facilities. *See, e.g., Torres*, 2020 WL 4197285, at *14 (citing *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (finding "while the harm imposed by COVID-19 on inmates at Elkton ultimately [is] not averted, the BOP has responded

reasonably to the risk and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights," noting evidence that the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, providing masks, and engaging in efforts to expand testing "demonstrate the opposite of a disregard of a serious health risk") (internal quotations and citations omitted); *Valentine v. Collier*, 956 F.3d 797, 802-03 (5th Cir. 2020) (prison officials showed likelihood of success on appeal of preliminary injunction issued by district court requiring the officials to immediately implement more preventive measures to combat COVID-19 in Texas state prison, reasoning the plaintiffs lacked evidence of the defendants' "subjective deliberate indifference" to the substantial risk of serious harm of COVID-19 and noting "[t]o the contrary, the evidence shows that [Texas Department of Criminal Justice] has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus"); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (finding that the district court incorrectly collapsed the subjective and objective components of the deliberate indifference inquiry for plaintiffs' Eighth Amendment claim and likely erred because (1) resultant harm does not establish a liable state of mind for deliberate indifference but the district court "treated the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk"; and (2) "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence'").

Defendants in this case are aware of the risks posed by COVID-19 as evidenced by the Declarations of Williams, Roska and Phillips. However, the evidence presented by Plaintiffs does not satisfy the subjective prong of Plaintiffs' Eighth Amendment claim by showing that the measures Defendants have taken, or not taken, to protect prisoners from COVID-19 were in conscious or reckless disregard of the safety and health of the detainees/prisoners, even if some do eventually contract COVID-19. *See Farmer*, 511 U.S. at 844 (the fact that "the harm ultimately was not averted" does not demonstrate deliberate

indifference); *Swain*, 958 F.3d at 1089. Accordingly, the record does not support that Defendants are likely to succeed on the merits of their Eighth Amendment claim or that there are serious questions going to the merits of that claim.

Because Plaintiffs have failed to show a likelihood of success of merits on either the Eighth or Fourteenth Amendment claims, the Court need not consider the remaining *Winter* elements. *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (citations omitted).

**3. ADA/RA**

Plaintiffs also assert claims and the ADA/RA on behalf of the Pretrial and Post-Conviction Disability subclasses and Puente. To prove a public program or service violates Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See* 42 U.S.C. § 12132; *Does 1-5 v. Chandler*, 83 F.3d 1150, 1154-55 (9th Cir. 1996). Under Section 504 of the Rehabilitation Act, a plaintiff must show: (1) he is an "individual with a disability"; (2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. *See* 29 U.S.C. § 794; *Bonner v. Lewis,* 857 F.2d 559, 562-63 (9th Cir. 1988); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir. 1988). Because the ADA has a broader scope, the Ninth Circuit analyzes both Acts under an ADA standard. *See Armstrong v. Davis*, 275 F.3d 849, 862 (9th Cir. 2001); *Zuckle v. Regents of the University of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act. Thus, courts have applied the same analysis to claims brought under both statutes.") (internal citations omitted). The plaintiff in a Title II case bears the initial burden "of producing evidence that a reasonable accommodation was possible." *Vinson v. Thomas* , 288 F.3d 1145, 1154 (9th Cir. 2002).

The burden then shifts to the public entity to show "that the requested accommodation was not reasonable." *Id*.

Plaintiffs argue in their Motion that the disability subclasses are vulnerable to severe illness or death if they contract COVID-19 and that Defendants have failed to take steps to protect this vulnerable group to prevent their infection, thereby denying them "an equal opportunity to benefit from the jails' services, including recreational 'activities,' medical 'services,' and education and vocational 'programs.'" (Doc. 14 at 34, quoting *Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998).) Plaintiffs cite to Tequida's Declaration where he states that he stays in his cell during the day and does not get in line to receive his medications or meals because there is no social distancing in the lines. (*Id*. at 35, citing Tequida Decl. ¶ 13.)

Defendants argue that although some of the Plaintiffs' medical conditions appear to qualify as disabilities under the ADA/RA, Plaintiffs fail to allege sufficient facts showing that they were discriminated against because of those conditions. (Doc. 28 at 44.) Plaintiffs respond that that they do not need to prove intentional, subjective discrimination based on disability, but that a defendant's failure to provide reasonable accommodations is sufficient to demonstrate discrimination "by reason of disability." (Doc. 40 at 39, quoting *McGary v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004).) Plaintiffs are correct that the Ninth Circuit, in *McGary*, found that the lower court erred in requiring that the defendants act "by reason of" the plaintiff's disability and held that "facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced." *McGary*, 386 F.3d at 1265.

Nevertheless, Plaintiffs have failed to show that being at a higher risk of contracting COVID-19 equates to a barrier of access to services. The cited affidavit that one Plaintiff does not want to leave his cell for fear of contracting the virus is insufficient to support that the subclasses are categorically inhibited.

Accordingly, Plaintiffs have failed to show a likelihood of success or serious questions going to the merits on their ADA/RA claim and the Court need not consider the remaining *Winter* elements. *Garcia.,* 786 F.3d at 740.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Ex Parte Application for Temporary Restraining Order (Doc. 14), which the Court construes as a Motion for Preliminary Injunction, and Defendants' Motion to Dismiss (Doc. 32).

(2) Defendants' Motion to Dismiss (Doc. 32) is **granted to the extent** that the Fourth and Eighth Amendment claims against Defendant Penzone are dismissed. The Motion is **denied** in all other respects.

(3) Plaintiff's Motion for Preliminary Injunction (Doc. 14) is **denied**.

Dated this 14th day of August, 2020.

Honorable Steven P. Logan
United States District Judge

# EXHIBIT 12

CASREF,CLASSACT,DTE,DTEATTY,PROTO

# U.S. District Court
# DISTRICT OF ARIZONA (Phoenix Division)
# CIVIL DOCKET FOR CASE #: 2:20−cv−01192−SPL−JZB

Fenty et al v. Penzone et al
Assigned to: Judge Steven P Logan
Referred to: Magistrate Judge John Z Boyle
Related Case: 2:20−cv−01245−DJH−−JZB
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 06/16/2020
Jury Demand: None
Nature of Suit: 555 Prisoner: Prison Condition
Jurisdiction: Federal Question

**Plaintiff**

**Jason Fenty**
*Appointed as representatives of the Pretrial Class, Pretrial Medically Vulnerable Subclass and Pretrial Disability Subclass per Order 67*

represented by

**Allison Ozurovich**
Dechert LLP − Los Angeles, CA
633 W 5th St., Ste. 4900
Los Angeles, CA 90071
213−808−5700
Fax: 213−808−5760
Email: Allie.Ozurovich@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
Dechert LLP − Los Angeles, CA
633 W 5th St., Ste. 4900
Los Angeles, CA 90071
213−808−5700
Fax: 213−808−5760
Email: Benjamin.Sadun@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
Dechert LLP − New York, NY
3 Bryant Park
1095 Avenue of the Americas
New York, NY 10036−6797
212−698−3500
Fax: 212−698−3599
Email: Brian.Raphel@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
ACLU − New York, NY
125 Broad St., 18th Fl.
New York, NY 10004
646−885−8373
Email: cspera@aclu.org
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
ACLU − Washington DC
915 15th St. NW, 7th Fl.
Washington, DC 20005
202−393−4930
Email: ckendrick@aclu.org

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
ACLU − Washington DC
915 15th St. NW, 7th Fl.
Washington, DC 20005
202−393−4930
Fax: 202−393−4931
Email: ebalaban@aclu.org
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
Stinson LLP − Kansas City, MO
1201 Walnut St., Ste. 2900
Kansas City, MO 64106
816−691−2628
Fax: 816−412−8192
Email: ethan.sanders@stinson.com
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
ACLU − New York, NY
125 Broad St., 18th Fl.
New York, NY 10004
212−549−2500
Email: hhandeyside@aclu.org
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
ACLU − Phoenix, AZ
P.O. Box 17148
Phoenix, AZ 85011
602−650−1854
Email: jkeenan@acluaz.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
ACLU − San Francisco, CA
Immigrants Rights Project
39 Drumm St.
San Francisco, CA 94111
202−393−4930
Fax: 202−393−4931
Email: kvirgien@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
Zwillinger Wulkan PLC
2020 N Central Ave., Ste. 675
Phoenix, AZ 85004
602−609−3800

Fax: 602−962−0089
Email: Larry.Wulkan@zwfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
ACLU − New York, NY
125 Broad St., 18th Fl.
New York, NY 10004
212−519−7855
Fax: 212−549−2654
Email: lwatson@aclu.org
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
ACLU − New York, NY
125 Broad St., 18th Fl.
New York, NY 10004
212−549−2663
Email: oakselrod@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
Dechert LLP − New York, NY
3 Bryant Park
1095 Avenue of the Americas
New York, NY 10036−6797
212−698−3500
Fax: 212−698−3599
Email: Pat.Andriola@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
Dechert LLP − Washington, DC
1900 K St. NW
Washington, DC 20006−1110
202−261−3300 7923
Fax: 202−261−3333
Email: shari.lahlou@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
ACLU − Washington DC
915 15th St. NW, 7th Fl.
Washington, DC 20005
202−904−7727
Email: strivedi@aclu.org
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
Dechert LLP − New York, NY
3 Bryant Park
1095 Avenue of the Americas

New York, NY 10036−6797
212−698−3500 8733
Fax: 212−698−3599
Email: timothy.ly@dechert.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
ACLU − San Francisco, CA
Immigrants Rights Project
39 Drumm St.
San Francisco, CA 94111
415−343−0769
Email: zbrennan−krohn@aclu.org
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
ACLU − Phoenix, AZ
P.O. Box 17148
Phoenix, AZ 85011
602−650−1854
Email: carellano@acluaz.org
*TERMINATED: 08/03/2021*

**Victoria Lopez**
ACLU − Phoenix, AZ
P.O. Box 17148
Phoenix, AZ 85011
602−773−6043
Email: vlopez@acluaz.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian Stepter**
*Appointed as representatives of the Pretrial Class, Pretrial Medically Vulnerable Subclass and Pretrial Disability Subclass per Order 67*

represented by

**Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas Crough**
*Appointed as representatives of the Pretrial Class, Pretrial Medically Vulnerable Subclass and Pretrial Disability Subclass per Order 67*

represented by

**Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edward Reason** represented by **Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jesus Tequida**
*Appointed as representative of the Post−Conviction Class, Post−Conviction Medically Vulnerable Subclass and Post−Conviction Disability Subclass per Order 67*

represented by

**Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ramon Aveneti**
*Appointed as representative of the Post−Conviction Class per Order 67*

represented by

**Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Scroggins**
*Appointed as representatives of the Pretrial Class, Pretrial Medically Vulnerable Subclass and Pretrial Disability Subclass per Order 67*

represented by

**Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Dale Perez**
*Appointed as representatives of the Pretrial Class per Order 67*

represented by **Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)

*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tamara Ochoa**
*Appointed as representatives of the Pretrial Class per Order 67*

represented by **Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**
(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Puente Human Rights Movement** represented by **Allison Ozurovich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Sadun**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian Christopher Raphel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clara Simone Spera**

(See above for address)
*TERMINATED: 09/16/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corene T Kendrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Balaban**
(See above for address)
*TERMINATED: 12/17/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Sanders**
(See above for address)
*TERMINATED: 09/10/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Handeyside**
(See above for address)
*TERMINATED: 01/27/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared G Keenan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Virgien**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence J Wulkan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olga Akselrod**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Nicholas Andriola**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shari Ross Lahlou**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Somil Bharat Trivedi**
(See above for address)
*TERMINATED: 06/22/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Ly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Brennan−Krohn**
(See above for address)
*TERMINATED: 05/20/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Arellano**
(See above for address)
*TERMINATED: 08/03/2021*

**Victoria Lopez**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Paul Penzone**
*Sheriff, in his official capacity*

represented by

**Ashlee B Hesman**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Fax: 480−420−1695
Email: ahesman@strucklove.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Patrick Struck**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Email: dstruck@strucklove.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin L Nguyen**
Struck Wieneke & Love PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600

Email: knguyen@strucklove.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Daniel Acedo**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Email: NAcedo@strucklove.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Love**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Fax: 480−420−1696
Email: RLove@strucklove.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne Marie Orcutt**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Email: aorcutt@strucklove.com
*ATTORNEY TO BE NOTICED*

**Eden Gabrielle Cohen**
Struck Love Bojanowski & Acedo PLC
3100 W Ray Rd., Ste. 300
Chandler, AZ 85226
480−420−1600
Fax: 480−420−1695
Email: ecohen@strucklove.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Maricopa, County of**
*a municipal entity*

represented by

**Ashlee B Hesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Patrick Struck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin L Nguyen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Daniel Acedo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Love**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Anne Marie Orcutt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eden Gabrielle Cohen**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2020 | 1 | PRISONER CIVIL RIGHTS COMPLAINT (TRO and Preliminary/Permanent Injunction requested) Injunctive Relief. Filing fee received: $ 400.00, receipt number 0970−18385988 filed by Ramon Aveneti, Douglas Crough, Anthony Scroggins, Tamara Ochoa, Brian Stepter, Dale Perez, Jason Fenty, Edward Reason, Puente Human Rights Movement, Jesus Tequida. (Wulkan, Lawrence) (Attachments: # 1 Civil Cover Sheet)(DLC) (Entered: 06/16/2020) |
| 06/16/2020 | 2 | Corporate Disclosure Statement by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (DLC) (Entered: 06/16/2020) |
| 06/16/2020 | 3 | SUMMONS Submitted by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Attachments: # 1 Summons)(DLC) (Entered: 06/16/2020) |
| 06/16/2020 | 4 | NOTICE OF ASSIGNMENT (DLC) (Entered: 06/16/2020) |
| 06/17/2020 | 5 | ORDER: Defendants Maricopa County Sheriff Paul Penzone, in his official capacity, and Maricopa County must answer the 1 "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief". If Plaintiffs do not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served. Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii). This matter is referred to Magistrate Judge John Z. Boyle pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1). See document for further details. Signed by Judge Steven P Logan on 6/17/20. (GMP) (Entered: 06/17/2020) |
| 06/17/2020 | 6 | Summons Issued as to Maricopa, County of, Paul Penzone. (GMP). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 06/17/2020) |
| 06/17/2020 | | Remark: Pro hac vice motion(s) granted for Eric Balaban on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 06/17/2020) |
| 06/18/2020 | | Remark: Pro hac vice motion(s) granted for Olga Akselrod and Zoe Brennan−Krohn on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, and Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 06/18/2020) |
| 06/18/2020 | | Remark: Pro hac vice motion(s) granted for Clara Simone Spera on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 06/18/2020) |

| | | |
|---|---|---|
| 06/19/2020 | | Remark: Pro hac vice motion(s) granted for Hugh Handeyside on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 06/19/2020) |
| 06/22/2020 | 7 | NOTICE of Appearance by Casey Arellano on behalf of Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Arellano, Casey) (Entered: 06/22/2020) |
| 06/29/2020 | 8 | * NOTICE OF FILING EXHIBITS SUPPORTING PLAINTIFF−PETITIONERS 10 MOTION FOR A TEMPORARY RESTRAINING ORDER (LODGED) AND 11 MOTION FOR CLASS CERTIFICATION by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida . (Attachments: # 1 Exhibit Exhibits 1 through 19, # 2 Exhibit Exhibit 20, # 3 Exhibit Exhibit 21 part 1 of 3, # 4 Exhibit Exhibit 21 part 2 of 3, # 5 Exhibit Exhibit 21 part 3 of 3, # 6 Exhibit Exhibits 22 through 27)(Wulkan, Lawrence) * Modified to add document linkage on 6/30/2020 (LAD). (Entered: 06/29/2020) |
| 06/29/2020 | 9 | MOTION MOTION TO EXCEED PAGE LIMIT FOR PLAINTIFF−PETITIONERS APPLICATION FOR A TEMPORARY RESTRAINING ORDER by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 06/29/2020) |
| 06/29/2020 | 10 | *Filed at 14 pursuant to 13 −−LODGED Proposed PLAINTIFF−PETITIONERS EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER re: 9 MOTION MOTION TO EXCEED PAGE LIMIT FOR PLAINTIFF−PETITIONERS APPLICATION FOR A TEMPORARY RESTRAINING ORDER . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) *Modified on 6/30/2020 (WLP). (Entered: 06/29/2020) |
| 06/29/2020 | 11 | MOTION to Certify Class by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 06/29/2020) |
| 06/30/2020 | 12 | NOTICE of Errata re: 8 Notice (Other) by Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida.. (Wulkan, Lawrence) (Entered: 06/30/2020) |
| 06/30/2020 | 13 | ORDER − IT IS ORDERED: 1. Petitioner's Motion (doc. 9 ) is granted. 2. The Clerk is directed to file Petitioner's proposed Ex Parte Application for Temporary Restraining Order (lodged at doc. 10 ). Signed by Magistrate Judge John Z Boyle on 6/30/2020. (WLP) (Entered: 06/30/2020) |
| 06/30/2020 | 14 | EX PARTE MOTION for Temporary Restraining Order by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(WLP) (Entered: 06/30/2020) |
| 06/30/2020 | | Remark: Pro hac vice motion(s) granted for Shari Ross Lahlou, Patrick Nicholas Andriola on behalf of Plaintiffs. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MSA) (Entered: 06/30/2020) |
| 06/30/2020 | | Remark: Pro hac vice motion(s) granted for Allison Ozurovich on behalf of Plantiffs. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MSA) (Entered: 06/30/2020) |
| 06/30/2020 | | Remark: Pro hac vice motion(s) granted for Ethan Sanders, Benjamin Sadun on behalf of plaintiffs. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MSA) (Entered: 06/30/2020) |

| | | |
|---|---|---|
| 07/02/2020 | 15 | ORDER − (1) Defendants−Respondents Penzone and Maricopa County shall have 14 days from the date of this Order to file a response to the Ex Parte Application for Temporary Restraining Order (Doc. 14 ), which the Court construes as a Motion for Preliminary Injunction. (2) Plaintiffs shall have 10 days from the filing of Defendants−Respondents' Response to file a Reply. (3) The Clerk of Court must send a copy of this Order to counsel for Defendants Penzone and Maricopa County by email to vigilj@mcao.maricopa.gov and certified mail to Maricopa County Attorney Civil Services Division, 225 W. Madison St., Phoenix, AZ 85003. (4) Plaintiffs must immediately file a "Notice of Change in Status" if there is any material change in a Plaintiff's custody status. Any request for relief must be made by separate motion and may not be included in the Notice. (See document for further details). Signed by Judge Steven P Logan on 7/2/2020. (LAD) (Entered: 07/02/2020) |
| 07/06/2020 | | Remark: Out of state attorneys Brian Raphel, Victoria Lopez, and Somil Trivedi removed as counsel of record for noncompliance with admission procedures; party or parties represented by other admitted counsel. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/06/2020) |
| 07/06/2020 | | Remark: Out of state attorney Timothy Ly removed as counsel of record for noncompliance with admission procedures; party or parties represented by other admitted counsel. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/06/2020) |
| 07/06/2020 | | Remark: Pro hac vice motion(s) granted for Brian Christopher Raphel on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/06/2020) |
| 07/07/2020 | 17 | NOTICE of Appearance by Kevin L Nguyen on behalf of Maricopa, County of, Paul Penzone. (Nguyen, Kevin) (Entered: 07/07/2020) |
| 07/07/2020 | 18 | MOTION for Extension of Time to File Response/Reply *to Plaintiffs Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order* by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Nguyen, Kevin) (Entered: 07/07/2020) |
| 07/09/2020 | 19 | ORDER − The 18 Motion is granted. Defendants shall have up to, and including, July 17, 2020 to file a response to Plaintiff's Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief; and Ex Parte Application for Temporary Restraining Order. See document for complete details. Signed by Magistrate Judge John Z Boyle on 7/9/2020. (MSA) (Entered: 07/09/2020) |
| 07/17/2020 | 20 | *MOTION for Extension of Time to File Response/Reply as to 1 Complaint, 14 Ex Parte MOTION for Temporary Restraining Order by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Struck, Daniel) *Modified to add document linkage on 7/20/2020 (GMP). (Entered: 07/17/2020) |
| 07/18/2020 | 21 | MOTION for Leave to File Excess Pages for Response to Plaintiffs−Petitioners Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Struck, Daniel) (Entered: 07/18/2020) |
| 07/18/2020 | 22 | *Filed at 28 pursuant to 27 −− LODGED Proposed Defendants Response to Plaintiffs Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order re: 14 MOTION for Temporary Restraining Order. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Struck, Daniel) *Modified on 7/20/2020 (WLP). (Entered: 07/18/2020) |
| 07/18/2020 | 23 | *Filed at 29 pursuant to 27 −− LODGED Proposed Declaration of B. Roska parts 1 and 2 is of Defendants Response laintiffs−Petitioners Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order re: 14 MOTION for Temporary Restraining Order. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Attachments: # 1 Roska Declaration 2 of 2)(Struck, Daniel) *Modified on 7/20/2020 (WLP). (Entered: |

| | | |
|---|---|---|
| | | 07/18/2020) |
| 07/18/2020 | 24 | *Filed at 30 pursuant to 27 −− LODGED Proposed Declaration of B. Willias parts 1 and 2 in Support of Defendants Response laintiffs−Petitioners Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order re: 14 MOTION for Temporary Restraining Order. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Attachments: # 1 Declaration of B. Williams part 2 of 2)(Struck, Daniel) *Modified on 7/20/2020 (WLP). (Entered: 07/18/2020) |
| 07/18/2020 | 25 | *Filed at 31 pursuant to 27 −− LODGED Proposed Declaration of G. Phillips in Support of Defendants Response to Plaintiffs Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief and Ex Parte Application for Temporary Restraining Order re: 14 MOTION for Temporary Restraining Order. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Attachments: # 1 Attachments 1−5 in Support of Declaration of G. Phillips, # 2 Attachments 6−15 in Support of Declaration of G. Phillips, # 3 Attachment 17 in Support of Declaration of G. Phillips)(Struck, Daniel) *Modified on 7/20/2020 (WLP). (Entered: 07/18/2020) |
| 07/18/2020 | 26 | *MOTION to Accept Late Filings re: 22 Lodged Proposed Document, 25 Lodged Proposed Document, 23 Lodged Proposed Document, 24 Lodged Proposed Document te Filing by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Acedo, Nicholas) *Modified on 7/20/2020 (GMP). (Entered: 07/18/2020) |
| 07/20/2020 | 27 | ORDER − IT IS ORDERED: 1. Respondents' Motion for Leave to File Excess Pages (doc. 21 ) is granted. The Clerk is directed to file Respondents' Proposed Response to the Petition for Writ of Habeas Corpus (lodged at doc. 22 ) and its corresponding declarations (lodged at docs. 23 , 24 , 25 ). 2. Respondents' Motion to Accept Late Filings (doc. 26 ) is granted. 3. Respondents' Motion for Extension of Time (doc. 20 ) is denied as moot. See document for complete details. Signed by Magistrate Judge John Z Boyle on 7/20/2020. (WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 28 | COMBINED RESPONSE to 1 Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, 14 EX PARTE MOTION for Temporary Restraining Order by Defendants Maricopa, County of, Paul Penzone. (WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 29 | DECLARATION of B. Roska in support of 28 Combined Response by Defendants Maricopa, County of, Paul Penzone. (Attachments: # 1 Declaration part 2)(WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 30 | DECLARATION of B. Willias in support of 28 Combined Response by Defendants Maricopa, County of, Paul Penzone. (Attachments: # 1 Declaration part 2)(WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 31 | DECLARATION of G. Phillips in support of 28 Combined Response by Defendants Maricopa, County of, Paul Penzone. (Attachments: # 1 Attachments 1−5 in Support of Declaration of G. Phillips, # 2 Attachments 6−15 in Support of Declaration of G. Phillips, # 3 Attachment 17 in Support of Declaration of G. Phillips)(WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 32 | MOTION to Dismiss Case by Maricopa, County of, Paul Penzone. (This entry was filed to reflect the Motion to Dismiss that was indicated in the same document that was filed at entry 28 Combined Response) (WLP) (Entered: 07/20/2020) |
| 07/20/2020 | 33 | Mail Returned as Undeliverable. Mail sent to Somil Trivedi. Reason for return: Return to Sender: Refused − Unable to Forward. Document number 5. (REK) (Entered: 07/21/2020) |
| 07/21/2020 | | Remark: Pro hac vice motion(s) granted for Timothy Ly on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, and Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/21/2020) |

| | | |
|---|---|---|
| 07/21/2020 | 34 | NOTICE re: Filing Signed Declaration of G. Phillips, M.D. in Support of Defendants−Respondents' Combined Response to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order and Defendants−Respondents' Motion to Dismiss Complaint for Injunctive and Declaratory Relief by Maricopa, County of, Paul Penzone re: 31 Declaration . (Attachments: # 1 Signed Declaration of G. Phillips, M.D.)(Nguyen, Kevin) (Entered: 07/21/2020) |
| 07/23/2020 | 35 | NOTICE of Errata re: 32 MOTION to Dismiss Case, 28 Response *to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order* by Defendants Maricopa, County of, Paul Penzone.. (Attachments: # 1 Exhibit − corrected p. 23, n.9)(Nguyen, Kevin) (Entered: 07/23/2020) |
| 07/27/2020 | 36 | *SUPPLEMENT Facts in Support re: 32 MOTION to Dismiss Case, 28 Response by Defendants Maricopa, County of, Paul Penzone. (Attachments: # 1 Second Declaration of G. Phillips, M.D.)(Nguyen, Kevin) *Modified to correct event on 7/28/2020 (GMP). (Entered: 07/27/2020) |
| 07/28/2020 | 37 | *RESPONSE in Opposition re: 11 MOTION to Certify Class and Request to Set Briefing Schedule by Maricopa, County of, Paul Penzone. (Nguyen, Kevin) *Modified to correct event on 7/28/2020 (GMP). (Entered: 07/28/2020) |
| 07/29/2020 | | Remark: Pro hac vice motion(s) granted for Somil Bharat Trivedi on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/29/2020) |
| 07/30/2020 | 38 | ORDER − IT IS ORDERED: 1. Defendants' Request to Delay Briefing on Plaintiff's Motion for Class Certification (doc. 37 ) is denied. 2. On or before August 14, 2020, Defendants shall respond to Plaintiff's Motion for Class Certification (doc. 11 ). Plaintiffs may file a reply within seven days of the filing date of the response. See document for complete details. Signed by Magistrate Judge John Z Boyle on 7/30/2020. (WLP) (Entered: 07/30/2020) |
| 07/30/2020 | 39 | MOTION for Leave to File Excess Pages for Reply in Support of Plaintiffs−Petitioners' Ex Parte Application for a Preliminary Injunction by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 07/30/2020) |
| 07/30/2020 | 40 | *(filed at doc. 44 ) − LODGED Proposed Reply in Support of Plaintiffs−Petitioners' Ex Parte Application for a Preliminary Injunction re: 39 MOTION for Leave to File Excess Pages for Reply in Support of Plaintiffs−Petitioners' Ex Parte Application for a Preliminary Injunction . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) Modified on 8/4/2020 (GMP). (Entered: 07/30/2020) |
| 07/30/2020 | 41 | NOTICE re: Filing Exhibits Supporting Plaintiffs−Petitioners' Reply In Support of Ex Parte Application for a Preliminary Injunction by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida re: 39 MOTION for Leave to File Excess Pages for Reply in Support of Plaintiffs−Petitioners' Ex Parte Application for a Preliminary Injunction . (Attachments: # 1 Exhibits 1−17 to Notice of Filing Exhibits)(Wulkan, Lawrence) (Entered: 07/30/2020) |
| 08/03/2020 | 42 | RESPONSE to Motion re: 32 MOTION to Dismiss Case filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 08/03/2020) |
| 08/04/2020 | 43 | ORDER: Granting Plaintiffs' 39 Motion for Leave to File Excess Pages. The Clerk is directed to file Plaintiffs' proposed Reply (lodged at doc. 40). Signed by Magistrate Judge John Z Boyle on 8/4/20. (GMP) (Entered: 08/04/2020) |

| | | |
|---|---|---|
| 08/04/2020 | 44 | REPLY to Response to Motion re: 14 MOTION for Temporary Restraining Order filed by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (GMP) (Entered: 08/04/2020) |
| 08/07/2020 | 45 | MOTION for Leave to File Declaration of G. Phillips and Declaration of B. Williams *in Support of Response to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order* by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Nguyen, Kevin) (Entered: 08/07/2020) |
| 08/07/2020 | 46 | *(filed at doc. 49 ) − LODGED Proposed Third Declaration of G Phillips MD re: 45 MOTION for Leave to File Declaration of G. Phillips and Declaration of B. Williams *in Support of Response to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order*. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Nguyen, Kevin) Modified on 8/10/2020 (GMP). (Entered: 08/07/2020) |
| 08/07/2020 | 47 | *(filed at doc. 50 ) − LODGED Proposed Second Declaration of B. Williams re: 45 MOTION for Leave to File Declaration of G. Phillips and Declaration of B. Williams *in Support of Response to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order*. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Maricopa, County of, Paul Penzone. (Nguyen, Kevin) Modified on 8/10/2020 (GMP). (Entered: 08/07/2020) |
| 08/10/2020 | 48 | ORDER: Granting defendant's 45 Motion for Leave to File. The Clerk is directed to file the proposed Declarations (lodged at docs. 46 & 47). Signed by Magistrate Judge John Z Boyle on 8/10/20. (GMP) (Entered: 08/10/2020) |
| 08/10/2020 | 49 | Third DECLARATION of G Phillips MD re: 28 Response by Defendants Maricopa, County of, Paul Penzone. (GMP) (Entered: 08/10/2020) |
| 08/10/2020 | 50 | Second DECLARATION of B Williams re: 28 Response by Defendants Maricopa, County of, Paul Penzone. (GMP) (Entered: 08/10/2020) |
| 08/11/2020 | 51 | NOTICE re: Filing Signed Third Declaration of G. Phillips, M.D. in Support of Defendants−Respondents' Response to Petition for Writ of Habeas Corpus and Ex Parte Application for Temporary Restraining Order by Maricopa, County of, Paul Penzone re: 49 Declaration . (Attachments: # 1 Signed 3rd Declaration of G. Phillips, M.D.)(Nguyen, Kevin) (Entered: 08/11/2020) |
| 08/14/2020 | 52 | ORDER: The reference to the Magistrate Judge is withdrawn as to Plaintiff's Ex Parte Application for Temporary Restraining Order 14 , which the Court construes as a Motion for Preliminary Injunction, and Defendants' Motion to Dismiss 32 . Defendants' Motion to Dismiss 32 is granted to the extent that the Fourth and Eighth Amendment claims against Defendant Penzone are dismissed. The Motion is denied in all other respects. Plaintiff's Motion for Preliminary Injunction 14 is denied. Signed by Judge Steven P. Logan on 8/14/2020. (LMR) (Entered: 08/14/2020) |
| 08/14/2020 | 53 | RESPONSE in Opposition re: 11 MOTION to Certify Class filed by Maricopa, County of, Paul Penzone. (Nguyen, Kevin) (Entered: 08/14/2020) |
| 08/14/2020 | 54 | DECLARATION of B. Williams (Third) re: 53 Response in Opposition to Motion *for Class Certification* by Defendants Maricopa, County of, Paul Penzone. (Nguyen, Kevin) (Entered: 08/14/2020) |
| 08/14/2020 | 55 | DECLARATION of G. Phillips MD (Fourth) re: 53 Response in Opposition to Motion *for Class Certification* by Defendants Maricopa, County of, Paul Penzone. (Nguyen, Kevin) (Entered: 08/14/2020) |
| 08/21/2020 | 56 | MOTION Exceed Page Limit for Reply re: 11 MOTION to Certify Class by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 08/21/2020) |
| 08/21/2020 | 57 | *(Filed at doc. 62 ) − LODGED Proposed Reply in Support of Motion for Class Certification re: 56 MOTION Exceed Page Limit for Reply re: 11 MOTION to Certify |

| | | |
|---|---|---|
| | | Class . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) Modified on 9/8/2020 (GMP). (Entered: 08/21/2020) |
| 08/27/2020 | 58 | MOTION for Extension of Time to Answer Plaintiffs Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Struck, Daniel) (Entered: 08/27/2020) |
| 08/27/2020 | 59 | NOTICE re: of Supplemental Authority by Maricopa, County of, Paul Penzone . (Attachments: # 1 Attachment A)(Nguyen, Kevin) (Entered: 08/27/2020) |
| 09/03/2020 | 60 | RESPONSE re: 59 Notice (Other) by Plaintiffs Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement. (Wulkan, Lawrence) (Entered: 09/03/2020) |
| 09/08/2020 | 61 | ORDER: Plaintiffs' 56 Motion to Exceed Page Limit is granted. The Clerk is directed to File Plaintiffs' Proposed Reply (doc. 57). Defendants' 58 Motion for Extension of Time is granted. On or before September 11, 2020, Defendants shall file their Answer to Plaintiffs' 1 Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief. Signed by Magistrate Judge John Z Boyle on 9/8/20. (GMP) (Entered: 09/08/2020) |
| 09/08/2020 | 62 | REPLY to Response to Motion re: 11 MOTION to Certify Class filed by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (GMP) (Entered: 09/08/2020) |
| 09/11/2020 | 63 | ANSWER to 1 Complaint *for Injunctive and Declaratory Relief* by Maricopa, County of, Paul Penzone.(Struck, Daniel) (Entered: 09/11/2020) |
| 09/16/2020 | 64 | NOTICE of Attorney Withdrawal *Clara Spera* filed by Lawrence J Wulkan. (Wulkan, Lawrence) (Entered: 09/16/2020) |
| 09/18/2020 | | Remark: Pro hac vice motion(s) granted for Leah Watson on behalf of Plaintiffs Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 09/18/2020) |
| 09/25/2020 | 65 | NOTICE re: Updated COVID−19 Test Results by Maricopa, County of, Paul Penzone . (Attachments: # 1 Exhibit 1)(Nguyen, Kevin) (Entered: 09/25/2020) |
| 10/02/2020 | 66 | NOTICE re: Plaintiff−Petitioner's Notice of Supplemental Authority in Support of Class Certification by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida re: 11 MOTION to Certify Class . (Wulkan, Lawrence) (Entered: 10/02/2020) |
| 11/13/2020 | 67 | ORDER − The reference to the Magistrate Judge is withdrawn as to Plaintiffs' Motion for Class Certification (Doc. 11 ) and the Motion is granted. The following Classes and Subclasses as discussed here in are certified. See Order for further details. Signed by Judge Steven P Logan on 11/13/20. (DXD) (Entered: 11/13/2020) |
| 11/13/2020 | 68 | NOTICE of Appearance by Victoria Lopez on behalf of Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lopez, Victoria) (Entered: 11/13/2020) |
| 12/16/2020 | | Remark: Pro hac vice motion(s) granted for Corene T Kendrick on behalf of Plaintiffs Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 12/16/2020) |

| | | |
|---|---|---|
| 12/17/2020 | 69 | NOTICE of Attorney Withdrawal *Eric Balaban* filed by Lawrence J Wulkan. (Wulkan, Lawrence) (Entered: 12/17/2020) |
| 01/07/2021 | 70 | *ORDER − Case Management Conference set for 2/8/2021 at 11:30 AM in Courtroom 302, 401 West Washington Street, Phoenix, AZ 85003 before Magistrate Judge John Z Boyle. Signed by Magistrate Judge John Z Boyle on 1/7/21. (DXD) *Modified to correct hearing judge; NEF regenerated on 1/8/2021 (MAP)(CEI). (Entered: 01/07/2021) |
| 01/27/2021 | 71 | NOTICE re: Withdrawal of Counsel by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida . (Wulkan, Lawrence) (Entered: 01/27/2021) |
| 01/27/2021 | 72 | REPORT of Rule 26(f) Planning Meeting by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 01/27/2021) |
| 02/04/2021 | 73 | ORDER − Discovery due by 7/6/2021. Dispositive motions due by 12/7/2021. IT IS FURTHER ORDERED that the Case Management Conference scheduled for February 8, 2021 (doc. 70 ) is vacated. (See document for complete details). Signed by Magistrate Judge John Z Boyle on 2/4/21. (SLQ) (Entered: 02/04/2021) |
| 02/22/2021 | 74 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 02/22/2021) |
| 02/22/2021 | 75 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 02/22/2021) |
| 03/05/2021 | 76 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 03/05/2021) |
| 03/18/2021 | 77 | Joint MOTION for Protective Order by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 03/18/2021) |
| 03/22/2021 | 78 | PROTECTIVE ORDER − The parties' Stipulation (Doc. 77 ) is granted. All Protected Health Information, Personal Information, and / or Security Information produced in discovery in this action shall be regarded as confidential information and subject to this Protective Order. See Order for further details. Signed by Magistrate Judge John Z Boyle on 3/22/21. (DXD) (Entered: 03/22/2021) |
| 03/29/2021 | 79 | MINUTE ORDER: Discovery Hearing set for 3/31/2021 at 02:00 PM in Courtroom 302, 401 West Washington Street, Phoenix, AZ 85003 before Magistrate Judge John Z Boyle. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (rkt) (Entered: 03/29/2021) |
| 03/30/2021 | 80 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 03/30/2021) |
| 03/31/2021 | 81 | MINUTE ENTRY for proceedings held before Magistrate Judge John Z Boyle: Telephonic Discovery Hearing held on 3/31/2021. Court and counsel discuss discovery re: jail tours. Order to issue.<br><br>APPEARANCES: Telephonic appearances by Olga Akselrod, Timothy Ly, and Lawrence Wulkan for Plaintiffs. Telephonic appearance by Ashlee Hesman for Defendants. (Recorded by COURTSMART.) Hearing held 1:59 PM to 2:44 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (KGM) (Entered: 03/31/2021) |
| 03/31/2021 | 82 | ORDER − Plaintiffs are permitted to conduct in−person Rule 34 inspections of the six Maricopa County Jails at issue here, subject to the limitations set forth in this order. See Order for further details. Signed by Magistrate Judge John Z Boyle on 3/31/21. (DXD) (Entered: 04/01/2021) |

| | | |
|---|---|---|
| 04/02/2021 | 83 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 04/02/2021) |
| 04/14/2021 | 84 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 04/14/2021) |
| 04/16/2021 | 85 | Joint MOTION for Extension of Time Completion of Good−Faith Settlement Discussions by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Kendrick, Corene) (Entered: 04/16/2021) |
| 04/19/2021 | 86 | ORDER − 1. The parties Stipulated Motion (doc. 85 ) is granted. 2. The deadline for the parties to engage in Good−Faith Settlement Discussions is extended until June 8, 2021. 3. All other deadlines and directives set forth in the Court's prior orders are affirmed. Signed by Judge Steven P Logan on 4/19/21. (LAD) (Entered: 04/19/2021) |
| 04/21/2021 | 87 | TRANSCRIPT REQUEST *re March 31 2021 Discovery Hearing* by Maricopa, County of, Paul Penzone for proceedings held on 03/31/2021, Magistrate Judge John Z Boyle hearing judge(s). (Hesman, Ashlee) (Entered: 04/21/2021) |
| 04/21/2021 | 88 | TRANSCRIPT REQUEST by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida for proceedings held on 3/31/2021, Magistrate Judge John Z Boyle hearing judge(s). (Kendrick, Corene) (Entered: 04/21/2021) |
| 04/23/2021 | 89 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Love, Rachel) (Entered: 04/23/2021) |
| 04/26/2021 | 90 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 04/26/2021) |
| 04/27/2021 | 91 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 04/27/2021) |
| 05/12/2021 | 92 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *TELEPHONIC DISCOVERY HEARING* proceedings held on 03/31/2021, before Magistrate Judge JOHN Z. BOYLE. [Transcriber: Barbara H. Stockford, Telephone number (602) 322−7247]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/2/2021. Redacted Transcript Deadline set for 6/14/2021. Release of Transcript Restriction set for 8/10/2021. (RAP) (Entered: 05/13/2021) |
| 05/14/2021 | 93 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 05/14/2021) |
| 05/20/2021 | 94 | NOTICE of Attorney Withdrawal *Zoe Brennan−Krohn* filed by Lawrence J Wulkan. (Wulkan, Lawrence) (Entered: 05/20/2021) |
| 05/21/2021 | 95 | First MOTION for Extension of Time Joint Motion to Modify Scheduling Order by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 05/21/2021) |
| 05/24/2021 | 96 | ORDER granting 95 Motion for Extension of Deadline. Discovery due by 8/24/2021. Dispositive motions due by 1/26/2022. See Order for further details. Signed by Magistrate Judge John Z Boyle on 5/24/21. (DXD) (Entered: 05/24/2021) |
| 05/26/2021 | 97 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 05/26/2021) |
| 05/26/2021 | 98 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: |

| | | |
|---|---|---|
| | | 05/26/2021) |
| 05/27/2021 | 99 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 05/27/2021) |
| 06/11/2021 | 100 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 06/11/2021) |
| 06/14/2021 | 101 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 06/14/2021) |
| 06/15/2021 | 102 | REPORT of Settlement Talks/Discussions *Joint Report on Settlement Talks* by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Kendrick, Corene) (Entered: 06/15/2021) |
| 06/22/2021 | 103 | NOTICE of Attorney Withdrawal *Leah Watson and Somil Trivedi* filed by Lawrence J Wulkan. (Wulkan, Lawrence) (Entered: 06/22/2021) |
| 07/02/2021 | 104 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 07/02/2021) |
| 07/12/2021 | 105 | Second MOTION for Extension of Time Joint Motion to Modify Scheduling Order by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Text of Proposed Order)(Wulkan, Lawrence) (Entered: 07/12/2021) |
| 07/16/2021 | 106 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 07/16/2021) |
| 07/19/2021 | 107 | ORDER granting 105 Stipulated Motion for Extension of Deadlines. Discovery due by 10/5/2021. Dispositive motions due by 3/9/2022. All other deadlines and directives set forth in the Courts prior orders are affirmed. Signed by Magistrate Judge John Z Boyle on 7/19/21. (DXD) (Entered: 07/19/2021) |
| 07/20/2021 | 108 | ORDER: Telephonic Discovery Dispute Hearing set for 7/22/2021 at 11:00 AM before Magistrate Judge John Z Boyle. FURTHER ORDERED that on or before 5:00 p.m., on Wednesday, July 21, 2021, the parties shall submit via email a joint summary of the discovery issues to be addressed at the hearing. See order for full details. Signed by Magistrate Judge John Z Boyle on 7/20/21. (SJF) (Entered: 07/20/2021) |
| 07/21/2021 | 109 | *NOTICE of Service of Discovery by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) *Modified to correct event on 7/22/2021 (DXD). (Entered: 07/21/2021) |
| 07/22/2021 | 110 | MINUTE ENTRY for proceedings held before Magistrate Judge John Z Boyle: Discovery Hearing held on 7/22/2021. Order to follow.<br><br>APPEARANCES: Telephonic appearance by Timothy Ly, Benjamin Sadun, and Lawrence Wulkan for Plaintiffs. Telephonic appearance by Ashlee Hesman for Defendants (Recorded by COURTSMART.) Hearing held 10:59 AM to 12:00 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/22/2021) |
| 07/22/2021 | 111 | ORDER − The Parties shall produce information as discussed herein. On or before 7/28/21, the parties shall contact the Courts Staff to schedule a hearing on Defendants' request to compel Plaintiffs to provide supplemental discovery responses. On or before 8/6/21, the parties shall submit a joint report via email to the Court. See Order for |

| | | |
|---|---|---|
| | | further details. Signed by Magistrate Judge John Z Boyle on 7/22/21. (DXD) (Entered: 07/22/2021) |
| 07/23/2021 | 112 | TRANSCRIPT REQUEST *re July 22, 2021 Discovery Hearing* by Maricopa, County of, Paul Penzone for proceedings held on July 22, 2021, Magistrate Judge John Z Boyle hearing judge(s). (Hesman, Ashlee) (Entered: 07/23/2021) |
| 07/23/2021 | 113 | TRANSCRIPT REQUEST by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida for proceedings held on 7/22/2021, Magistrate Judge John Z Boyle hearing judge(s). (Wulkan, Lawrence) (Entered: 07/23/2021) |
| 07/23/2021 | 114 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 07/23/2021) |
| 07/24/2021 | 116 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *TELEPHONIC DISCOVERY HEARING* proceedings held on 07/22/2021, before Magistrate Judge JOHN Z. BOYLE. [Transcriber: Elaine Cropper, Telephone number (602) 322−7245]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/19/2021. Redacted Transcript Deadline set for 8/30/2021. Release of Transcript Restriction set for 10/27/2021. (RAP) *Modified to correct date filed to match court reporter delivery date on 7/29/2021 (RAP). (Entered: 07/29/2021) |
| 07/29/2021 | 115 | ORDER: IT IS ORDERED that the parties shall appear for a telephonic discovery hearing before the Court on August 18, 2021 at 10:30 a.m. in Courtroom 302 of the Sandra Day O'Connor Federal Courthouse in Phoenix, Arizona. Signed by Magistrate Judge John Z Boyle on 7/29/21. (SST) (Entered: 07/29/2021) |
| 08/02/2021 | 117 | ORDER − telephonic Discovery Hearing set for 8/10/2021 at 3:30 PM before Magistrate Judge John Z Boyle. Signed by Magistrate Judge John Z Boyle on 8/2/21. (DXD) (Entered: 08/02/2021) |
| 08/03/2021 | 118 | STIPULATION *to Extend Date to Submit Joint Report* by Maricopa, County of, Paul Penzone. (Attachments: # 1 Text of Proposed Order)(Hesman, Ashlee) (Entered: 08/03/2021) |
| 08/03/2021 | 119 | ORDER granting 118 Stipulation: The parties Joint Report shall be filed on or before 8/13/21. Signed by Magistrate Judge John Z Boyle on 8/3/21. (DXD) (Entered: 08/03/2021) |
| 08/03/2021 | 120 | NOTICE of Attorney Withdrawal *Casey Arellano* filed by Victoria Lopez. (Lopez, Victoria) (Entered: 08/03/2021) |
| 08/10/2021 | 121 | MINUTE ENTRY for proceedings held before Magistrate Judge John Z Boyle: Discovery Hearing held on 8/10/2021. Order to follow.<br><br>APPEARANCES: Telephonic appearance by Timothy Ly for Plaintiffs. Ashlee Hesman for Defendants. (Recorded by COURTSMART.) Hearing held 3:30 PM to 3:54 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 08/10/2021) |
| 08/10/2021 | 122 | TRANSCRIPT REQUEST by Ramon Avenenti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida for proceedings held on August 10, 2021, Magistrate Judge John Z Boyle hearing judge(s). (Kendrick, Corene) (Entered: 08/10/2021) |
| 08/10/2021 | 123 | NOTICE TO FILER OF DEFICIENCY re: AO435 122 Transcript Request filed by Dale Perez, Jason Fenty, Brian Stepter, Tamara Ochoa, Jesus Tequida, Puente Human Rights Movement, Ramon Avenenti, Edward Reason, Douglas Crough, Anthony Scroggins. Item 18 − ORDER: E−mail address not provided where e−mail copy should be sent. ***FOLLOW−UP ACTION REQUIRED:*** Please refile and provide an email address for delivery. Deficiency must be corrected within one business day of |

| | | |
|---|---|---|
| | | this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 08/10/2021) |
| 08/10/2021 | 124 | AMENDED TRANSCRIPT REQUEST pursuant to 123 Notice of Deficiency by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida for proceedings held on August 10, 2021, Magistrate Judge John Z Boyle hearing judge(s). (Kendrick, Corene) (Entered: 08/10/2021) |
| 08/10/2021 | 125 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Wulkan, Lawrence) (Entered: 08/10/2021) |
| 08/11/2021 | 126 | ORDER − Defendants shall conduct threading of the responsive emails as discussed at the hearing. The parties shall evenly split the cost of threading the responsive emails (estimated to be $1400). See Order for further details. Signed by Magistrate Judge John Z Boyle on 8/10/21. (DXD) (Entered: 08/11/2021) |
| 08/12/2021 | | Remark: Pro hac vice motion(s) granted for Kyle Virgien on behalf of Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 08/12/2021) |
| 08/13/2021 | 127 | TRANSCRIPT REQUEST by Maricopa, County of, Paul Penzone for proceedings held on 08/10/2021, Magistrate Judge John Z Boyle, Judge Steven P Logan hearing judge(s). (Hesman, Ashlee) (Entered: 08/13/2021) |
| 08/13/2021 | 128 | REPORT *(Joint Report as per Order dated 8/3/2021)* re: 119 by Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Exhibit 1)(Raphel, Brian) (Entered: 08/13/2021) |
| 08/16/2021 | 139 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *TELEPHONIC DISCOVERY HEARING* proceedings held on 08/10/2021, before Magistrate Judge JOHN Z. BOYLE. [Transcriber: Barbara H. Stockford, Telephone number (602) 322−7247]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/21/2021. Redacted Transcript Deadline set for 10/1/2021. Release of Transcript Restriction set for 11/29/2021. (RAP) *Modified to correct date filed to match court reporter delivery date on 8/31/2021 (RAP). (Entered: 08/31/2021) |
| 08/18/2021 | 129 | MINUTE ENTRY for proceedings held before Magistrate Judge John Z Boyle: Discovery Hearing held on 8/18/2021. Order to issue.<br><br>APPEARANCES: Telephonic appearance by Timothy Ly for Plaintiffs. Telephonic appearance by Ashlee Hesman for Defendants. (Recorded by COURTSMART.) Hearing held 10:32 AM to 11:51 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (KGM) (Entered: 08/18/2021) |
| 08/19/2021 | 130 | TRANSCRIPT REQUEST *re August 18, 2021 Discovery Hearing* by Maricopa, County of, Paul Penzone for proceedings held on 8/18/2021, Magistrate Judge John Z Boyle, Judge Steven P Logan hearing judge(s). (Hesman, Ashlee) (Entered: 08/19/2021) |
| 08/19/2021 | 131 | NOTICE TO FILER OF DEFICIENCY re: AO 435 130 Transcript Request filed by Maricopa, County of, Paul Penzone. Item 18 − ORDER: Multiple boxes checked for CATEGORY. ***FOLLOW−UP ACTION REQUIRED:*** Please refile with the appropriate box checked under ORIGINAL + 1. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (NEC) Modified on 8/19/2021 (NEC). (Entered: 08/19/2021) |

| | | |
|---|---|---|
| 08/19/2021 | 132 | AMENDED TRANSCRIPT REQUEST pursuant to 131 Notice of Deficiency by Maricopa, County of, Paul Penzone for proceedings held on 8/18/2021, Magistrate Judge John Z Boyle, Judge Steven P Logan hearing judge(s). (Hesman, Ashlee) (Entered: 08/19/2021) |
| 08/20/2021 | 133 | ORDER granted in part and denied in part 128 Request to Compel Supplemental Responses as discussed herein. Dispositive motions due by 3/30/2022. See order for further details. Signed by Magistrate Judge John Z Boyle on 8/20/21. (DXD) (Entered: 08/20/2021) |
| 08/24/2021 | 134 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 08/24/2021) |
| 08/25/2021 | 135 | APPEAL OF MAGISTRATE JUDGE DECISION TO DISTRICT COURT by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida re: 126 Order. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Forms C, # 4 Declaration of Douglas Crough, # 5 Declaration of Edward Reason, # 6 Declaration of Anthony Scroggins, # 7 Declaration of Brian Stepter, # 8 Declaration of Jovana Renteria)(Lahlou, Shari) (Entered: 08/25/2021) |
| 08/26/2021 | 136 | NOTICE of Appearance by Anne Marie Orcutt on behalf of Maricopa, County of, Paul Penzone. (Orcutt, Anne) (Entered: 08/26/2021) |
| 08/26/2021 | 144 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *TELEPHONIC DISCOVERY DISPUTE HEARING* proceedings held on 08/18/2021, before Magistrate Judge JOHN Z. BOYLE. [Transcriber: Linda Schroeder, Telephone number (602) 322−7249]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (RAP) *Modified to correct date filed to match court reporter delivery date on 9/7/2021 (RAP). (Entered: 09/07/2021) |
| 08/30/2021 | 137 | First MOTION for Extension of Time Unopposed−Expedited to Modify the Court's Order Dkt No. 133 by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Proposed Order)(Lahlou, Shari) (Entered: 08/30/2021) |
| 08/31/2021 | 138 | ORDER − IT IS ORDERED: 1. Plaintiffs' Motion (doc. 137 ) is granted. 2. On or before September 3, 2021, Plaintiffs shall produce to Defendants all documents and things Plaintiffs intend to use to show the associational standing of Plaintiff Puente. 3. All other deadlines and directives set forth in the Court's prior orders are affirmed. Signed by Magistrate Judge John Z Boyle on 8/31/21. (SMH) (Entered: 08/31/2021) |
| 09/02/2021 | 140 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/FIRM NAME by Lawrence J Wulkan. (Wulkan, Lawrence) (Entered: 09/02/2021) |
| 09/07/2021 | 141 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/07/2021) |
| 09/07/2021 | 142 | *MOTION to Withdraw as Attorney *Motion for Order to Withdraw as Counsel* by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement. (Attachments: # 1 Proposed Order)(Torres, Javier) *Modified to correct event on 9/8/2021 (DXD). (Entered: 09/07/2021) |
| 09/07/2021 | 143 | MOTION for Extension of Time to Complete Depositions *[Unopposed]* by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Proposed Order)(Lahlou, Shari) (Entered: 09/07/2021) |

| | | |
|---|---|---|
| 09/08/2021 | 145 | NOTICE TO FILER OF DEFICIENCY re: 142 MOTION to Withdraw as Attorney. Document not in compliance with LRCiv 5.5(g) − Documents signed by an attorney shall be filed using that attorney's ECF log−in and password and shall not be filed using a log−in and password belonging to another attorney. Document(s) signed by attorney Ethan J. Sanders but submitted using the log−in and password belonging to attorney Javier Torres. ***No further action is required***. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (DXD) (Entered: 09/08/2021) |
| 09/08/2021 | 146 | NOTICE of Deposition of Puente Human Rights Movement, filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/08/2021 | 147 | NOTICE of Deposition of Jason Fenty, filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/08/2021 | 148 | NOTICE of Deposition of Anthony Scroggins, filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/08/2021 | 149 | NOTICE of Deposition of Brian Stepter, filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/08/2021 | 150 | RESPONSE re: 135 Appeal of Mag Judge Decision to Dist Court (Rule 72(a) Objection) by Defendants Maricopa, County of, Paul Penzone. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/08/2021 | 151 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/08/2021) |
| 09/09/2021 | 152 | MOTION for Extension of Time to Provide Medical Records and Executed Waivers for Correctional Facilities−Expedited by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Declaration of Timothy Ly In Support, # 2 Proposed Order)(Lahlou, Shari) (Entered: 09/09/2021) |
| 09/10/2021 | 153 | ORDER granting 142 Attorney Ethan Sander's Motion to Withdraw as Attorney. Plaintiffs' Motion for Extension of Deadline to Take Depositions of ESI Custodians (Doc. 143 ) is granted. The deadline for Plaintiffs to take the deposition of any of Defendants' ESI custodians1 is extended until 10/20/2021. Signed by Magistrate Judge John Z Boyle on 9/9/21. (DXD) (Entered: 09/10/2021) |
| 09/10/2021 | 154 | ORDER granting in part 152 Motion for Extension of Time. Plaintiffs' deadline to comply with the Court's Order (Doc. 133 at 3−4) is extended through 9/24/2021. Signed by Magistrate Judge John Z Boyle on 9/10/21. (DXD) (Entered: 09/10/2021) |
| 09/13/2021 | 155 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/13/2021) |
| 09/15/2021 | 156 | AMENDED ORDER − 1. Plaintiffs' Motion (doc. 152 ) is granted in part. 2. Plaintiffs' deadline to comply with Section II(a)1 and (b)2 of the Courts August 20, 2021 Order (doc. 133 at 3−4) is extended through September 24, 2021. 3. All other deadlines and directives set forth in the Courts prior orders are affirmed. See attached Order for complete details. Signed by Magistrate Judge John Z Boyle on 9/10/21. (SMH) (Entered: 09/15/2021) |
| 09/15/2021 | 157 | REPLY re: 135 Appeal of Mag Judge Decision to Dist Court (Rule 72(a) Objection) by Plaintiffs Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Virgien, Kyle) (Entered: 09/15/2021) |
| 09/17/2021 | 158 | NOTICE of Deposition of PAUL PENZONE, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 159 | NOTICE of Deposition of DAVID CRUTCHFIELD, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |

| | | |
|---|---|---|
| 09/17/2021 | 160 | NOTICE of Deposition of GREGORY HARSHA, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 161 | NOTICE of Deposition of GRANT PHILLIPS, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 162 | NOTICE of Deposition of VINCENT GALES, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 163 | NOTICE of Deposition of LANCE LESLIE, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 164 | NOTICE of Deposition of BARRY ROSKA, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 165 | NOTICE of Deposition of BARRON−IRBY, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 166 | NOTICE of Deposition of VICTOR GAN, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 167 | NOTICE of Deposition of TANIA LYNCH, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 168 | NOTICE of Deposition of MARICOPA COUNTY, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/17/2021 | 169 | First MOTION for Extension of Time to Depose Plaintiffs by Maricopa, County of, Paul Penzone. (Attachments: # 1 Proposed Order)(Hesman, Ashlee) (Entered: 09/17/2021) |
| 09/17/2021 | 170 | NOTICE of Deposition of BRENT WILLIAMS, filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/17/2021) |
| 09/21/2021 | 171 | ORDER: Defendants' Motion 169 is granted. Defendants' deadline to depose Plaintiffs is extended until October 18, 2021. Signed by Magistrate Judge John Z Boyle on 9/21/2021. (REK) (Entered: 09/21/2021) |
| 09/22/2021 | 172 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 09/22/2021) |
| 09/23/2021 | 173 | ORDER on Appeal of Magistrate Judge Decision to District Court. The Plaintiff's Objections are overruled and the August 11, 2021 Order (Doc. 126 ) is affirmed. Signed by Judge Steven P Logan on 9/23/21. (SJF) (Entered: 09/23/2021) |
| 09/24/2021 | 174 | Second MOTION for Extension of Time to Provide Medical Records Expedited Unopposed by Ramon Aveneti, Douglas Crough, Jason Fenty, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Supplemental Declaration of Timothy Ly In Support, # 2 |

| | | |
|---|---|---|
| | | Proposed Order)(Lahlou, Shari) (Entered: 09/24/2021) |
| 09/24/2021 | 175 | NOTICE of Service of Discovery filed by Ramon Aveneti, Douglas Crough, Jason Fenty, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Lahlou, Shari) (Entered: 09/24/2021) |
| 09/24/2021 | 176 | AMENDED DOCUMENT by Ramon Aveneti, Douglas Crough, Jason Fenty, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. Amendment to 174 Second MOTION for Extension of Time to Provide Medical Records Expedited Unopposed *(Corrected Proposed Order)*. (Lahlou, Shari) (Entered: 09/24/2021) |
| 09/28/2021 | 177 | Joint MOTION for Extension of Time to Extend Deadlines by Ramon Aveneti, Douglas Crough, Jason Fenty, Tamara Ochoa, Dale Perez, Puente Human Rights Movement, Edward Reason, Anthony Scroggins, Brian Stepter, Jesus Tequida. (Attachments: # 1 Proposed Order)(Lahlou, Shari) (Entered: 09/28/2021) |
| 09/30/2021 | 178 | ORDER granting 174 Motion for Extension of Time. Plaintiffs' deadline to respond to Defendants' Interrogatories is extended to 11/8/2021. The parties' Joint Motion for Extension of Case Management Deadlines (Doc. 177 ) is granted. Discovery due by 1/14/2022. Dispositive motions due by 6/17/2022. Signed by Magistrate Judge John Z Boyle on 9/29/21. (DXD) (Entered: 09/30/2021) |
| 10/05/2021 | 179 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 10/05/2021) |
| 10/19/2021 | 180 | NOTICE of Service of Discovery filed by Maricopa, County of, Paul Penzone. (Hesman, Ashlee) (Entered: 10/19/2021) |
| 10/20/2021 | 181 | NOTICE of Appearance by Eden Gabrielle Cohen on behalf of Maricopa, County of, Paul Penzone. (Cohen, Eden) (Entered: 10/20/2021) |