**No. 21-71351**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

JASON FENTY, ET. AL.

*Petitioners,*

**v.**

UNITED STATES DISTRICT COURT-DISTRICT OF ARIZONA,

*Respondent,*

SHERIFF PAUL PENZONE, IN HIS OFFICIAL CAPACITY, AND MARICOPA COUNTY, A MUNICIPAL ENTITY,

*Real Parties in Interest.*

*On Petition for a Writ of Mandamus to the United States District Court for the District of Arizona,*
*Case No. 2:20-CV-01192-SPL-JZB*

---

# AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONERS' PETITION FOR MANDAMUS RELIEF

---


Lauren Bonds
National Police Accountability Project
2022 St. Bernard Avenue, Suite 310
New Orleans, LA 70116
(504) 220-0401
legal.npap@nlg.org

John Burton
The Law Offices of John Burton
128 North Fair Oaks Avenue
Pasadena, California 91103
(626) 449-8300
jb@johnburtonlaw.com

*Counsel for Amicus Curiae National Police Accountability Project*

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae is the National Police Accountability Project (NPAP), a non-profit § 501(c)(3) corporation formed under the laws of New York. Amicus curiae does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

PRELIMINARY STATEMENT .......... 1

INTEREST OF AMICUS CURIAE .......... 2

SUMMARY OF THE ARGUMENT .......... 3

ARGUMENT .......... 4

I. The District Court's Order Will Have a Significant Chilling Effect on Future Indigent Plaintiffs Seeking to Enforce Their Civil Rights. .......... 4

A. Litigation Costs Create Barriers for Victims of Police Misconduct and Other Civil-Rights Abuses .......... 5

1. A High Proportion of Plaintiffs in Police Misconduct and Jail Abuse Cases Cannot Afford to Directly Pay for Their Opponent's Discovery Production Costs. .......... 5

2. Indigent Plaintiffs Often Must Rely on Their Attorneys to Advance Litigation Costs and Will Struggle to Find Counsel to Accept Their Cases If They Require High Outlays. .......... 9

B. The Prospect of Being Forced to Pay High ESI Costs May Hinder Plaintiffs' Attorneys from Obtaining Evidence Crucial to Proving Civil-Rights Claims. .......... 13

II. Petitioners Are Uniquely Positioned to Seek Relief from the Harmful Lower Court Order. .......... 16

CONCLUSION .......... 18

## TABLE OF AUTHORITIES

### CASES

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ....................................................11

*Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003) ........................17

### OTHER AUTHORITIES

Alison L. Patton, *The Endless Cycle of Abuse: Why 42 U.S.C. §1983 Is Ineffective in Deterring Police Brutality*, 44 Hastings L.J. 753 (1993)................................12

Andrea Fenster and Margo Schlanger, *Slamming the Courthouse Door: 25 years of evidence for repealing the Prison Litigation Reform Act*, Prison Policy Initiative (Apr. 26, 2021) ..........................................................................................11

Emery G. Lee III, *Law Without Lawyers: Access to Civil Justice and the Cost of Legal Services*, 69 U. Miami L. Rev. 499 (2015) ..............................................15

Irving Joyner, *Litigating Police Misconduct Claims in North Carolina,* 19 N.C. Cent. L.J. 113 (1991)...........................................................................................10

Joanna Schwartz, *After Qualified Immunity*, 120 Colum. L. Rev. 309 (2020) .......10

Joanna Schwartz, *Qualified Immunity's Selection Effects*, 114 Nw. U. L. Rev. 1101 (2020).......................................................................................... 9, 10, 11

Judith A.M. Scully, *Rotten Apple or Rotten Barrel?: The Role of Civil Rights Lawyers In Ending The Culture of Police Violence*, 21 Nat'l Black L.J. 137 (2009)...................................................................................................................6

Kenneth Levine, *In Forma Pauperis Litigators: Witness Fees & Expenses in Civil Actions*, 53 Fordham L. Rev. 1461 (1985).........................................................14

Kimberly Kidani, *How to Actually Fix A Broken Window*, Geo. J. on Poverty L. & Pol'y Online (Feb. 21, 2018)........................................................................8

Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555 (2003) ...................12

Martin Redish, *The Future of Discovery: Discovery Cost Allocation, Due Process, and the Constitution's Role in Civil Litigation*, 71 Vand. L. Rev. 1847 (2018)..14

Maureen Carroll, *Fee Shifting Statutes & Compensation for Risk*, 95 Ind. L.J. 1021 (2020)....................................................................................................11

Meera Jagannathan, *1 in 5 LGBTQ Americans lives in poverty—and some groups are particularly worse off*, Marketwatch (Oct. 23, 2019) ....................................7

Michael Avery, *Police Misconduct Law and Litigation* (3d Ed. 2020) ................10

Nanette Goodman, et. al., *Financial Inequality: Disability, Race and Poverty in America*, The National Disability Institute (2017)................................................6

Neil Bhutta, et. al., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances*, Feds Notes (Sept. 28, 2020) ............................................6

Nicholas P. Johnson, *Cash Rules Everything Around the Money Bail System: The Effect of Cash-Only Bail on Indigent Defendants in America's Money Bail System*, 36-37 Buff. Pub. Int. L.J. 29 (2019)..........................................................8

Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 NW. U. L. Rev. Colloquy 182 (2007) ..................................................... 9, 12, 16

Seth Eichenholtz, *Pricing Processing in E-Discovery: Keep the Invoice from Being a Surprise*, Pretrial Practice and Discovery, Winter/Spring 2011 .......................13

Shanin Specter, Thomas R. Kline, Andrew J. Stern, Andrew S. Youman, Testimony to the Advisory Committee on Civil Rules (Apr. 10-11, 2014).. 13, 16

Shankar Vedantam, *How A Theory of Crime And Policing Was Born, And Went Terribly Wrong*, NPR (Nov. 1, 2016, 12:00 AM) ..................................................8

Stewart J. Schwab & Theodore Eisenberg, *Explaining Constitutional Tort Litigation: The Influence of the Attorney Fees Statute and the Government as Defendant*, 73 Cornell L. Rev. 719 (1988).........................................................17

Testimony of Joseph M. Sellers to the Advisory Committee on Civil Rules (Apr. 10-11, 2014)..........................................................................................................14

Testimony of the Lawyers' Club of San Francisco to the Advisory Committee on Civil Rules (Apr. 9-10, 2015).........................................................................15

Testimony of the Maryland Trial Lawyers Association to the Advisory Committee on Civil Rules (Apr. 9-10, 2015) ....................15

Valerie Wilson, *Racial disparities in income and poverty remain largely unchanged amid strong income growth in 2019*, Economic Policy Institute (Sept. 16, 2020) ....................6

William H.J. Hubbard, *A Fresh Look at Plausibility Pleading*, 83 U. Chi. L. Rev. 693 (2016) ....................10

## PRELIMINARY STATEMENT

Petitioners are indigent incarcerated people and a grassroots nonprofit that sued the Maricopa County Sheriff to challenge dangerous conditions created by the jail's inadequate response to the COVID-19 virus. Petitioners' sole motivation for bringing this case is to improve safety protocols and make the facility safer for inmates and staff. They are not suing to recover damages. Due to Petitioners' indigency and the lack of monetary relief available in the case, their counsel is working on a pro bono basis.

During discovery, the Sheriff failed to properly produce emails in response to Petitioners' request for production. Petitioners moved the District Court to compel production. While the District Court granted the motion, it ordered Petitioners to split the costs. The District Court's order requiring indigent plaintiffs to pay for the production of electronically stored information ("ESI") is not only contrary to law but sets a precedent that could deter civil-rights litigation and effective discovery for future low-income victims of government abuse. Petitioners' counsel's unique ability to take on the burden of a mandamus petition make this case the ideal vehicle to correct the District Court's troubling ruling.

## INTEREST OF AMICUS CURIAE[1]

The National Police Accountability Project (NPAP) was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil-rights lawyers. NPAP has approximately six hundred attorney members practicing in every region of the United States, including a number of members in Arizona. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and correction officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients. Litigation costs are consistently a barrier for victims of police and detention facility misconduct who seek accountability in the civil justice system.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), amicus curiae state that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than amicus curiae, their members, or their counsel contributed money intended to fund preparing or submitting this brief. All parties consented to the National Police Accountability Project's participation as amicus curiae in this case.

## SUMMARY OF THE ARGUMENT

Litigation costs can pose major barriers to effective civil-rights enforcement. People who live in poverty are uniquely vulnerable to experiencing constitutional violations. Accordingly, many victims of civil-rights abuse cannot afford to vindicate their rights unless they can find an attorney to advance the costs of litigation. The District Court's order creating a new discovery expense for indigent civil-rights plaintiffs in the form of ESI cost-shifting will make it even harder for low-income people to self-finance litigation and will impair their abilities to find attorneys to take on their cases. Civil-rights attorneys will screen out cases that have high or unpredictable costs vis-à-vis the expected recovery. In particular, most attorneys that litigate police misconduct and jail abuse cases already operate on a limited budget and will be reluctant to take on a case where ESI discovery is likely. Even if the prospect of ESI cost-shifting does not deter attorneys from taking on a case, it may cause them to forgo appropriate discovery.

The District Court's order creates troubling precedent that few indigent civil-rights plaintiffs will be able to challenge through a mandamus petition. Because the majority of civil-rights attorneys have small practices and limited resources, they are unlikely to be able to commit the time and expense required to seek extraordinary relief when the defendant's ESI costs are assigned to their indigent client. Instead, they will likely decide to withdraw their discovery request. Here,

Petitioners' have the capacity to take on the burden of seeking relief, providing the Court a rare opportunity to decide the important question of ESI cost-shifting to indigent civil-rights plaintiffs. NPAP urges the Court to grant the Petition and to ensure that future indigent civil-rights plaintiffs are not chilled from suing or seeking discovery.

## ARGUMENT

### I. The District Court's Order Will Have a Significant Chilling Effect on Future Indigent Plaintiffs Seeking to Enforce Their Civil Rights.

Upholding the District Court's order requiring indigent civil-rights plaintiffs to pay the costs of a defendant's discovery production would establish troubling precedent undermining enforcement of constitutional protections in the Ninth Circuit. If the order is left to stand, future victims of civil-rights abuses will face a potentially prohibitive cost barrier to effective litigation, making it more difficult for them to find counsel and to obtain discovery. Even if future courts apply the order sparingly, the possibility of having to take on these additional expenses will impact counsel's decisions about whether to take on a case, and subsequently whether to insist on complete discovery production. Because the District Court's order could deter future civil-rights litigants, relief should be granted.

### A. Litigation Costs Create Barriers for Victims of Police Misconduct and Other Civil-Rights Abuses.

The District Court's order will have an acute impact on indigent plaintiffs suing to enforce their civil rights. A significant number of civil-rights plaintiffs, including petitioners, lack the financial resources to directly fund litigation and cannot shoulder the costs of an order to a defendant's production. For instance, in this case, Petitioner Stepter's only source of income is Supplemental Security Income. Pet. Br. at Ex. 7. He cannot afford any expenses other than those necessary for his subsistence. *Id.*

Instead, plaintiff's  counsel will have to advance the costs of paying for half of a defendant's production, an expense that could make the case unaffordable for many attorneys. These barriers to litigation not only prevent civil-rights victims from securing justice but undermine the broader societal benefit of civil-rights enforcement.

#### 1. A High Proportion of Plaintiffs in Police Misconduct and Jail Abuse Cases Cannot Afford to Directly Pay for Their Opponent's Discovery Production Costs.

Many of the individuals and organizations that sue to enforce civil-rights laws have limited financial resources. The historical and contemporary oppression of minority groups has generated significant income and wealth inequality. While no socio-economic class is immune from constitutional violations, the

marginalized groups that have historically been denied civil-rights protections and continue to be targets of government abuse are overwhelmingly poor. For instance, Black Americans, who were the initial intended beneficiaries of many civil-rights statutes, are overrepresented in poverty counts. *See Eg.* Judith A.M. Scully, *Rotten Apple or Rotten Barrel?: The Role of Civil Rights Lawyers In Ending The Culture of Police Violence*, 21 Nat'l Black L.J. 137, 145 (2009) (noting one of Section 1983's primary purposes was to provide African Americans with a civil remedy for government sanctioned violence); Neil Bhutta, et. al., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances*, FEDS NOTES (Sept. 28, 2020).[2] Similarly, Latinx people, people with disabilities, and members of the LGBTQIA community all have faced systemic oppression by the government and have disproportionately low annual incomes. Valerie Wilson, *Racial disparities in income and poverty remain largely unchanged amid strong income growth in 2019*, Economic Policy Institute (Sept. 16, 2020);[3] Nanette Goodman, et. al., *Financial Inequality: Disability, Race and Poverty in America*, The National Disability Institute 12 (2017)[4] (noting the rate of poverty for people living with disabilities was twice that of people with no

---

[2] Available at: https://doi.org/10.17016/2380-7172.2797.
[3] Available at: https://www.epi.org/blog/racial-disparities-in-income-and-poverty-remain-largely-unchanged-amid-strong-income-growth-in-2019/.
[4] Available at: http://www.advancingstates.org/sites/nasuad/files/Disability-Race-Poverty-in-America.pdf.

disability); Meera Jagannathan, *1 in 5 LGBTQ Americans lives in poverty—and some groups are particularly worse off*, Marketwatch (Oct. 23, 2019).[5] The classes of people many civil-rights laws were designed to protect also lack the resources to independently finance their enforcement.

Moreover, poor people are particularly likely to be exposed to abuse during contact with the criminal justice system due to overpolicing and overincarceration of people in poverty. Police use force at higher rates in low-income neighborhoods. Robert O. Motley Jr. and Sean Joe, *Police Use of Force by Ethnicity, Sex, and Socioeconomic Class*, Journal of the Society for Social Work & Research, 53-55 (Spring 2018)[6] (finding officers were most likely to use physical force against individuals with incomes of less than $20,000 per year); Francie Diepjan, *Police Are Most Likely to Use Deadly Force in Poorer, More Highly Segregated Neighborhoods*, Pacific Standard Magazine (Jan. 24, 2019)[7] (police use deadly force most often in poor, majority Black neighborhoods). People with low incomes are also more frequently the targets of broken windows policing, which often involves unconstitutional stops and searches. *See* Kimberly Kidani, *How to*

---

[5] Available at: https://www.epi.org/blog/racial-disparities-in-income-and-poverty-remain-largely-unchanged-amid-strong-income-growth-in-2019/.

[6] Available at: https://cpb-us-w2.wpmucdn.com/sites.wustl.edu/dist/7/497/files/2018/07/Police-Use-of-Force-by-Ethnicity-Sex-and-Socioeconomic-Class-1h3fybv.pdf.

[7] Available at: https://psmag.com/news/police-are-most-likely-to-use-deadly-force-in-poorer-more-highly-segregated-neighborhoods.

*Actually Fix A Broken Window*, Geo. J. on Poverty L. & Pol'y Online (Feb. 21, 2018);[8] Shankar Vedantam, *How A Theory of Crime And Policing Was Born, And Went Terribly Wrong*, NPR (Nov. 1, 2016, 12:00 AM),[9] (detailing how broken windows policing philosophies often produce illegal stop-and-frisk policies in poor neighborhoods).

Poor people, like the petitioners, remain vulnerable to harm after they are arrested. People with lower incomes are more likely to face abuse in jail in large part because the cash-bail system forces them to remain in pretrial detention longer than middle- or high-income individuals. *See* Nicholas P. Johnson, *Cash Rules Everything Around the Money Bail System: The Effect of Cash-Only Bail on Indigent Defendants in America's Money Bail System*, 36-37 Buff. Pub. Int. L.J. 29, 97 (2019). For instance, Petitioners Crough and Scroggins are currently incarcerated awaiting trial because they cannot afford to pay bond. Pet. Br. at Ex. 4, 6.

The District Court's order establishes a precedent that will create additional financial burdens for litigants who cannot easily take on the costs. Pro-se indigent plaintiffs responsible for financing their own litigation will be priced out of suing if

---

[8] Available at: https://www.law.georgetown.edu/poverty-journal/blog/how-to-actually-fix-a-broken-window/.
[9] Available at: https://www.npr.org/2016/11/01/500104506/broken-windows-policing-and-the-origins-of-stop-and-frisk-and-how-it-went-wrong.

they are required to cover expenses of defendant's ESI production. Victims of government abuse who are advanced costs by their counsel could similarly be shut out of litigation because many attorneys will be unable to afford to take on cases that carry added ESI expenses.

**2. Indigent Plaintiffs Often Must Rely on Their Attorneys to Advance Litigation Costs and Will Struggle to Find Counsel to Accept Their Cases If They Require High Outlays.**

Given the prevalence of poverty amongst civil-rights victims, most attorneys who litigate police misconduct and jail abuse cases must advance the cost of litigation for their clients. *See, e.g.*, Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 Nw. U. L. Rev. Colloquy 182, 184 (2007) (explaining that expense of civil-rights enforcement and that it is often borne by plaintiffs' counsel); Joanna Schwartz, *Qualified Immunity's Selection Effects*, 114 Nw. U. L. Rev. 1101, 1110 n. 36 (2020) (noting that 92 of 94 surveyed police misconduct lawyers had fee arrangements in which they advanced litigation costs). Most of these representation arrangements take the form of contingency-fee agreements where the attorney anticipates recouping the time and costs invested in the case by taking a percentage of their client's damage award. *Id.* at 1111.

For a contingency-fee case to be economically feasible, the litigation costs cannot exceed the attorney's share of the expected recovery. *See* William H.J.

Hubbard, *A Fresh Look at Plausibility Pleading*, 83 U. Chi. L. Rev. 693, 707 (2016) ("plaintiffs' attorney working on contingency must offset the entire cost of litigating every case with a fraction of the judgments in the successful cases"); Joanna Schwartz, *After Qualified Immunity*, 120 Colum. L. Rev. 309, 346 (2020) ("scholars assume that attorneys representing plaintiffs on a contingency fee will only accept a case if the expected recovery is greater than the anticipated litigation costs."). Accordingly, police misconduct lawyers closely analyze possible litigation costs before agreeing to take on a case. *See* Schwartz, *supra*, at 1110 (explaining Section 1983 attorneys file cases where "the likelihood of prevailing and their expected monetary gain is greater than or equal to their anticipated costs."); Irving Joyner, *Litigating Police Misconduct Claims in North Carolina,* 19 N.C. Cent. L.J. 113, 143 (1991) (noting capacity to front costs is a common reason attorneys do not pursue police abuse cases); Michael Avery, *Police Misconduct Law and Litigation*, 694 (3d Ed. 2020) (noting attorneys suing the police must consider "out of pocket office expenses" and "determine funding sources before you file suit"). Cases that require significant outlay are less attractive to attorneys, aside from those that present the possibility of a high damage award, a rarity in the majority of Section 1983 cases. *See* Hubbard, *supra,* at 748 ("[f]rom the plaintiff's perspective, litigation costs are also a first-order concern, because high litigation costs deter potentially meritorious claims for modest damages."); *City of Riverside*

*v. Rivera*, 477 U.S. 561, 577 (1986) (acknowledging civil-rights cases "frequently involve substantial expenditures of time and effort but produce only small monetary recoveries"). Cost pressures are especially burdensome for attorneys who accept civil-rights cases governed by the Prison Litigation Reform Act where fees are capped at 150% of damages and attorneys are forced to accept a below-market rate. *See* Andrea Fenster and Margo Schlanger, *Slamming the Courthouse Door: 25 years of evidence for repealing the Prison Litigation Reform Act*, Prison Policy Initiative (Apr. 26, 2021).[10]

Pro bono attorneys who represent victims of police abuse will similarly be deterred from taking on cases that depend on hard-to-access evidence. Most nonprofit legal organizations and pro bono law firms have finite litigation budgets and analyze projected costs as part of their case selection criteria. *See* Schwartz, *supra*, at 1111 ("because pro bono attorneys and nonprofits have limited time and resources, they will want to select cases most likely to achieve their intended goals and may be disinclined to take a case that will be particularly expensive or timeconsuming to litigate"); Maureen Carroll, *Fee Shifting Statutes & Compensation for Risk*, 95 Ind. L.J. 1021, 1029 n. 48 (2020) ("even in the context of nonprofit and pro bono work, risk plays a role in case selection by affecting the firm's analysis of whether a matter's expected benefits are worth its expected

[10] Available at: https://www.prisonpolicy.org/reports/PLRA_25.html.

costs”). Thus, the District Court’s order burdens pro bono civil-rights cases with a new budget line item in an already competitive selection process.

Because civil-rights cases are already expensive to litigate, the possibility of new, hard to predict costs can be a dispositive factor for an attorney deciding whether to take on the case. Police misconduct and jail abuse cases often require considerable upfront costs. *See, e.g.* Avery, *supra*, at 895-897 (describing need for expert testimony to prove broad range of civil-rights claims against police defendants); Alison L. Patton, *The Endless Cycle of Abuse: Why 42 U.S.C. §1983 Is Ineffective in Deterring Police Brutality*, 44 Hastings L.J. 753, 760-61 (1993) (identifying typical up-front expense to litigate in police misconduct cases); Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1611 (2003) (discovery and expert fees often required for inmate litigation); Bagenstos, *supra.* at 184 (“civil rights claimants often must present expert testimony, which they and their lawyers may have difficulty locating and paying for”). These ordinary expenses force many civil-rights attorneys to operate on a tight budget and prevent them from easily absorbing another category of discovery costs.

Firms and nonprofits with greater resources may also be hesitant to take on cases that carry the possibility of ESI cost-sharing given uncertainty about the potential amount. Unlike some litigation costs, the price of ESI extraction and production may be difficult for plaintiff’s counsel to predict at the outset of a case

and could be extremely expensive. *See* Shanin Specter, Thomas R. Kline, Andrew J. Stern, Andrew S. Youman, Testimony to the Advisory Committee on Civil Rules (Apr. 10-11, 2014) (noting that "individual plaintiffs have no way of assessing the cost of production" when they make a request);[11] Seth Eichenholtz, *Pricing Processing in E-Discovery: Keep the Invoice from Being a Surprise*, Pretrial Practice and Discovery, Winter/Spring 2011,[12] (describing the vendor costs of processing ESI). Plaintiffs have no way of knowing how the defendant is storing probative evidence or the expense of producing it. Given the expenses already required to effectively litigate police misconduct and jail claims, many attorneys may decide against taking a meritorious case where they would be required to go half in on the defendant's unspecified discovery production costs.

### B. The Prospect of Being Forced to Pay High ESI Costs May Hinder Plaintiffs' Attorneys from Obtaining Evidence Crucial to Proving Civil-Rights Claims.

The District Court's order may also deter appropriate discovery in civil-rights cases. First, ESI production may be cost-prohibitive for plaintiffs. Moreover, uncertainty about costs associated with ESI production and the risk of a high bill may dissuade attorneys from making requests in the first instance.

---

[11] Available at: https://www.uscourts.gov/sites/default/files/fr_import/CV2014-04.pdf.
[12] Available at: http://perma.cc/AW94- C3YG.

Plaintiffs generally must forgo evidence if they cannot afford to pay an assigned discovery cost. *See Eg.* Kenneth Levine, *In Forma Pauperis Litigators: Witness Fees & Expenses in Civil Actions*, 53 Fordham L. Rev. 1461, 1464 (1985) (explaining wealth-based restrictions to discovery for indigent plaintiffs where costs are not advanced or waived); Martin Redish, *The Future of Discovery: Discovery Cost Allocation, Due Process, and the Constitution's Role in Civil Litigation*, 71 Vand. L. Rev. 1847, 1867 (2018) (noting a plaintiff would only be able to prove their case with evidence they could afford in a cost-shifting model). An indigent civil-rights plaintiff with insufficient funds to pay for a government defendant's ESI production will simply not get the information they need to prosecute their case. Practitioners have noted that shifting the cost of production would frustrate effective discovery in civil-rights cases because plaintiffs are typically under-resourced. *See, e.g.* Testimony of Joseph M. Sellers to the Advisory Committee on Civil Rules (Apr. 10-11, 2014) ("particularly in civil rights and employment cases, there is an asymmetry in the parties' resources and their access to evidence without formal discovery. If ordered to pay, a plaintiff may forgo discovery and be forced to proceed without the information.");[13] Testimony of the Lawyers' Club of San Francisco to the Advisory Committee on Civil Rules

---

[13] Available at: https://www.uscourts.gov/sites/default/files/fr_import/CV2014-04.pdf.

(Apr. 9-10, 2015) (explaining that increasing cost-sharing "would impede and restrict discovery unnecessarily by individual claimants");[14] Testimony of the Maryland Trial Lawyers Association to the Advisory Committee on Civil Rules (Apr. 9-10, 2015) (arguing cost-shifting "will have a harsh result" since "the injured party is at an economic disadvantage to the opposing entity, which is usually insured").[15] Requiring indigent plaintiffs to split ESI production will put critical evidence out of reach. It may also discourage indigent plaintiffs from making requests for hard to access discovery.

Plaintiffs' attorneys generally strategize to limit their requests throughout discovery to keep costs at a minimum. Emery G. Lee III, *Law Without Lawyers: Access to Civil Justice and the Cost of Legal Services*, 69 U. Miami L. Rev. 499, 515 (2015) (describing economic considerations for plaintiffs' attorneys seeking discovery in contingency fee cases). While a plaintiff's cost-benefit analysis in all discovery decisions involves some guess work, they are at a unique disadvantage when it comes to hard to access information in the defendant's control. Unsure of the cost of production and ultimate probative benefit of the ESI, many attorneys may decide it is more logical to forgo discovery of certain ESI. *See* Shanin Specter

---

[14] Available at: https://www.uscourts.gov/sites/default/files/fr_import/CV2015-04.pdf.
[15] Available at: https://www.uscourts.gov/sites/default/files/fr_import/CV2015-04.pdf.

Testimony, *supra*, (explaining that cost sharing "will have a chilling effect on discovery" in part because plaintiffs do not know the costs of extraction). For instance, the prospect of cost-splitting ESI production may chill plaintiffs from insisting on access to native files, legacy databases, and a number of other sources of difficult to obtain information that is probative of civil-rights claims.

Accordingly, the District Court's order threatens to discourage indigent plaintiffs from seeking essential discovery and prompt them to make the best of inferior or incomplete production.

## II. Petitioners Are Uniquely Positioned to Seek Relief from the Harmful Lower Court Order.

This case offers the Court an opportunity to clarify the law of discovery cost-shifting in civil-rights cases. Because counsel for most civil-rights plaintiffs are small firms or solo practitioners who lack the resources required to challenge the shifting of unexpected discovery costs, this issue is unlikely to reach the Court again. *See* Bagenstos, *supra*, at 184 (noting most civil rights cases are filed "by individual lawyers who are trying to make a living…public interest organizations tend to focus on the few large-scale law reform cases at the expense of the important day-to-day enforcement work of individual cases. And pro bono is very rarely deployed for civil rights cases"); Stewart J. Schwab & Theodore Eisenberg, *Explaining Constitutional Tort Litigation: The Influence of the Attorney*

*Fees Statute and the Government as Defendant*, 73 Cornell L. Rev. 719, 768 (1988) ("[M]ost civil rights litigation is not brought by institutional litigators or by large firms engaging in pro bono activity.").

Petitioners are uniquely positioned in that they are represented by pro bono counsel with the capacity to absorb unexpected litigation burdens and therefore the ability to bring this petition. *See Fenty v. Penzone,* Petition for Writ of Habeas Corpus and Claim for Injunctive and Declaratory Relief, ECF No. 1, ¶ 38. Yet Petitioners are representative of most civil-rights plaintiffs as indigent individuals who cannot and should not bear the burden of shifted discovery costs. *See* Pet. Br., Ex. 4,6, 8.

Left undisturbed, the order below will impact countless more civil-rights litigants. It will create precedent that will chill public interest litigation, ultimately eroding civil rights. The Court should look beyond the resources available to these particular plaintiffs and take this opportunity to clarify the law as it relates to all plaintiffs challenging violations of their civil rights.

Finally, it bears repeating that the financial capacity of plaintiff's counsel is irrelevant to the Court's cost-shifting analysis under the federal rules. Rather, the analysis focuses on "[t]he total cost of production, compared to the resources available to each *party*," among other factors. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 322 (S.D.N.Y. 2003) (emphasis added). Accordingly, the Court must

consider the indigence of Petitioners, rather than the resources of their counsel, when determining the propriety of cost shifting. Although Petitioners' counsel has the capacity to shoulder the litigation burdens of bringing this mandamus petition, it should not be expected to front the costs of discovery. The lower court's erroneous discovery order should be overturned.

## CONCLUSION

For the foregoing reasons, Amicus Curiae National Police Accountability Project supports Petitioners' request for mandamus relief from the District Court's order requiring cost-shifting.

Dated: November 2, 2021 Respectfully submitted,

/s/ John Burton
John Burton
The Law Offices of John Burton
The Marine Building
128 North Fair Oaks Avenue
Pasadena, California 91103
jb@johnburtonlaw.com

Lauren Bonds
National Police Accountability Project
2022 St. Bernard Avenue, Suite 310
New Orleans, LA 70116
legal.npap@nlg.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I am an attorney for amicus curiae. This brief contains 3651 words, excluding the items exempted by Fed. R. App. P. 32(f) and Cir. R. 21-2(c). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 21-2(c) and 32-3(2).

Date: November 2, 2021

/s/ John Burton
John Burton

*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, John Burton, hereby certify that I filed the foregoing Brief of Amicus Curiae National Police Accountability Project on November 2, 2021, via the Court's CM/ECF system, which delivered an electronic copy to all counsel of record for all parties.

s/ John Burton
John Burton

*Attorney for Amicus Curiae*