**No. 21-71351**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

In re: JASON FENTY; et al.

JASON FENTY; et al.

*Petitioners,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, PHOENIX

*Respondent,*

PAUL PENZONE, Sheriff, in his official capacity; MARICOPA COUNTY, a municipal entity,

*Real Parties in Interest.*

On Petition for Writ of Mandamus to the United States District Court for the District of Arizona,
No. 2:20-cv-01192-SPL-JZB

# ANSWER TO PETITION FOR WRIT OF MANDAMUS

Daniel P. Struck
Nicholas D. Acedo
**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
(480) 420-1600

*Attorneys for Real Parties in Interest*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

ISSUE PRESENTED .......... 2

FACTS AND PROCEDURAL BACKGROUND .......... 2

REASONS THE COURT SHOULD DENY THE PETITION .......... 10

I. Standard of Review .......... 10

II. Petitioners Have Not Established Entitlement to Mandamus Relief .......... 11

A. Petitioners Can Attain the Relief They Desire on Direct Appeal and Their Proclaimed Prejudice Can Be Corrected on Appeal .......... 11

B. Petitioners Concede That Their Claim of Error Is an "Outlier" .......... 15

C. The District Judge Did Not Commit Clear Error .......... 15

1. Rule 54(d)(1) does not govern allocation of discovery costs .......... 17

2. The district judge acted well within his discretion in allocating costs for an unnecessary discovery-collection process that Petitioners' counsel insisted upon .......... 18

D. The Petition Does Not Raise a New Problem or an Issue of First Impression .......... 24

CONCLUSION .......... 24

STATEMENT OF RELATED CASES .......... 26

**TABLE OF CONTENTS**
**(continued)**

**Page**

CERTIFICATION OF COMPLIANCE ....................................................................27

CERTIFICATE OF SERVICE ...........................................................................28

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.*
881 F.2d 1486 (9th Cir. 1989) ....................13

*Bauman v. United States District Court*
557 F.2d 650 (9th Cir. 1977) ....................10

*Cal. Power Exch. Corp. v. FERC*
245 F.3d 1110 (9th Cir. 2001) ....................10

*Chambers v. Whirlpool Corp.*
980 F.3d 645 (9th Cir. 2020) ....................2

*Cole v. U.S. Dist. Ct. for Dist. of Idaho*
366 F.3d 813 (9th Cir. 2004) .................... 11, 15

*In re Grice*
974 F.3d 950 (9th Cir. 2020) ....................16

*In re Mersho*
6 F.4th 891 (9th Cir. 2021) ....................11

*In re S. Bay United Pentecostal Church*
992 F.3d 945 (9th Cir. 2021) ....................15

*In re Swift Transportation Co. Inc.*
830 F.3d 913 (9th Cir. 2016) .................... 12, 15, 16

*In re Walsh*
15 F.4th 1005 (9th Cir. 2021) .................... passim

*In re Williams-Sonoma, Inc.*
947 F.3d 535 (9th Cir. 2020) ....................13

*Jeff D. v. Otter*
643 F.3d 278 (9th Cir. 2011) ....................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*John B. v. Goetz*
879 F. Supp. 2d 787 (M.D. Tenn. 2010)....................22

*Lawson v. Spirit AeroSystems, Inc.*
2020 WL 3288058 (D. Kan. June 18, 2020)....................23

*Levi v. Dir. of Corr.*
2006 WL 845733 (E.D. Cal. Mar. 31, 2006)....................15

*Little v. City of Seattle*
863 F.2d 681 (9th Cir. 1988)....................18

*Lloyd v. Buzell*
2020 WL 8812045 (W.D. Wash. Aug. 11, 2020)....................14

*Matthews v. Puckett*
670 F. App'x 964 (9th Cir. 2016)....................14

*McPherson v. Fla. Dep't of Corr.*
2019 WL 11271430 (N.D. Fla. Oct. 9, 2019)....................22

*Multitechnology Servs., L.P. v. Verizon Sw. f/k/a GTE Sw. Inc.*
2004 WL 1553480 (N.D. Tex. July 12, 2004)....................23

*Olic v. Beard*
2019 WL 2208468 (E.D. Cal. May 22, 2019)....................14

*Oppenheimer Fund, Inc. v. Sanders*
437 U.S. 340 (1978)....................20

*Perez v. DirecTV Grp. Holdings, LLC*
2021 WL 840437 (C.D. Cal. Jan. 25, 2021)....................21

*Perry v. Schwarzenegger*
591 F.3d 1147 (9th Cir. 2010)....................14

*Price v. Synapse Grp., Inc.*
2018 WL 9517276 (S.D. Cal. Sept. 12, 2018)....................22

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Semsroth v. City of Wichita*
239 F.R.D. 630 (D. Kan. 2006) ....................20

*Shapiro v. Rynek*
250 F. Supp. 3d 775 (D. Colo. 2017).................... 14, 18

*Stanley v. Univ. of S. California*
178 F.3d 1069 (9th Cir. 1999) .................... 15, 17

*Tedder v. Odel*
890 F.2d 210 (9th Cir. 1989) .................... 14, 18

*U.S. ex rel. Guardiola v. Renown Health*
2015 WL 5056726 (D. Nev. Aug. 25, 2015) ....................22

*United States v. Guerrero*
693 F.3d 990 (9th Cir. 2012) ....................10

*Unknown Parties v. Johnson*
2017 WL 7520603 (D. Ariz. Dec. 19, 2017) ....................22

*Varsic v. U.S. Dist. Ct. for Cent. Dist. of Calif.*
607 F.2d 245 (9th Cir. 1979) ....................13

*Zubulake v. UBS Warburg LLC*
216 F.R.D. 280 (S.D.N.Y. 2003) .................... 21, 23

*Zubulake v. UBS Warburg*
*LLL*, 217 F.R.D. 309 (S.D.N.Y. 2003) .................... 18, 21, 23

**Statutes**

28 U.S.C. § 1915(f)(1) ....................15

28 U.S.C. § 2412 ....................4

42 U.S.C. § 1988 ....................4

## TABLE OF AUTHORITIES
## (continued)

**Page**

**Rules**

Fed. R. Civ. P. 26 .......... 21, 23

Fed. R. Civ. P. 26(b) .......... 19, 20, 23, 24

Fed. R. Civ. P. 26(b)(1) .......... 21, 22

Fed. R. Civ. P. 26(b)(2)(B) .......... 23

Fed. R. Civ. P. 26(b)(2)(C) .......... 23

Fed. R. Civ. P. 26(b)(2)(C)(i) .......... 21

Fed. R. Civ. P. 26(b)(2)(C)(iii) .......... 21

Fed. R. Civ. P. 26(c) .......... 20, 23, 24

Fed. R. Civ. P. 26(c)(1)(B) .......... 20, 21, 23

# INTRODUCTION

An Answer is necessary because the Petition does not accurately state the facts or the law. The district court's order has nothing to do with an impending risk of harm from COVID-19 or indigent prisoners' ability to defend their civil rights. It does not even involve the denial of discovery. The order simply required class counsel to pay a nominal amount towards a completely unnecessary and duplicative cost to thread already collected emails—a process *they* insisted on to benefit themselves. The district court was well within its discretion to allocate that litigation cost. In fact, Respondents should not have been allocated any of it.

Petitioners' counsel nonetheless bemoan having to pay anything and seek this Court's extraordinary intervention. But the threading has been done, and the resultant files have been produced. At this point, they can challenge the district court's order on direct appeal and, if successful, they will never have to pay anything. Although they attempt to frame the issue as a novel one needing this Court's immediate guidance, it simply does not rise to that level. Rule 26 sets forth the guidelines for permissible discovery and cost allocation, and this Court has afforded district courts wide discretion in controlling discovery. The district court's order is run-of-the-mill, and the Petition disclaims any trending disregard for the Rules of Civil Procedure. What Petitioners are really attempting to do is *change* those guidelines to *restrict* a court's discretion.

The trivial amount at issue—$636.73—raises serious questions as to the motive for pursuing a writ of mandamus. The objections below and this appeal undoubtedly cost Petitioners' counsel tens of thousands of dollars. It can only be that this is a calculated investment towards a much bigger savings: total impunity from any discovery costs in future civil rights litigation. That would be another club in the arsenal for class counsel pursuing institutional class litigation on behalf of indigent claimants. *See Chambers v. Whirlpool Corp.*, 980 F.3d 645, 666 (9th Cir. 2020) ("Class action plaintiffs thus have an incentive to seek aggressive discovery (and log a tremendous number of hours in the process) without fear of reciprocally burdensome discovery."). As discussed below, the law does not support that goal, and the facts do not support its pursuit here. The Petition should be denied.

## ISSUE PRESENTED

Whether this Court should deny a writ of mandamus seeking to reverse an order allocating $636.73 in litigation costs to Petitioners for an unnecessary and duplicative collection process that only they wanted.

## FACTS AND PROCEDURAL BACKGROUND

On June 16, 2020, Puente Human Rights Movement and nine Maricopa County Jail detainees filed a Petition for Writ of Habeas Corpus and Complaint for

Injunctive and Declaratory Relief in Arizona District Court.[1] (Dkt. 1.) They ("Petitioners") alleged that the Jail implemented inadequate safeguards to protect inmates and staff from COVID-19, in violation of the Eighth and Fourteenth Amendments, the Americans with Disabilities Act, and the Rehabilitation Act. (*Id*.) They sought an injunction and/or writ of habeas corpus seeking the immediate release of those detainees who were medically vulnerable and the implementation of additional COVID-19 protocols at all Maricopa County Jails.[2] (*Id*.)

Petitioners did not proceed *pro se* or *in forma pauperis*. To the contrary, they were well-armed with a battalion of 15 lawyers across five states and resources from one national law firm (Stinson LLP), one international law firm (Dechert LLP), the American Civil Liberties Union ("ACLU"), and the ACLU Foundation of Arizona. (*Id*. at 1–2.) Stinson has "nearly 500 lawyers, with 13 offices spread throughout the United States." (Dkt. 8-6 at 31, ¶ 14.) Dechert "has more than 900 lawyers in 26 offices spread throughout the world." (*Id*. at 26, ¶ 6.) It claims it "has more than sufficient resources to litigate this matter to completion."[3] (*Id*. at 27, ¶ 10.) And the ACLU boasts being "the nation's largest public interest law firm," with

---

[1] The named Defendants-Respondents are Maricopa County Sheriff Paul Penzone and Maricopa County ("Respondents"). (Dkt. 1.)

[2] There are five jails in the Maricopa County Jail system. (Dkt. 28 at 6.)

[3] Dechert was recently named as a top-grossing firm in 2020, with a revenue of more than $1,000,000,000. (Exhibit 1.)

approximately 100 attorneys who handle "close to 6,000 cases annually." (*Id*. at 16, ¶ 4.) The Petition and Complaint requested their "attorneys' fees and expenses," pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988. (*Id*. at 50.) Petitioners are currently represented by 12 lawyers from four law firms/organizations.[4]

Just days after filing the 215-paragraph Petition and Complaint, Petitioners filed an Application for Temporary Restraining Order (Dkt. 10) and Motion for Class Certification (Dkt. 11). The district judge granted class certification, finding the elements of Rule 23 satisfied (including the adequacy of class counsel), and certified four Subclasses. (Dkt. 67.) However, the district judge denied the Application for Temporary Restraining Order, which he construed as a motion for preliminary injunction.[5] (Dkt. 52.) He ruled that Petitioners were not likely to succeed on their constitutional or statutory claims. (*Id*. at 36–42.) Specifically, the district judge found that Respondents were neither objectively nor subjectively deliberately indifferent in responding to COVID-19; rather, they had taken "measures to abate the risk," some of which went "beyond what the CDC recommends." (*Id*.) He further found that Petitioners did not establish a "barrier of access to services" at the Jails. (*Id*.)

---

[4] Zwillinger Wulkan PLC substituted in for Stinson LLP. (Dkt. 140.) The other firms and organizations remain as counsel.

[5] The Application was supported by 15 declarations, including an expert declaration. (Dkt. 8.)

Despite that ruling, Petitioners pressed forward with their claims in scorched-earth fashion.[6] The litigation continues to be mired in discovery even though all nine individual Petitioners are no longer detained in a Maricopa County Jail. Fortunately, fact discovery closes in just a few weeks. (Dkt. 178.)

The Petition arises out of a dispute concerning their requests for production ("RFP") and the production of electronically stored information ("ESI"). (Dkt. 150-1 at 15–19.) The parties discussed general parameters (proposed terms and custodians and scope of the initial ESI pull), and Respondents agreed to run a search to determine the total potential volume and provide a cost estimate to assess whether the request was proportional to the needs of the case. (Ex. 2, ¶¶ 8–11.) Respondents retained an outside ESI vendor to process the collected ESI. (*Id.*, ¶ 12.) Processing included extracting the collected ESI from container files, identifying and extracting meta-data and other content from the email containers (.msg and .msg files), virus scanning, and assigning each file a unique hash value for identification and comparison. (*Id.*) The vendor then filtered the results, which included de-duplication. (*Id.*, ¶¶ 13–16.)

---

[6] Petitioners' counsel have served 37 requests for admission, 19 interrogatories, and 35 requests for production. (Exhibit 2, ¶ 7.) These productions have totaled 11,653 pages of hard copy documents. (*Id.*) Petitioners' counsel have also taken five depositions (with four more to be scheduled), which they staff with at least three or four attorneys.

On June 25, 2021, the vendor reported that the initial collection, after processing, began with 292,338 files (22.20 GB), but was reduced to 85,554 files (14.39 GB) after de-duplication. (*Id.*, ¶ 17.) Once the initial set of search terms were applied, 85,284 non-duplicative files (14.36 GB) remained. (*Id.*) The estimated cost to review that data would have exceeded $186,000. (*Id.*, ¶¶ 18–19.) By the end of June 2021, Respondents had incurred more than $2,775 for this processing. (*Id.*, ¶ 21.) On July 6, 2021, Respondents' counsel provided Petitioners' counsel with a detailed analysis of the ESI search results and objected to the disproportionate burden to the needs of the case. (*Id.*, ¶ 22.) Nonetheless, Petitioners' counsel insisted on full production. (*Id.*, ¶¶ 23–24.)

On July 22, 2021, the magistrate judge held a hearing on the dispute. The magistrate judge was skeptical of the scope of the production, doubting its relevance to Petitioners' claims:

> So, generally, we have a problem with the breadth of the disclosure, 80,000 emails is both expensive, time-consuming and I don't know how helpful it is. Obviously there's a question of potential cost-sharing and whether or not we can target the ESIs in a different way....
>
> But I have to say that I don't know how helpful all of these emails are going to be. Certainly one of them or two of them or a hundred of them might be, but we have an issue regarding how to do this in a proportional way and a cost-effective way as normal.

(Dkt. 135-1 at 5:11–25.) The magistrate judge ruled, however, that Petitioners must modify their search terms to provide for a target search that would result in a production of between 8,000 and 10,000 files. (*Id*. at 21:19–22:5.) He further asked Respondents' counsel "to make your best efforts to deduplicate emails. It's not an absolute requirement. I'll just require best efforts." (*Id*. at 17:8–10.)

The vendor ran Petitioners' revised search terms, which resulted in 11,050 files. (Ex. 2, ¶¶ 26–27.) Petitioners' counsel insisted, however, that Respondents perform an unnecessary and additional threading process. (Dkt. 150-2 at 2.) Threading is a method whereby certain components of an email message are analyzed to determine if they are part of a larger conversation. (Ex. 2, ¶ 28.) In other words, it will identify replies to messages. (*Id*.) It is an unnecessary and additional expense in the processing of ESI and served only to benefit Petitioners' counsel by reducing the volume of produced ESI they would need to review. (*Id*., ¶ 31.) Respondents objected to that request, which would have cost an additional $1,400, and the vendor proceeded to process the 11,050 files for in-house review and production. (*Id*., ¶¶ 30, 33.) The vendor completed the original processing on August 4, 2021, at a cost of $735. (*Id*., ¶¶ 33–34.)

On August 10, 2021, the magistrate judge held another hearing to resolve Petitioners' counsel's threading request. The magistrate judge stated that he would order the threading if Petitioners' counsel wanted it done, but that "the parties

[would] split [the cost to do so] in half. … So each party would bear $700." (Dkt. 135-2 at 4:3-6.) Petitioners' counsel argued that cost-sharing was not appropriate because the process "actually ends up saving both plaintiffs and defendants attorney time in terms of reviewing" the threaded files. (*Id*. at 6:7–25.) Petitioners' counsel further argued that his "clients are indigent" and that ordering cost-sharing in this case "may set a precedent that could backfire and force other indigent plaintiffs [to share costs]." (*Id*. at 7:2-6, 7:10–17.) The magistrate judge interjected at that point:

> THE COURT: It won't; it won't. This is a one-off on this specific ruling based on the low cost of the threading. You've suggested that this threading will reduce the amount of discovery by 30 percent. That's a significant amount. You get a benefit, if you are in fact correct, of having proved to this court that you've actually received fewer documents than you are entitled to. So I think, in that regard, since you've raised that threshold of 30 percent, you're entitled to bear some of that cost to override the defendant's statement that they've already de-duplicated these and it's not needed. So that's why you bear the cost. It's only $700 per side. So it won't affect a future case.

(*Id*. at 7:18–8:5.)[7]

---

[7] Contrary to Petitioners' assertion, they were not required "to personally pay" the expense. (*See* Doc. 1-2 at 13.)

After that hearing, Petitioners' counsel did not withdraw their request for threading. On August 18, 2021, the threading was completed.[8] (Ex. 2, ¶ 36; *see also* Exhibit 3 at 53.) It resulted in 8,322 files. (*Id.*, ¶ 36.) An invoice dated August 31, 2021, in the amount of $636.73, was billed to Petitioners' counsel, Dechert LLP. (Exhibit 4; *see also* Ex. 2, ¶ 37.) After reviewing the files for privileged information, Respondents produced all threaded non-privileged files to Petitioners' counsel by October 19, 2021. (Ex. 2, ¶¶ 38–39.)

Meanwhile, Petitioners filed objections to the magistrate judge's ruling on August 25, 2021. (Dkt. 135.) On September 23, 2021, the district judge overruled those objections, noting that "[n]othing contained therein could be characterized as clearly erroneous or contrary to law." (Dkt. 173.) Petitioners' counsel filed the Petition on October 27, 2021, more than a month later and after they had received the threaded files. (Doc. 1-2.)[9] In response to this Court's order inviting the district court to address the Petition (Doc. 6), the district judge issued a supplemental order, ruling:

> "Threading" is a third-party screening of the responsive discovery to remove similar emails. At the August 10, 2021 hearing, Plaintiffs represented to Judge Boyle that

[8] This required the vendor to provide a completely new set of ESI. (Ex. 2, ¶ 35.) It also effectively negated approximately 16 hours of work spent on reviewing the original set for privileged information. (*Id.*, ¶ 35.)

[9] "Doc." refers to this Court's docket, whereas "Dkt." refers to the district court's docket.

> this additional screening would significantly reduce attorney review time for both sides if completed. (Doc. 139 at 5 (estimating a 30% reduction in the number of documents to review).) However, Defendants had already paid to produce and de-duplicate the responsive emails in compliance with Judge Boyle's July 22, 2021 Order (Doc. 111). Thus, the Court found the additional expense of threading the emails both unnecessary and unrelated to the production of discovery material ordered by Judge Boyle. Accordingly, because it was Plaintiffs who sought the additional screening of the responsive discovery, over Defendants' objection, this Court agreed with Judge Boyle's determination that the additional, unnecessary expense should be borne by both parties, equally.

(Doc. 7.)

## REASONS THE COURT SHOULD DENY THE PETITION

### I. Standard of Review.

A writ of mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *United States v. Guerrero*, 693 F.3d 990, 999 (9th Cir. 2012). "The party seeking mandamus relief must establish that its right to issuance of the writ is clear and indisputable." *Cal. Power Exch. Corp. v. FERC*, 245 F.3d 1110, 1120 (9th Cir. 2001) (internal quotations omitted). This is a "high bar" and "especially difficult" to establish when a petitioner seeks to vacate a discovery order. *In re Walsh*, 15 F.4th 1005, 1010 (9th Cir. 2021).

In determining whether a writ of mandamus should be granted, this Court considers the five factors outlined in *Bauman v. United States District Court*, 557 F.2d 650 (9th Cir. 1977)—whether:

> (1) the party seeking the writ has no other means, such as a direct appeal, of attaining the desired relief, (2) the petitioner will be damaged in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the order is an oft-repeated error, or manifests a persistent disregard of the federal rules, and (5) the order raises new and important problems, or issues of law of first impression.

*Cole v. U.S. Dist. Ct. for Dist. of Idaho*, 366 F.3d 813, 817 (9th Cir. 2004). These factors "should not be mechanically applied." *Id*. "A showing of only one factor does not mean the writ must be denied, nor does a showing of all factors mean that the writ must be granted." *In re Mersho*, 6 F.4th 891, 897–98 (9th Cir. 2021).

## II. Petitioners Have Not Established Entitlement to Mandamus Relief.

Petitioners do not attempt to establish one of the five *Bauman* factors and the remaining four factors weigh strongly against mandamus relief. Moreover, their failure to establish "clear error" is dispositive.

### A. Petitioners Can Attain the Relief They Desire on Direct Appeal, and Their Proclaimed Prejudice Can Be Corrected on Appeal.

"The first *Bauman* factor highlights the need for mandamus to be used only when no other realistic alternative is (or was) available to a petitioner. The second *Bauman* factor is similar but focuses on whether the harm to the petitioners cannot be corrected on a direct appeal." *Mersho*, 6 F.4th at 902 (internal citations and quotations omitted). "These factors are usually considered together." *Id.*

Petitioners contend that they have "no other option but to petition this Court for mandamus" because the discovery order is a nonfinal, interlocutory order, and

the “$700 bill” presents a “serious financial strain” and “may chill civil rights litigation,” neither of which can be corrected on direct appeal. (Pet. at 25–27.) As a threshold matter, Petitioners’ claimed prejudice is entirely self-inflicted. Their counsel proceeded with the threading even after the district court stated they would be responsible for paying half the cost. That they manufactured this entire issue weighs against the Court swooping in now to provide mandamus relief. The absence of any allegation that the individual Petitioners have paid or will ultimately be responsible for paying the threading cost further undercuts any alleged harm.

Furthermore, they have already received the threaded production, which effectively moots any entitlement to mandamus relief. *See In re Swift Transportation Co. Inc.*, 830 F.3d 913, 916 (9th Cir. 2016) (where the cost of discovery had already been incurred, alleged prejudice was “not correctable by mandamus relief”). At this point, Petitioners can challenge on direct appeal following a final judgment the district court’s cost-allocation order (and that assumes that they have paid or will pay the invoice). *See id.* at 916 (first *Bauman* factor asks whether “there is any other adequate means, *such as a direct appeal*, to attain the relief the petitioner desires”) (emphasis added). If they are successful on direct appeal, they can attain the remedy they seek—a reallocation of the total threading amount and reimbursement by Respondents of the $636.73 (if paid).

The circumstances in this case are different from those in which it was still possible (through mandamus relief) to prevent an irreparable harm resulting from a discovery order. *See, e.g*, *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 540 (9th Cir. 2020) ("Williams-Sonoma has no other adequate means for relief available to it at this time, and before direct appeal could be taken and heard, the disclosure and damage to its (and its customers') interests would be complete—its claim would be mooted."); *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.*, 881 F.2d 1486, 1490 (9th Cir. 1989) ("If Admiral is required to produce a privileged statement, it will suffer immediate, irreparable harm."); *see also Varsic v. U.S. Dist. Ct. for Cent. Dist. of Calif.*, 607 F.2d 245, 252 (9th Cir. 1979) (holding that the prejudice of forcing indigent plaintiff to travel 3,000 miles to prosecute his action is a prejudice that "can never be corrected"). The impending, irreparable prejudice in those cases rendered a direct appeal practically unavailable. *See, e.g.*, *Mersho*, 6 F.4th at 903 ("Petitioners could technically challenge the district court's order on direct appeal. But the harm to Petitioners will not be meaningfully corrected on appeal.") (internal citations omitted). Here, Petitioners not only manufactured their own alleged harm, but any harm is not irreparable because it can be easily corrected in a direct appeal if necessary (if paid and they prevail).

Petitioners' contention that the district court's order may chill *other* plaintiffs from pursuing civil rights litigation does not tip the scales in their favor either. It is

highly speculative that any future civil rights claimant would abstain from pursuing a civil rights violation by the mere existence of the benign order in this case. And as the magistrate judge made clear, the unique circumstances in this case presented a "one-off" situation.[10] (Dkt. 135-2 at 7:18–8:5.)

More importantly, indigent plaintiffs, like any plaintiff, are not exempt from litigation costs, including discovery costs. *See*, *e.g.*, *Matthews v. Puckett*, 670 F. App'x 964, 965 (9th Cir. 2016); *Tedder v. Odel*, 890 F.2d 210, 212 (9th Cir. 1989); *accord Lloyd v. Buzell*, 2020 WL 8812045, at *2 (W.D. Wash. Aug. 11, 2020) (a prisoner "is financially responsible for all other costs of litigation including the cost of obtaining discovery documents"); *Olic v. Beard*, 2019 WL 2208468, at *1 (E.D. Cal. May 22, 2019) ("The federal courts have uniformly held that an indigent prisoner litigant must bear his own costs of litigation."); *Shapiro v. Rynek*, 250 F. Supp. 3d 775, 779 (D. Colo. 2017) ("Plaintiff's indigence alone is not dispositive and the court observes that Congress has specifically provided litigants proceeding in forma pauperis shall be liable for costs in the same manner 'as in other

[10] This case has nowhere near the notoriety as the litigation in *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152, 1158 (9th Cir. 2010), which involved an order requiring proponents of California's controversial and well-known Proposition 8 ban on same-sex marriages to produce "internal campaign communications relating to campaign strategy and advertising," which had "the practical effect of discouraging the exercise of First Amendment associational rights" and applied "to the myriad social, economic, religious and political organizations that publicly support or oppose ballot measures."

proceedings.'") (quoting 28 U.S.C. § 1915(f)(1)); *Levi v. Dir. of Corr.*, 2006 WL 845733, at *2 (E.D. Cal. Mar. 31, 2006) ("Even an indigent, imprisoned litigant must bear his own costs of litigation."). The $636.73 cost in this case is not "so outside the realm of normal litigation expense" to weigh in favor of mandamus relief. *Swift*, 830 F.3d at 916; *cf. Stanley v. Univ. of S. California*, 178 F.3d 1069, 1080 (9th Cir. 1999) (involving a post-judgment cost award in the amount of $46,710.97).

These two factors weigh strongly against mandamus relief.

### B. Petitioners Concede That Their Claim of Error Is an "Outlier."

The Petition does not address the fourth *Bauman* factor—whether the order is "an oft-repeated error, or manifests a persistent disregard of the federal rules." *Cole*, 366 F.3d at 817. In fact, Petitioners characterize the order as an "outlier" and concede that "the fourth factor is absent here." (Doc. 1-2 at 26, 38.) Their concession confirms that this factor weighs against mandamus relief.

### C. The District Judge Did Not Commit Clear Error.

"[T]he third factor, clear error as a matter of law, is a necessary condition for granting a writ of mandamus." *Walsh*, 15 F.4th at 1008 (citation omitted). "[T]he absence of factor three … will always defeat a petition for mandamus." *In re S. Bay United Pentecostal Church*, 992 F.3d 945, 949 (9th Cir. 2021) (citation omitted). The clear-error standard is a "highly deferential standard of review" and requires this Court to have a "firm conviction that the district court misinterpreted the law or

committed a clear abuse of discretion." *Walsh*, 15 F.4th at 1009 (citation omitted). Simply identifying a "legal error" is not enough. *Id*. The clear-error standard makes the availability of the writ "especially difficult" when the challenge is to a discovery order because this Court "is particularly reluctant to interfere with a district court's day-to-day management of its cases." *Walsh*, 15 F.4th at 1010 (citation omitted).

The Petition does not meet this standard because it admits that the district court's order does not violate Ninth Circuit precedent. (*See* Doc. 1-2 at 20 ["Petitioners are unaware of binding authority by this Court addressing cost-shifting…"]; *see also id*. at 24–26 [urging this Court to adopt a new standard].) "Where no prior Ninth Circuit authority prohibits the district court's ruling, or where the issue in question has not yet been addressed by any circuit court in a published opinion, the ruling cannot be clearly erroneous." *In re Grice*, 974 F.3d 950, 954–55 (9th Cir. 2020); *see also Swift*, 830 F.3d at 917 ("If no prior Ninth Circuit authority prohibited the course taken by the district court, its ruling is not clearly erroneous.") (citation omitted). Moreover, "a question of first impression not yet addressed by any circuit court in a published opinion cannot satisfy the third *Bauman* factor." *Swift*, 830 F.3d at 917 (citation omitted). Because Petitioners cannot establish any error, let alone that any error was clear, they flunk this factor and are not entitled to mandamus relief.

Nonetheless, Petitioners' argument on the merits is entirely wrong and does not establish any legal error, much less clear error.

**1. Rule 54(d)(1) does not govern allocation of discovery costs.**

Petitioners first argue that the district judge "failed to account for this Court's case law from the context of cost-shifting under Rule 54(d)(1)," which considers a plaintiff's indigence and the potential chilling effect on civil rights litigation.[11] (Doc. 1-2 at 23–24.) This argument is flawed. Rule 54(d)(1) governs a post-judgment award of costs to a prevailing party. It does not apply to discovery cost allocations and Petitioners cite no authority in which a court has applied Rule 54(d)(1) in the context of a discovery dispute. Rule 26—and only Rule 26—governs.

Petitioners' reliance on *Stanley* is unavailing. That case involved a Rule 54(d) post-judgment award, not an allocation of discovery costs under Rule 26. *Stanley*, 178 F.3d at 1079–80. Thus, it is inapposite. Moreover, in *Stanley*, the Court held only that district courts "should *consider* the financial resources of the plaintiff and the amount of costs in civil rights cases." *Id.* (emphasis added). In that case, the district court's failure to even consider the plaintiff's indigency or whether a "high" cost award in the amount of $46,710.97 "may chill civil rights litigation" was an abuse of discretion. *Id.* Here, the magistrate judge *did* consider these factors, but

[11] Petitioners contend that they were precluded from briefing this before the magistrate judge, but their counsel made the arguments during oral argument *and* in their objections to the district judge.

rejected them: "This is a one-off on this specific ruling" involving a nominal amount that "won't affect a future case." (Dkt. 135-2 at 7:2-6, 7:10–17,7:18–8:5.)[12]

### 2. The district judge acted well within his discretion in allocating costs for an unnecessary discovery-collection process that Petitioners' counsel insisted upon.

Petitioners essentially take the position that a district court should never shift litigation costs to an indigent plaintiff. (Doc. 1-2 at 13–14.) That position is clearly untenable, *see Tedder*, 890 F.2d at 212, so they urge the Court to adopt a "fair test for shifting discovery costs" and argue that the district court's order fails that test. (Doc. 1-2 at 24–26.) The test they propose derives from *Zubulake v. UBS Warburg LLL*, 217 F.R.D. 309 (S.D.N.Y. 2003). The Court should reject Petitioners' invitation because the test outlined in *Zubulake* does not apply in the circumstances here, and the district court's order is expressly authorized by Rule 26 and its "wide discretion in controlling discovery." *Jeff D. v. Otter*, 643 F.3d 278, 289 (9th Cir. 2011) (quoting *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988)). Adopting the test that Petitioners propose would curtail that authority and undermine Rules 26(b)(1), 26(b)(2)(C), and 26(c).

---

[12] Petitioners also cite *Shapiro v. Rynek*, 250 F. Supp. 3d 775 (D. Colo. 2017), to support their claim that ordering an indigent plaintiff to pay costs is unjust. (Doc. 2-1 at 13.) But *Shapiro* involved a request for costs and fees under Rule 54(d) in the amount of $167,219.00. *See Shapiro v. Rynek*, No. 13-cv-03086-KMT (D. Colo. Mar. 10, 2017), Dkt. 229. And, in that case, the plaintiff had "prevailed on the single most important issue before the court." *Shapiro*, 250 F. Supp. 3d at 781.

The analysis starts (and ends) with Rule 26(b)(2)(C), which expressly requires a district court to limit the scope of discovery in certain circumstances:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; [or]
>
> ***
>
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Rule 26(b)(1) precludes discovery of privileged matters, matters that are not relevant to any party's claim, and matters that are not "proportional to the needs of the case." The purpose of these rules is "to deal with the problem of over-discovery" and "guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." Fed. R. Civ. P. 26(b), advisory committee's notes (2015 amendment). In fact, they are "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse" and afford judges "greater judicial involvement in the discovery process." *Id.* "[J]udicial management" is even more necessary when e-discovery is involved. *Id.* And in exercising that discretion, "consideration of the parties' resources does not foreclose discovery requests addressed to an impecunious party, nor justify unlimited discovery requests

addressed to a wealthy party." *Id.* A court "must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent." *Id.* Notably absent from the Petition is any reference to these Rules.

Rule 26(c)(1)(B) further and expressly authorizes a district court to allocate discovery costs to protect a party "from annoyance, embarrassment, oppression, or undue burden or expense." Prior to its addition in 2015, courts had already exercised such authority. Fed. R. Civ. P. 26(c), advisory committee's notes (2015 amendment); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) (acknowledging a court's "discretion under Rule 26(c) to grant orders protecting [a responding party] from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery"); *Semsroth v. City of Wichita*, 239 F.R.D. 630, 634 (D. Kan. 2006) ("[T]he Court has discretion in determining whether to shift the costs of discovery."). It was added to "forestall the temptation some parties may feel to contest this authority." *Id.*

Here, the district judge ordered Petitioners to bear half the cost of threading because it was "both unnecessary and unrelated to the production of discovery material ordered by" the magistrate judge." (Doc. 7.) Indeed, it was "unreasonably cumulative or duplicative" and in fact "obtained from some other source that is more

convenient, less burdensome, or less expensive," as the discovery had already been de-duplicated. Fed. R. Civ. P. 26(b)(2)(C)(i). It was also not "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C)(iii), and sought only to annoy and oppress Respondents, Fed. R. Civ. P. 26(c)(1)(B).[13] Rule 26, and a court's inherent authority to control and limit discovery, thus authorized the district judge to allocate half of the cost to Petitioners. He was not restricted by Petitioners' "impecunious" status, and in fact it was Petitioners' own counsel that forced the issue and proceeded with incurring the cost. The district judge acted well within his discretion. Petitioners have not shown that he committed "clear error."

Petitioners pursuit to adopt and apply *Zubulake* is a red herring. That case involved the allocation of costs to *produce* ESI that was not reasonably accessible. 217 F.R.D. at 313, 318; *see also Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 289–91 (S.D.N.Y. 2003) (applying newly created test and allocating costs to produce the requested ESI). All the cases cited by Petitioners that purportedly applied the *Zubulake* test and refused cost allocation did so as well. *See, e.g.*, *Perez v. DirecTV Grp. Holdings, LLC*, 2021 WL 840437, at *1, 4 (C.D. Cal. Jan. 25, 2021) (involving the cost to produce a list identifying DirecTV subscribers contacted by law firm);

[13] Petitioners did not challenge below, nor do they challenge on appeal, the magistrate judge's ruling limiting the scope of the production to between 8,000 and 10,000 files.

*Price v. Synapse Grp., Inc.*, 2018 WL 9517276, at *2–6, 9–10 (S.D. Cal. Sept. 12, 2018) (involving the cost to produce ESI, documents, audio files, and other information); *Unknown Parties v. Johnson*, 2017 WL 7520603, at *4, 7 (D. Ariz. Dec. 19, 2017) (involving the cost to produce "video recordings"); *U.S. ex rel. Guardiola v. Renown Health*, 2015 WL 5056726, at *1 (D. Nev. Aug. 25, 2015) (involving the cost to produce emails); *John B. v. Goetz*, 879 F. Supp. 2d 787, 794, 875 (M.D. Tenn. 2010) (involving cost to produce ESI); *see also McPherson v. Fla. Dep't of Corr.*, 2019 WL 11271430, at *3 (N.D. Fla. Oct. 9, 2019) (ruling that Rule 26(b)(1) proportionality factors required "production of the requested communications").

The district judge's order did not involve an order to produce unreasonably accessible discovery. Rather, it involved a post-collection process (threading) that would have reduced the number of files that were already ordered to be produced and collected. Petitioners admit this much: "the expense stems from processing information rather than collecting inaccessible information." (Doc. 1-2 at 21.) The decision to allocate the cost of that "unnecessary" and "unrelated" litigation expense is "even more subject to the district court's discretion." *See Walsh*, 15 F.4th at 1010 ("Thus, the Secretary is not opposing the disclosure itself. Instead, the Secretary is only opposing the disclosure on an earlier date, which is a decision that is even more

subject to the district court's discretion."). This Court should "decline to interfere with the district court's day-to-day case management." *Id*. at 1010.

Petitioners' attempt to tether *Zubulake* to Rule 26(c)(1)(B) is unavailing. Rule 26 was amended in 2006 "to reflect the principles articulated in *Zubulake* and subsequent cases on shifting costs for non-reasonably accessible ESI." *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 3288058, at *8 (D. Kan. June 18, 2020), *aff'd*, 2020 WL 6939752 (D. Kan. Nov. 24, 2020). Those principles are now embodied in Rule 26*(b)(2)(B)*, not Rule 26(c). *Id*.; *see also* Fed. R. Civ. P. 26(b), advisory committee's notes (2006 amendment). Rule 26(b)(2)(B) applies to "electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." The 2006 advisory committee notes suggest seven considerations for determining whether the burden and cost of being required to produce the ESI is justified. Those seven considerations mirror the seven-factor *Zubulake* test.[14] *Compare* Fed. R. Civ. P. 26(b), advisory committee's notes (2006 amendment); *with Zubulake* 217 F.R.D. at 324. Rule 26(c) did not add Subsection (c)(1)(B) until 2015, and merely codified the district court's discretion to allocate

---

[14] Rule 26(b)(2)(B) also states that the limitations in Rule 26(b)(2)(C) still apply. *See Multitechnology Servs., L.P. v. Verizon Sw. f/k/a GTE Sw. Inc.*, 2004 WL 1553480, at *1 (N.D. Tex. July 12, 2004) ("[N]othing in *Zubulake* purports to interfere with the court's authority to enter any appropriate protective order in the discovery process pursuant to Rule 26(c), regardless of whether the information sought is available on paper or electronically.").

costs that pre-dated *Zubulake*. *See* Fed. R. Civ. P. 26(b), advisory committee's notes (2015 amendment).

At bottom, *Zubulake* is inapplicable. Rules 26(b) and (c) govern. And the district judge properly exercised his discretion under those Rules.[15] It did not clearly err. This factor not only weighs against mandamus relief but dispositively denies it.

### D. The Petition Does Not Raise a New Problem or an Issue of First Impression.

Petitioners argue that this Petition "provides this Court with an opportunity to establish, for the first time, that the *Zubulake* test is the law of this Circuit." (Doc. 1-2 at 38.) But as just discussed, *Zubulake* is inapplicable. Petitioners also argue that this issue will evade review if not addressed now. But just as Petitioners' counsel have pursued this Petition they can pursue a direct appeal following a final judgment. Waiting until then will result in no prejudice or irreparable harm. Their repeated claim that the underlying order "may" chill future lawsuits is still speculative. This factor also weighs against mandamus relief.

## CONCLUSION

For these reasons, the Petition for Writ of Mandamus should be denied.

---

[15] Petitioners spend most of the Petition arguing that they have sufficiently satisfied the *Zubulake* test. (Doc. 1-2 at 26–35.) Respondents disagree, but if the Court concludes that *Zubulake* is applicable and adopts it, it should remand to allow the parties to develop the record and the district court to apply the standard in the first instance.

RESPECTFULLY SUBMITTED this 22nd day of December, 2021.

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

By s/ Nicholas D. Acedo
Daniel P. Struck
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Real Parties in Interest*

## STATEMENT OF RELATED CASES

There are no known related cases pending in the Ninth Circuit Court of Appeals.

RESPECTFULLY SUBMITTED this 22nd day of December, 2021.

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

By s/ Nicholas D. Acedo
Daniel P. Struck
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Real Parties in Interest*

## CERTIFICATE OF COMPLIANCE

This Answer to Petition for Writ of Mandamus, comprised of 6,015 words, does not exceed 7,800 words, excluding items exempted by FRAP 21(a)(2)(C). The Answer's type size and typeface (14 point and proportionally spaced Times New Roman) complies with FRAP 32(a) and 32(c)(2).

RESPECTFULLY SUBMITTED this 22nd day of December, 2021.

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

By s/ Nicholas D. Acedo
Daniel P. Struck
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Real Parties in Interest*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

In addition, a true copy of the foregoing will be served by electronic mail and First Class Mail on:

HONORABLE STEVEN P. LOGAN
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 521
401 West Washington Street, SPC 82
Phoenix, AZ 85003-2161
logan_chambers@azd.uscourts.gov

*Respondent Judge*

Description of Documents: ANSWER TO PETITION FOR WRIT OF MANDAMUS

RESPECTFULLY SUBMITTED this 22nd day of December, 2021.

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

By s/ Nicholas D. Acedo
Daniel P. Struck
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Real Parties in Interest*

# Exhibit 1

**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# BigLaw's Big Guns Of Revenue Keep Growing

By **Anna Sanders**

Law360 (December 15, 2021, 11:02 AM EST) -- The widening revenue gap between a handful of legal titans that pull in billions each year and other law firms will only continue to grow, experts say, resulting in a market consolidation that will likely give them a competitive advantage even over their BigLaw peers.

**Law360 Pulse Prestige Leaders**

**here**

The 10 law firms with the highest gross revenue accounted for nearly 29% of the nearly $100 billion in revenue posted by the 130 firms that supplied or confirmed revenue data for Law360 Pulse's **Prestige Leaders** report. The report used figures for 2020 or a firm's most recently completed fiscal year.

Kirkland is poised to hit $5 billion in gross revenue this year after reaching $4.83 billion in 2020, while Latham & Watkins LLP attained more than $4.33 billion last year. Together, the two firms represent 9.2% of the total revenue reported by the 130 firms.

## The Top-Grossing Firms of 2020

Kirkland is poised to hit the $5 billion mark in 2021, setting new thresholds among firms pulling in $1 billion and up.

| RANK | FIRM | REVENUE |
|---|---|---|
| 1 | Kirkland | $4,830,000,000 |
| 2 | Latham | $4,333,763,000 |
| 3 | DLA Piper | $3,133,829,000 |
| 4 | Baker McKenzie | $2,899,834,472 |
| 5 | Sidley Austin | $2,462,935,000 |
| 6 | Morgan Lewis | $2,446,000,000 |
| 7 | Hogan Lovells | $2,308,401,000 |
| 8 | Ropes & Gray | $2,192,810,000 |
| 9 | Gibson Dunn | $2,160,542,264 |

| | | |
|---|---|---|
| 10 | Davis Polk | $1,770,000,000 |
| 11 | Greenberg Traurig | $1,730,230,000 |
| 12 | Cooley | $1,552,149,000 |
| 13 | Paul Weiss | $1,543,730,000 |
| 14 | King & Spalding | $1,529,418,000 |
| 15 | Mayer Brown | $1,517,100,000 |
| 16 | Goodwin | $1,486,262,769 |
| 17 | McDermott | $1,381,814,195 |
| 18 | Covington | $1,321,296,000 |
| 19 | Reed Smith | $1,310,596,000 |
| 20 | Paul Hastings | $1,310,126,000 |
| 21 | Eversheds Sutherland | $1,270,000,000 |
| 22 | WilmerHale | $1,243,384,000 |
| 23 | Milbank | $1,235,499,000 |
| 24 | Debevoise | $1,224,941,626 |
| 25 | Cleary | $1,223,119,000 |
| 26 | Akin Gump | $1,208,738,110 |
| 27 | Morrison & Foerster | $1,165,000,000 |
| 28 | Orrick | $1,152,850,000 |
| 29 | Wilson Sonsini | $1,130,000,000 |
| 30 | Squire Patton Boggs | $1,100,000,000 |
| 31 | Dechert | $1,071,163,401 |
| 32 | Holland & Knight | $1,044,337,000 |
| 33 | K&L Gates | $1,019,673,735 |
| 34 | Wachtell | $1,010,664,000 |
| 35 | Perkins Coie | $1,001,498,000 |

The big guns of revenue continue to dominate by offering clients a wide variety of legal services across dozens of practices and localities around the world and maintaining a cohesive culture despite their size, according to experts.

"Firms are realizing that to be in consideration for all big matters they need to be a certain size and geographic threshold," said William Henderson, a professor at Indiana University Bloomington's Maurer School of Law who studies the legal industry. "So we're going to continue to see the consolidation for a while."

Experts said law firms like Kirkland can leverage their size to get more business — and drive their revenue even higher — because corporate clients can turn to them for multiple matters.

"You can't blame any client for wanting one of those top 10 on a big matter because it's a safety net," said Michele DeStefano, a legal consultant and professor at the University of Miami School of

Law.

> You can't blame any client for wanting one of those top 10 on a big matter because it's a safety net.



Michele DeStefano

Professor, University of Miami School of Law

These firms can use their high revenue to grow their profits even more because there's also value in being seen as elite by prospective corporate clients who are competing for legal services with other companies and entities in their field or on the other side of litigation, according to experts.

"Eliteness is something these firms are trying to optimize because you'd tell potential clients that for the most sensitive matters you should hire us because we're where your peers go," Henderson added.

Kirkland and Latham also stand apart because of the practice areas and legal work they prioritize.

Kirkland has several marquee practices, including intellectual property, litigation and bankruptcy, experts said. And the Chicago-based firm also made a big investment in private equity in 1984 when that industry was still young.

"They're very good at spotting and taking the opportunities," said Michael Rynowecer, president of BTI Consulting Group Inc., a legal research firm. "Latham made a decision many, many years ago to focus on global companies, and that whole global infrastructure is a key strategic market for them. That's a very big market, and it happened to be one that grew dramatically over the last two decades."

Looking at how the big accounting firms consolidated and focused their work, BigLaw saw that "to really be sophisticated, you have to not only have a practice area orientation, but also an industry orientation, and really the two together create a matrix," according to Gerry Riskin, a lawyer and founder of Edge International, which consults with law firms and legal departments.

"Both these firms understand that so well," Riskin said.

The concentration of law firm revenue at the top mimics the consolidation and decreased competition trending across the entire U.S. economy, according to experts. Before the pandemic, a record 115 mergers involving at least one U.S.-based firm were completed in 2019. The industry saw only 67 such deals in 2020, but law firm mergers are rebounding and have exceeded 70 this year, according to Law360 Pulse's new **law firm merger tracker** released in October.

While mergers can boost revenue in the short term, experts said firms like Kirkland and Latham are only able to sustain their growth over the long term by preserving a workplace culture across all offices with a focus on client service, profitability and aggressive recruiting.

"There are many firms that have the same name on this planet, but they're so diverse in the way they're managed across the offices, they're decentralized to the point where you could argue they're not really one firm," Riskin said.

Firms like Kirkland and Latham "relentlessly focus on client service, revenue and profitability," according to Randy Kiser, a legal profession scholar and principal analyst at DecisionSet.

"They have a phenomenally strong culture, and whether somebody agrees with the values or doesn't agree with them, it's irrelevant," Kiser said of law firms like Kirkland and Latham and their attorneys.

The highest-revenue shops like Kirkland and Latham also have an "unflappable" commitment to growth and success as well as an "overall level of aggressiveness that is not common in most firms," Rynowecer said.

Kirkland and Latham did not immediately respond to requests for comment.

As the market consolidates, the more capital these firms have and the bigger they are, the more risks they can take, experts said. Even amid a hot lateral market like the one this year, high-revenue law firms can use their massive size to hedge against any departures. And they can more easily poach rainmakers and recruit the best talent when they have the deepest pockets.

"It starts to be a real competitive advantage, not just the spoils you enjoy from making more money, but it gives you more capital and it gives you more flexibility," Rynowecer said. "It gives you the ability to make different decisions."

Some firms could use their increasing revenue to focus on sustainability or social issues, as well as to increase diversity.

But experts stressed that the accumulation of revenue in a small number of massive firms could also hurt diversity and inclusion efforts.

"In some ways it scares me that the big keep getting bigger, because traditionally, it's hard to break into those firms if you're not from a certain law school with a certain background and a certain income and certain abilities," DeStefano said.

This concentration of wealth also "makes it harder for the smaller firms to stay afloat, and sometimes the smaller firms are known for being better at diversity and inclusion, flexible work schedules and programs for mental health," she said.

There are also downsides if small firms choose to merge to compete or survive, experts said.

"There could potentially be less cognitive diversity among attorneys, fewer female attorney leaders, decreased attorney well-being, lowered emphasis on innovation and more incidences of 'competitor neglect' caused by overconfidence," Kiser said.

While experts said growth doesn't stop specialty shops and boutiques from attracting clients and top talent, there may be less lateral mobility among associates and partners if some firms cannot offer competitive income. There's also a risk of greater overhead costs if a firm is trying to grow its revenue, among other issues.

"What we see is less price competition, higher fees, definitely a greater potential for conflicts of interest because you have more clients being serviced by the same firms," Kiser said. "You have a tremendous emphasis on extrinsic motivation as opposed to intrinsic motivation." This extrinsic focus on external rewards like income and prestige could foster lack of innovation, lower well-being and less creativity, he added.

What we see is less price competition, higher fees, definitely a greater potential for conflicts of interest because you have more clients being serviced by the same firms.



Randy Kiser

Principal analyst, DecisionSet

The increased potential for conflicts also forces firms to spend a lot of time developing policies to avoid them.

"And, at some point if you become so large and you're perceived to somehow influence the industry in a negative way … you could attract regulatory scrutiny," Rynowecer added.

Firms that grow rapidly may not necessarily stay profitable or boost revenue if they acquire various assets that have different levels of profitability.

"Just ask our old friends at Dewey & LeBoeuf," said David Wilkins, faculty director of the Center on the Legal Profession and the Center for Lawyers and the Professional Services Industry at Harvard Law School.

Dewey & LeBoeuf LLP, formed through a 2007 deal that was then the largest merger of New York law firms, filed for bankruptcy in 2012 when the firm couldn't pay for generous compensation packages used to lure star attorneys.

After the firm's collapse, several lower-level employees pled guilty to fraud. A criminal trial of the firm's leaders ended with a jury deadlock in 2015. A pared-down second trial a couple of years later ended with the **former chief financial officer convicted** of securities fraud and conspiracy charges and the former executive director acquitted. **The former chairman made a deal** with prosecutors to avoid the second trial.

"There are a lot of firms who embarked on an incredible acquisition spree to grow themselves and have grown themselves into unprofitability or failure because of it," Wilkins said.

A united and distinctive culture is also harder to maintain as firms expand.

Managing partners had better be careful "that they're maintaining excellent leadership and that they're managing people in a way that they appreciate. If they don't, they're just creating a platform where lawyers can bounce from one place to another," Riskin said.

The coronavirus pandemic has only emphasized the importance of firm culture with most partners, associates and others working from home, experts said. And COVID-19 also reinforced some benefits of consolidation because corporate clients were looking for wide-ranging legal guidance from a single law firm with numerous practices.

"Everything from contact-tracing, vaccines, bankruptcy, restructuring — there was an explosion in legal work and a lot of it was novel, so people were looking for lawyers who they thought could answer novel questions at the highest level," Wilkins said.

While some law firms furloughed workers or cut staff, BigLaw had a relatively prosperous 2020.

"But the people at the top had better years, so it actually accentuated the difference," Wilkins said. "Because the top firms also had their best years, and they had their best years at the top of the market which made them move even further away from even very good firms."

And Kirkland and Latham were in a particularly good position to grow during the pandemic.

"While some industries were in the tank, private equity was booming, booming for Kirkland," Rynowecer said. "Latham is very big in technology and life sciences, two areas that were also booming."

Kirkland didn't return emails seeking comment. A spokesperson for Latham declined to comment.

The business of law is far less consolidated than other industries because of conflicts and regulatory rules. But experts said they don't see consolidation slowing down anytime soon.

"We're not at the beginning of this, and we're certainly nowhere close to the end of it," Kiser said.

--Editing by Pamela Wilkinson, Kerry Benn, John Campbell and Gerald Schifman. Graphics by Chris Yates.

*Correction: An earlier version of this story omitted revenue information provided by one firm. The error has been corrected.*

---

All Content © 2003-2021, Portfolio Media, Inc.

# Exhibit 2

**No. 21-71351**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

In re: JASON FENTY; et al.

JASON FENTY; et al.

*Petitioners,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, PHOENIX

*Respondent,*

PAUL PENZONE, Sheriff, in his official capacity; MARICOPA COUNTY, a municipal entity,

*Real Parties in Interest.*

On Petition for Writ of Mandamus to the United States District Court for the District of Arizona,
No. 2:20-cv-01192-SPL-JZB

# DECLARATION


Daniel P. Struck
Nicholas D. Acedo
**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
(480) 420-1600

*Attorneys for Real Parties in Interest*

I, Michael N. Giardina, ACP, make the following Declaration:

1. I am over the age of 18 years, and am competent to testify to and have personal knowledge of the matters set forth in this Declaration.

2. I received my B.A. in Economics in 1994. Starting in 1995, I began my career as a paralegal in Washington, D.C. I successfully passed the Certified Legal Assistant Examination offered by the National Association of Legal Assistants in January 2006, at which point I earned my Certified Paralegal (CP) designation. In January 2011, I successfully completed the requirement of the National Association of Legal Assistants and earned the designation of Advanced Certified Paralegal (ACP) in Discovery. In June 2015, I successfully completed the requirement of the National Association of Legal Assistants and earned a second ACP credential in E-Discovery. The National Association of Legal Assistants requires that an individual seeking to maintain a designation as a Certified or Advanced Certified Paralegal must complete 50 hours of continuing legal education, at least five of which must be in ethics, every five years. I have successfully renewed those credentials in 2011, 2016 and 2021.

3. I am an active member of the Arizona Paralegal Association, the National Association of Legal Assistants, and the International Legal Technology Association.

4. During my career, I have worked in litigation firms with nationwide practices located in Washington, D.C.; Baltimore, Maryland; and Phoenix, Arizona. I have twenty-two years' experience as a litigation paralegal supporting attorneys with cases proceeding to trial in both state and federal courts and administrative proceedings in Alaska, Arizona, California, Delaware, the District of Columbia, Kentucky, Hawaii, Illinois, Indiana, Maryland, New Mexico, North Carolina, Ohio, and, Virginia.

5. Since February 2006, I have continuously worked under the supervision of Daniel P. Struck as a paralegal on complex matters for a variety of corporate and governmental clients, including Maricopa County. I have been assigned the role as E-Discovery Liaison in several class actions. At all relevant times in this case I have acted under the supervision and direction of counsel for Real Parties in Interest in this appeal, Paul Penzone and Maricopa County (collectively, "Defendants").

6. On February 22, 2021, the parties exchanged Initial Disclosure Statements in accordance with Fed. R. Civ. P. 26(a)(1).

7. Between March 5, 2021 and December 21, 2021, Defendants responded to extensive discovery requests, including 19 Interrogatories, 35 Requests for Production, and 37 Requests for Admission. With their responses, Defendants produced 11,653 pages of hard copy documents.

8. On April 27, 2021, in response to Plaintiffs' First Set of Interrogatories, Defendants' counsel emailed Petitioners' counsel with a preliminary proposal for collection of Electronically Stored Information (ESI). The purpose of this proposal was to quantify the burden of production and arrive at a proportional volume of relevant ESI to be collected, reviewed, and produced in response to Plaintiffs' discovery requests.

9. Defendants' preliminary proposal included six custodians, each from the Maricopa County Sheriffs' Office ("MCSO") and Correctional Health Services ("CHS"), which is a separate entity that provides health care services at the Maricopa County Jails. MCSO and CHS maintain separate email servers.

10. Over the weeks that followed, the parties continued to meet and confer regarding Plaintiffs' demands for ESI collection from nearly 32 additional custodians and their additional requests to add search terms to enlarge the scope of the ESI collection. Defendants objected to these increases, and proceeded with the original proposal to develop a reliable estimate of the volume of ESI potentially at issue.

11. On June 22, 2021, Defendants completed a second ESI collection of the initial six custodians, but with an additional keyword search term that Plaintiffs had demanded.

12. Defendants' counsel retained an ESI vendor to process the collected ESI. "Processing" is the method of: (1) identifying and extracting the collected ESI from container files (.zip or .pst files); (2) identifying and extracting meta-data and other content from the individual email containers (.msg and .msg files); (3) identifying and verifying file types; (4) virus scanning the results; and (5) assigning each file a unique hash value for identification and comparison.

13. Once processing was completed, initial filtering was done. "Initial filtering" includes the removal of system- and program-files based upon the list maintained by the National Institute of Standards and Technology (de-NISTing).

14. "Initial filtering" also includes deduplication. "Deduplication" of ESI uses cryptographic hash values to identify files which are identical duplicates to streamline the review and reduce the data volume. Deduplication based upon file hash matching, as was done here, has been said to be "the simplest and most defensible approach to deduplication." Craig Ball, *Processing in E-Discovery, a Primer* (2019) at 47 (available at: http://www.craigball.com/Ball_Processing_2019.pdf).

15. Deduplication can be done either within the emails for each custodian or across the entire set of all custodians. In this case, global deduplication was conducted across all custodians, whether MSCO or CHS. Global deduplication leaves one copy of the file to be promoted for review, while withholding the rest.

16. Further, using the NUIX e-discovery tool, the search terms were reapplied to the collected data to ensure that responsive documents are not missed because the tools used for the initial collection have limited capabilities.

17. On June 25, 2021, the e-Discovery Vendor reported that the initial collection, after processing, began with 292,338 files, totaling 22.20 uncompressed GB of data. Deduplication reduced this to 85,554 files (14.39 GB of uncompressed data). Once the initial set of search terms were applied, 85,284 non-duplicative files (14.36 GB of uncompressed data) remained.

18. The sheer volume of data at that point was large enough to require that the data be hosted by a vendor for review and production. The estimated on-going monthly costs of hosting starts at $500 each month and increases as the case progresses due to the increase in volume over the litigation life-cycle. And the estimated time it would take to review the data would have been more than 2,842.8 hours (using the DOJ's benchmark of 30 documents per hour for review), at a likely review cost exceeding $186,000. It is our firm's experience that, on average, a paralegal or attorney at our office can review approximately 85 documents per hour.

19. Additional vendor costs would be assessed based upon the volume and quantity of responsive, non-privileged files and images produced.

20. Defendants' Counsel determined that this quantity of ESI was disproportionate to the needs of the case, and such further promotion for review of

the entire set of ESI was unnecessarily burdensome and should not be done without a court order. Rather, counsel for defendants, began working with their vendor to identify methods to further cull the remaining data to a reasonable and proportionate volume, including domain restrictions, modifications to search terms, date restrictions, and even removal of certain custodians, in preparation for further discussions with Plaintiffs' counsel.

21. By the end of June 2021, Defendants have incurred more than $2,775 for processing and project-manager time relating to reporting on potential additional methods just to cull the data to a proportional volume.

22. On July 6, 2021, Defendants counsel explained their objections that Plaintiffs' proposed ESI search terms would result in a disproportionate burden to Plaintiffs' needs in this case. Further they explained that while the volume of data was large, it was not large enough that a Technology Assisted Review or Computer Aided Learning would be cost effective, as adequately training any machine learning algorithm would still necessitate a human review of 90–95% of the entire document corpus. Further, vendor estimates obtained to permit hosting, use of analytics software including Technology Assisted Review, and document production cases were estimated to be between $9,000 and $11,000, in addition to the attorney review costs to complete the production.

23. Plaintiffs, however, requested further analysis and reporting to be completed before the parties scheduled meet and confer on July 14, 2021. At that point, Defendants proposed that the parties share the costs of the ESI processing, hosting, review, and production. In response, Plaintiff agreed to modify certain search terms and exclude certain domains. Defendants then asked their vendor to apply to proposed modifications of the search terms and domain exclusions, and report on the remaining volume.

24. Before such reports could be returned from the ESI vendor, on July 20, 2021, Plaintiffs notified Defendants' counsel that they would not continue to negotiate but would take the issue to the district court for resolution. Immediately thereafter, Plaintiffs' contacted Magistrate Judge Boyle about the dispute, and a telephonic hearing was set for July 22, 2021.

25. While Defendants objected that the production of any emails would have been disproportionate to Plaintiffs' needs in the case, Defendants were willing to produce in good faith a target volume of 10,000 emails. Such a volume was less burdensome because it: (1) could be hosted at a local server, which would obviate the need for ongoing monthly hosting costs;(2) could be produced using litigation support tools by firm personnel, resulting in the saving of per document or per image production costs; (3) would reduce the amount of time needed to review, such that

review and production of responsive ESI would cost the Defendants approximately $20,000 total.

26. Following the hearing, the parties met and conferred on July 23, 2021, and Plaintiffs proposed a revised set of custodians, revised search terms, and to exclude certain file types from the production.

27. On July 28, 2021, Defendants' vendor reported that the revised search terms resulted in 11,050 items for review and potential production.

28. "Email threading" is a method whereby certain components of an email message are analyzed to determine if they are part of a larger conversation. In other words, it will identify replies to messages. Threading practices vary by processing system, and review platform. Some systems will simply use threading to organize related messages together, while some may identify and remove messages which are included. *See,* EDRM, *EDRM Guidelines for E-Discovery Processing* (official draft for public comment) (2021) at 24. I am aware of at least one reported instance where email threading improperly resulted in the exclusion of relevant attachments to an email message. *See, In Re: National Prescription Opiate Litigation,* 2020 WL 6083455 at *2 (N.D. Ohio Oct. 14, 2020).

29. Other pitfalls are known to exist with email threading. If email threading involves exclusion of prior email messages, there is a risk in improperly eliminating shorter branching emails. For example, when multiple persons are

involved in a conversation, and then side-conversations develop, or multiple persons simultaneously reply to all and send separate messages, then capturing the longest thread would not necessarily identify all portions of the conversation. Moreover, when email threading is based upon message-header information, using the longest thread carries the risk of omitting body content in email replies. This would occur, for instance, if someone participating in the conversation were to delete some information in the email that he or she was forwarding, effectively changing the content of the message. In such circumstances, email threading would risk eliminating the original message text ever being discovered.

30. Moreover, email threading is an advanced analytic tool that is not available in the NUIX e-discovery processing software used in this case. Rather, it required that data to be moved to a Relativity database, which must first be built and hosted. Only then can Brainspace Analytics be used to perform the email threading. The individual Relativity database costs, analytics costs, and associate project manager time to do this were estimated to total $1,400.

31. E-mail threading is an additional step and expense in the processing of ESI which Defendants determined was unnecessary and disproportionate to the needs of this case. It would have been more economical, and Defendants would have reviewed and produced all 11,050 files (assuming 100% responsiveness and no privilege), rather than to incur the unnecessary expense of e-mail threading. E-mail

threading only served to benefit the Plaintiffs' counsel by reducing the volume of produced responsive non-privileged ESI they would need to review.

32. Sedona Principle 6 provides that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." Sedona Conference, "The Sedona Principles, Third Edition: Best Practices, Recommendations and Principles for Addressing Electronic Document Production," 19 *Sedona Conf. J.* 1, 118 (2018). There is no one-size fits all best practice relating to handling and processing of ESI. Rather, decisions on best practices, and cost-efficacy need to be made considering the specific volume and nature of the data collection and the needs of the case. In fact, it is recommended under the Electronic Discovery Reference Model, that "legal professionals must … often make decisions about which [e-discovery processing] steps should [or should not] be included for particular data set and/or which options at each step should [or should not] be chosen. EDRM, *EDRM Guidelines for E-Discovery Processing* (official draft for public comment) (2021) at 26 (available at: https://edrm.net/wp-content/uploads/2021/11/EDRM-Guidelines-for-E-Discovery-Processing-Draft-for-Public-Comment-12_01_2021.pdf)

33. Defendants advised that based upon its cost, they were objecting to email threading. They would proceed with having all 11,050 documents processed

for in-house review and production by counsel, and reserved the issue over potential reduction in volume over the remaining difference of 1,050 documents. To meet the interim initial production date, final output of documents by the vendor commenced on July 30, 2020. Additional vendor costs in the amount of $735 relating to database searches and reporting were incurred in July 2021.

34. On August 4, 2021, the vendor provided the complete search result of 11,050 emails. Defendants' counsel then commenced review of the complete set, beginning with the first output file.

35. The decision to thread effectively negated 16.2 hours of work that had already been spent on litigation support database construction and review of over 700 responsive, non-privileged emails (1574 pages) as of August 9, 2021. The vendor also had to go back to the original set of 11,050 items, email thread them, and then provide a completely new set of ESI.

36. On August 18, 2021, email threading was completed, and the vendor provided us the 8,322 results along with metadata and image files. We built a second litigation support database and commenced review for responsiveness and privilege.

37. On September 1, 2021, we received invoices 77178 and 77179 from Teris. Invoice 77178 was addressed to Dechert LLP, whereas invoice 77179 was sent to our firm. Both invoices were for $636.73, which represented 50% of the costs of the email threading demanded by Plaintiffs.

38. On September 9, 2021, Defendants produced 1,910 responsive and non-privileged files. The remaining 5,345 responsive non-privileged files were produced on October 4, 2021.

39. After being notified of a discrepancy in the production numbers, Defendants amended and reproduced the entire ESI production on October 19, 2021. This final production consisted of 7,407 files, totaling 23,500 images and/or native files.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 22nd day of December, 2021 at Chandler, Arizona.

______________________________
Michael N. Giardina, ACP

# Exhibit 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Avenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa on behalf of themselves and those similarly situated, | CV-20-1192-PHX-SPL |
| Plaintiff-Petitioners, | Phoenix, Arizona<br>August 18, 2021<br>10:32 a.m. |
| Puente Human Rights Movement, | |
| Plaintiff, | |
| vs. | |
| Paul Penzone, in his official capacity, and Maricopa County, a municipal entity, | |
| Defendants. | |

BEFORE: THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY DISPUTE HEARING

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

# A P P E A R A N C E S

For the Plaintiff-Petitioners:

Dechert LLP
By: TIMOTHY LY, ESQ.
3 Bryant Park
1095 Avenue of the Americas
New York, NY 10036

ACLU - San Francisco, CA
By: KYLE VIRGIEN, ESQ.
39 Drumm Street
San Francisco, CA 94111

For the Defendants:

Struck Love Bojanowski & Acedo
By: ASHLEE B. HESMAN, ESQ.
3100 West Ray Road, Suite 300
Chandler, AZ 85226

couple hearings in front of you regarding that issue.

THE COURT: Right.

MS. HESMAN: The Court's last order required defendants to thread the e-mails. The threading was complete yesterday, and the new total is 8,322 documents, which lands within the Court's ordered range.

Unfortunately the threading has relabeled and renumbered the documents, so all of our work of review is now meaningless. We have to start over.

And so because of that, I would ask for a three-week extension of time to comply with the Court's deadlines. I did reach out to Mr. Ly about 15 minutes before the hearing, so I understand that he was not given much notice. But to the extent the Court's willing to grant that extension, we would appreciate it.

THE COURT: Mr. Ly, any objection?

MR. LY: Your Honor, I am just -- I don't quite understand the relabeling, and again maybe it's a difference in the system that they're using and what we used previously. But once a document is given a control number, it's not modified. There's no reason for it to be modified. In other words, I don't understand why they need -- why it was -- the control number was changed and why they needed extra time. The control number shouldn't have been changed.

THE COURT: Well, I can see how it would, but let me

# C E R T I F I C A T E

I, LINDA SCHROEDER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 24th day of August, 2021.

s/Linda Schroeder
Linda Schroeder

# Exhibit 4

TERIS

# Invoice

| Date | Invoice # |
|---|---|
| 8/31/2021 | 77178 |

| Bill To | Please Pay: |
|---|---|
| Dechert LLP<br>Three Bryant Park<br>1095 Avenue of the Americas<br>New York, New York 10036-6797 | TERIS<br>11333 N. Scottsdale Road, Suite 294<br>Scottsdale, AZ 85254<br><br>602-241-9333<br>admin@teris.com |

| Client Reference # | Terms | Rep | Client Contact | Job Number |
|---|---|---|---|---|
| Fenty v. Maricopa County, | Net 30 | NT | Timothy Ly | P08210017812 |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Case name: Fenty v. Maricopa County, C-M No. 63100-10015 | | | |
| Processing OCR: OCR - STR-FEN-001 ; FENTYESI01 - FENTYESI10 | 275.5 | 0.01 | 2.76T |
| File Conversion to TIFF - per GB: TIFF - STR-FEN-001 ; FENTYESI01 - FENTYESI10 | 3 | 150.00 | 450.00 |
| Project Management Time - per hour - Steven Sprague:<br><br>• Communications, database updates, and reporting.<br>• Project Management Time (per hour), Steven Sprague - Prod QC<br>• Setup, Finalize, QC, and report on threading results and deliverable. | 1.05 | 175.00 | 183.75 |
| Total Sales Tax | | 8.05% | 0.22 |

To pay electronically:
Chase Bank
3620 N Central Ave
Phoenix, AZ 85012
[redacted]

**Thank you for choosing TERIS.**
**We appreciate your business!**
**Federal Tax ID 86-0962319**

| | |
|---|---|
| **Total** | **$636.73** |
| **Payments/Credits** | **$0.00** |
| **Balance Due** | **$636.73** |